**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHEAST LAND DEVELOPMENT ASSOCIATES, L.P., SQUARE 706, L.L.C., and KENNETH B. WYBAN <br><br> Plaintiffs, <br><br> vs. <br><br> THE DISTRICT OF COLUMBIA <br><br> and <br><br> ANTHONY A. WILLIAMS, <br><br> Defendants. | Civil Action No. _____ |

**MEMORANDUM IN SUPPORT OF APPLICATION FOR**
**<u>PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... i

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND................................................................................................. 5

    A.    The Ballpark Financing and Cost Trigger Legislation. ................................................ 5

    B.    Defendants Violated the Ballpark Financing and Cost Trigger Legislation................ 10

    C.    Defendants Are Proceeding to Acquire Plaintiffs' Property Despite the Report's Invalidity. ................................................................................................. 13

ARGUMENT ........................................................................................................................ 15

    A.    There is a Substantial Likelihood That Plaintiffs Will Succeed on the Merits of Their § 1983 and Constitutional Claims.................................................... 16

        1.    Defendant Williams and the District Are Persons Acting Under Color of State Law. ....................................................................................................... 16

        2.    Defendants' actions violate Plaintiffs' federally-protected rights. ......................... 17

        3.    Plaintiffs are likely to succeed on their claim that Defendants have violated the Fifth Amendment Public Use Doctrine.............................................. 18

        4.    Defendants are violating Plaintiffs' substantive due process rights protected by the Fifth and Fourteenth Amendments to the United States Constitution.................................................................................................. 21

    B.    Defendants Are Directly Causing the Deprivation of Plaintiffs' Rights. .................... 25

    C.    Plaintiffs Will Suffer Irreparable Injury in the Absence of the Requested Relief........................................................................................................................ 25

    D.    Other Interested Parties Will Not Suffer Substantial Harm if the Injunction is Granted, and Granting the Preliminary Injunction is in the Public Interest................ 26

CONCLUSION..................................................................................................................... 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alton & Southern Railway Co. v. Brotherhood of Maintenance of Way Employees*, 883 F. Supp. 755 (D.D.C. 1995) ................................................................26

*Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75 (D.D.C. 2003) .........................................................................................................15

*Berman v. Parker*, 348 U.S. 26 (1954) ...........................................................................18

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ....................................................... 21-22

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ..........................................................................18

*CSX Transport v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) ..........................................15

*City of Canton v. Harris*, 489 U.S. 378 (1989) ..............................................................25

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) ...............................21

*Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461 (7th Cir.1988) ...................22

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ................................................ 22-23

*Daniels v. Williams*, 474 U.S. 327 (1986) ......................................................................21

*Dent v. West Virginia*, 129 U.S. 114 (1889) ...................................................................21

*Fallbrook Irrigation District v. Bradley*, 164 U.S. 112 (1896) .......................................18

*George Washington University v. District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003) ............................................................................................................................23

*Hamilton Bank, N.A. v. Office of Comptroller of the Currency*, 227 F. Supp. 2d 1 (D.D.C. 2001) .............................................................................................................26

*Kelo v. City of New London*, 545 U.S. ___ (2005) ..........................................................18

*Kentucky v. Graham*, 473 U.S. 159 (1985) .....................................................................25

*Lingle v. Chevron*, 554 U.S. ___ (2005) .........................................................................22

*Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182 (D.D.C. 2001) ................................5

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984) ............................................................25

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) ................................................................................................................... 16, 25

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) ............................15

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ....................................15

*O'Callaghan v. District of Columbia*, 741 F. Supp. 273 (D.D.C. 1990) .........................16

*Polk County v. Dodson*, 454 U.S. 312 (1981) .................................................................25

*Reeve Aleutian Airways, Inc. v. U.S.*, 982 F.2d 594 (D.C. Cir. 1993) .............................21

*Silverman v. Barry*, 845 F.2d 1072 (D.C.Cir.1988)............................................................22

*Southern Mutual Help Association, Inc. v. Califano*, 574 F.2d 518 (D.C. Cir. 1977) ................................................................................................................................18

*Texas v. Thomas*, 70 F.3d 390 (5th Cir. 1995)..................................................................23

*Tri County Industries v. District of Columbia*, 104 F.3d 455 (D.C. Cir.1997)................22

*Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997) .....................................16

*U.S. v. Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002)...........................................18

*U.S. v. Midwest Oil Co.*, 236 U.S. 459 (1915)...................................................................5

*United States v. Classic*, 313 U.S. 299 (1941)..................................................................17

*Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991)...........................................14

*Wellington v. District of Columbia*, 851 F. Supp. 1 (D.D.C. 1994) ..................................16

*Zinermon v. Burch*, 494 U.S. 113 (1990).........................................................................21

## FEDERAL STATUTES

42 U.S.C. § 1983...............................................................................................................16

U.S. Const. amend. V....................................................................................................18, 21

## STATE STATUTES

2004 (D.C. Code Ann. § 10-1601)............................................................................... 2, 7-10

2004 (D.C. Code Ann. § 3-1401).....................................................................................2, 7

D.C. Code Ann. § 1-102(a) (1981) ..................................................................................16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOUTHEAST LAND DEVELOPMENT
ASSOCIATES, L.P., SQUARE 706,
L.L.C., and KENNETH B. WYBAN  )
                              )
        Plaintiffs,           )
                              )
        vs.                   )        Civil Action No. _____
                              )
THE DISTRICT OF COLUMBIA      )
                              )
        and                   )
                              )
ANTHONY A. WILLIAMS,          )
                              )
        Defendants.           )

## MEMORANDUM IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

Plaintiffs Southeast Land Development Associates, L.P. ("SLDA"), Square 706, L.L.C., and Kenneth B. Wyban (collectively, "Plaintiffs") respectfully submit this Memorandum in Support of Plaintiffs' Application for Preliminary Injunction.

### PRELIMINARY STATEMENT

Mayor Anthony A. Williams and the District of Columbia ("Defendants") are in the process of unlawfully confiscating Plaintiffs' private property located on a site near the Anacostia Waterfront, in order to build a professional baseball stadium complex (the "primary ballpark site"). Plaintiffs seek preliminary relief because Defendants have already begun the process of acquiring this property and will complete the seizure within a matter of weeks – even though Defendants' actions are illegal – because they know that if they move fast enough their unconstitutional actions will escape judicial review and remedy. Defendants' conduct is

1

impermissible under the Fifth and Fourteenth Amendments to the United States Constitution. Defendants' seizure of Plaintiffs' property fails to meet the "public use" requirement of the Fifth Amendment and is completely arbitrary and irrational under the Fifth and Fourteenth Amendments.

On September 29, 2004, Defendants signed an agreement with Major League Baseball to bring a professional baseball team to Washington, D.C.  Although Major League Baseball insisted that Defendants build a stadium in the primary ballpark site, Defendants needed legislative authority to acquire Plaintiffs' private property for this purpose.  The District of Columbia City Council (the "Council") gave Defendants conditional authority, legislating that social and economic benefits to the community justify building a ballpark at the primary ballpark site *only if* certain costs associated with acquiring the land and preparing the site are not too high.[1]  To assure that the Defendants acted consistent with the public purpose determination before taking any property, the Council required that the Defendants first prepare a valid estimate of these acquisition costs by May 15, 2005.  If that estimate showed that these costs would exceed $165 million, the Council prohibited Defendants from proceeding at the primary ballpark site because it would no longer be justified for the public purposes identified by the Council.  In such a case, the Council specifically directed Defendants to consider alternative, less costly sites to achieve the public purpose that a ballpark might serve.

On March 25, 2005, Defendants issued a report that purported to "re-estimate" the costs for the primary ballpark site (the "Report").  (*See* Exhibit 1.)  The Defendants' Report claimed that the costs of acquiring the site would be $161.35 million.  This figure, however, is not an

---

[1]  The Council's determination is embodied in the Private or Alternative Stadium Financing and Cost Trigger Emergency Act of 2004 (D.C. Code Ann. § 3-1401) ("Cost Trigger Act") and the Ballpark Omnibus Financing and Revenue Act of 2004 (D.C. Code Ann. § 10-1601) (collectively, "Ballpark Financing and Cost Trigger Legislation" or the "Legislation").

estimate within the meaning of the Legislation.  It was chosen not because it is accurate or reliable, but because it is less than $165 million, and is the only way Defendants can build the stadium that Major League Baseball wants without regard to the Council's defined purpose and Plaintiffs' property rights.  This figure does not even approach being an estimate as required by the Legislation because, among other things:

- It intentionally ignores the express statutory requirement that it be based on *separate appraisals of each of the 63 properties* to be confiscated even though Defendants admit that they could have done the appraisals.

- The Report is inconsistent with the Uniform Standards of Professional Appraisal Practices.

- Instead of performing separate individual land appraisals for the properties that are to be acquired, Defendants created a fictional "aggregate market value" based on stale data from irrelevant properties that artificially depressed the costs.

- Defendants' aggregate market value is kept below $165 million by ignoring and selectively considering information.  For example,

  o Defendants' fictional "aggregate market figure" starts with the 13 chosen properties from a pool of approximately 250; most are either irrelevant because of their location or are too old to be reliable for any valuation under any acceptable professional standard.  This allowed Defendants to start with a "median sales price" that was as low as possible.

  o Defendants apparently manufactured a "modest" appreciation figure to support their claim that they "adjusted" the median sales price to reflect current conditions.  But their chosen adjustment was not based on appreciation data from current sales or for any other ascertainable basis consistent with professional standards.

  o Defendants then used unexplained "adjustments" to discount even the "modest" increases so that their final estimate would remain below $165 million.

- Defendants ignore undisputed evidence that the value of at least one of the Plaintiffs' property is *three times* what the Defendants' estimate suggests.

- Defendants failed to prepare an environmental remediation cost estimate, required by law, that meets any reasonable set of professional standards, and instead arbitrarily create a number that has no basis.

3

Defendants' conduct is particularly unconscionable because they admit to these failures:

- Defendants' Deputy Mayor of Economic Development confirmed that the CFO's Report was based on inappropriate and faulty data because (1) sales prices should not be based on the "weighted average" of dated, stale sales numbers, as was done in the Report; (2) the old sales data used by the CFO should not be relied on as a gauge of value, as was done in the Report; and (3) there was no reason the CFO could not have performed the appraisals.

- Defendants expressly admit in the Report that their Report "may not be relied upon as an appraisal of the market value" and that "it would be inappropriate to use the Report for negotiating or setting market value on a parcel-by-parcel basis."

- Defendants' CFO, who was responsible for preparing the "estimate," admitted that he had no expertise to do so.

These many errors result in a figure that lacks any reasonable foundation, and, in any event, is significantly below what even a minimally reliable estimate would have disclosed. For example, correcting just one of the many errors in the Defendants' Report (*i.e.,* an adjustment to reflect real estate appreciation) reveals that the total estimated acquisition cost will be at least $204 million, far more than the $165 million cap imposed by the Council. Moreover, even the $204 million is likely to be low, because it does not account for the actual individual market value of each property since the Defendants ignored the requirement to conduct individual appraisals. Among other things, without an explanation, various mysterious and unexplained "adjustment factors" appear to reduce the "aggregate market value" by approximately $60 million to $100 million. Had Defendants undertaken separate professional appraisals as they were instructed and were able to do, and otherwise engaged in an analysis that meets even minimum professional quality standards, they would have been faced with property values many times higher than what Defendants claim in their theoretical "aggregate" figure.

For purposes of preliminary relief, the fundamental factual "merits" question is whether Defendants failed to provide a valid re-estimate of the acquisition costs for the primary ballpark

4

site demonstrating that the acquisition costs will not exceed $165 million. If Plaintiffs can show

that Defendants failed to provide the requisite estimate, then Defendants' efforts to seize

Plaintiffs' properties are unconstitutional because they do not serve any valid public purpose as

determined by the Council and, thus, are arbitrary and irrational.

The urgency of Plaintiffs' concerns cannot be overstated. Defendants are proceeding at

this site and are doing so as these papers are being filed. If Defendants are permitted to complete

this process before Plaintiffs' claims are heard, Defendants will have replaced their own will for

that of the Council and confiscated property without a valid purpose in flagrant disregard of the

law and the Constitution.

## FACTUAL BACKGROUND

### A.    The Ballpark Financing and Cost Trigger Legislation.

For years, D.C. government officials have worked to bring a Major League Baseball

("MLB") team back to the District. On September 29, 2004, Defendants entered into an

agreement with a professional baseball club owned by MLB. (*See* Baseball Stadium Agreement

dated September 29, 2004, attached hereto as Exhibit 5).[2] Under the Baseball Stadium

Agreement, Defendants agreed to place a ballpark on a tract of land on the Anacostia Waterfront[3]

that includes Plaintiffs' property (*i.e.*, the "primary ballpark site"). (*Id.* ¶ 4.01; *see also* Exhibit

2, Declaration of Plaintiff Southeast Land Development Associates, L.P., ¶ 4 (hereafter "Ex. 2,

---

[2] The Baseball Stadium Agreement is a public document with respect to which the Court may take judicial notice. *U.S. v. Midwest Oil Co.*, 236 U.S. 459, 485 (1915); *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001).

[3] The Anacostia Waterfront, which is the subject of a longstanding and carefully considered mixed-use redevelopment effort dating back at least five years, was never a site that the Defendants considered for a professional ballpark as part of the Anacostia Waterfront Initiative. (*See* Anacostia Waterfront Initiative, March 22, 2000, at http://planning.dc.gov/planning/cwp/view,a,1285,q,571854.asp; Anacostia Waterfront Initiative Memorandum of Understanding, March 22, 2000, at http://planning.dc.gov/planning/cwp/view.asp?a=1285&q=571868-).

SLDA Decl.”); Declaration of Plaintiff Square 706, L.L.C., Exhibit 3, (hereafter “Ex. 3, Square

706, L.L.C. Decl., ¶ 7.”); Declaration of Kenneth B. Wyban, Exhibit 4, ¶ 2 (hereafter “Ex. 4,

Wyban Decl.”)).  Defendants also agreed to demonstrate by December 31, 2004, evidence of

their legislative authority to accomplish this task.  (*See* Ex. 5, Baseball Stadium Agreement ¶

7.01.)  Defendants further agreed to acquire Plaintiffs’ property on the primary ballpark site by

no later than December 31, 2005.  (*See id.* ¶ 7.02.)

      After Defendants entered into the Baseball Stadium Agreement, Defendants needed the

Council to enact the necessary legislation by no later than December 31, 2004, to give

Defendants the authority to acquire Plaintiffs’ property.  Significant debate ensued, focusing

almost exclusively on whether a stadium was “worth it,” *i.e.*, whether the public financing costs

of constructing a professional stadium (including land acquisition) would outweigh the benefits

that a stadium might bring to the District and where that important line should be drawn. (*See*

*generally* Transcript of D.C. City Council Hearings, Exhibit 6 (hereafter “Ex. 6, Council

Proceedings, at __,”).)  According to at least one Councilmember, this debate was much more

contentious than that which surrounded most other issues.  (*See* Ex. 6, Council Proceedings, at

2.)  As the following passages from the Council Proceedings on November 30, 2004 indicate, the

Council’s concern was heavily focused on the need for a realistic estimate of the cost of

confiscating private property to make sure those costs would not outweigh the public purpose

that building a ballpark might otherwise serve.

> My position has not changed. The difference, possibly with me and
> some others is that ***I don’t want baseball to come to the District at***
> ***any cost.***  I think there has to be some kind of limit with regard to
> how baseball comes into the District of Columbia. (Ex. 6, Council
> Proceedings, at 3.) [Mrs. Cropp]

> What we get with Mr. Fenty’s amendment is the ability to see one
> of the nagging unanswered questions in this whole proposal is how
> much the land will cost. And what this permits us to do is see

firsthand how much the land will cost; otherwise, if we don't have this amendment, the land can cost as much as the Mayor wants. . . . (*Id.* at 23:11-17.) [Mr. Catania]

But without this trigger in there, if as we started moving down this road, between now and May, because of the issues that have been raised recently by Mr. Catania on the land acquisition, several other members, Mrs. Schwartz, had raised land acquisition, many members raised land acquisition and other costs.... What the intent of this amendment was... during a reasonable time, before we started building the stadium....it requires now the CFO to look at the actual costs because we will, by this time, would have seen what some of these costs are in the real world. Hopefully the executive would go by this time and start trying to acquire the land. And if the cost of acquiring the land increases significantly over what the original proposal was, this is a trigger, to stop it and say, go back to Major League Baseball and say that this site is no longer available.... (*Id.* at 27:1-24.) [Mrs. Cropp]

So what the intent of this was to at least push the District government to move forward at some point, to say at some point, folks this has proven to be too costly. We need to now look for another site...[W]hat I was trying to do was truly do because I had a level of frustration of getting the District to move to looking for another site when this one was determined to be unavailable because the price was getting too high. (*Id.* at 31-32.) [Mr. Fenty]

On December 24, 2004, the Council decided that a professional ballpark on the primary ballpark site desired by Major League Baseball would serve a valid public purpose and need *if* it did not cost too much and based on this gave Defendants conditional and limited authority to proceed. This decision was embodied in the Private or Alternative Stadium Financing and Cost Trigger Emergency Act of 2004 (D.C. Code Ann. § 3-1401) (Exhibit 7) and the Ballpark Omnibus Financing and Revenue Act of 2004 (D.C. Code Ann. § 10-1601) (Exhibit 8). The Council initially stated as follows:

(1) The ownership, construction, development, or renovation of a publicly financed stadium in the District of Columbia, after October 1, 2004, for use primarily for professional athletic team events is a municipal use that is in the interest of, and for the benefit of, the citizens of the District of Columbia because such a publicly-owned stadium or arena will contribute to the social and

> economic well-being of the citizens of the District of Columbia
> and significantly enhance the economic development and
> employment opportunities within the District of Columbia.
> (2) To further that interest, it is appropriate for the District of
> Columbia to pay all or a portion of the cost of constructing,
> developing, or renovating a stadium.

(Ex. 8, Ballpark Omnibus Financing and Revenue Act of 2004 § 101.)  The Council further

stated that the purpose of the Legislation is:

> to authorize and require the Mayor and the Sports and
> Entertainment Commission to acquire land, to develop and
> construct a ballpark, and to lease the ballpark; to require the
> solicitation of alternative, private financing proposals for the
> ballpark, which private financing shall constitute 50% of the cost
> of the construction of the stadium; *to require the review of cost
> estimates by the Chief Financial Officer and, if the re-estimated
> cost exceeds $165 million, to deem the designated site financially
> unavailable and to require the Mayor and the Sports and
> Entertainment Commission to pursue a replacement site*.

(*Id.*, Preamble (emphasis added).)

The Council included a number of specific provisions to preserve its determination that

placing a ballpark at the primary ballpark site would serve a valid public purpose if it was not too

expensive.  *First*, the Council expressed this intent by defining the "primary ballpark site":

> [T]he site bounded by N Street, S.E., Potomac Avenue, S.E., South
> Capitol Street, S.E., and 1st Street, S.E., *or such other* site as
> determined in accordance with subsection (b)(2) of this section *if
> this primary site shall be unavailable to be acquired by the Mayor.*

(*Id.* § 105(a)(2) (emphasis added).)[4]  *Second*, Section 105(b)(2) requires the Mayor to look at

other sites if the primary ballpark site is unavailable:

> Acquire and convey to the Anacostia Waterfront Corporation, for
> use by the Sports and Entertainment Commission to satisfy its
> responsibilities under this title, all necessary real property,

---

[4]  The Baseball Stadium Agreement describes the primary ballpark site "footprint" in identical
terms.  (*See* Ex. 5, § 4.01.)

including rights-of-way or other easements, that shall be required
to develop, construct, and complete a ballpark within the site
bounded by N Street, S.E., Potomac Avenue, S.E., South Capitol
Street, S.E., and 1st Street, S.E.; *provided, that if this site shall be
unavailable or infeasible* for the timely completion of a ballpark on
or prior to March 1, 2008 relying only on the funding authority
provided in this title, any designated alternative site in the District
of Columbia . . . that the Mayor determines, . . . will be available
and feasible for the timely completion of a ballpark relying only on
the funding authority provided in this title;…

(*Id.* § 105(b)(2) (emphasis added).)

*Third,* the Council established two conditions precedent that had to be met before

Defendants would be authorized to confiscate Plaintiffs' property and to ensure that building the

ballpark on Plaintiffs' property achieved the valid public purpose while keeping costs low.

Section 107 required the District of Columbia Chief Financial Officer ("CFO") to perform a "re-

estimate" of the costs for land acquisition and infrastructure by May 15, 2005, and prohibits the

Defendants from pursuing the primary ballpark site if the re-estimated costs exceed $165

million:

(d) *Prior to May 15, 2005*, and prior to the date upon which the
District enters into any obligation to acquire or purchase any
property on a site bounded by N Street, S.E., Potomac Avenue,
S.E., South Capitol Street, S.E., and 1st Street, S.E. ("primary
ballpark site"), the Chief Financial Officer shall re-estimate the
costs to the District for land acquisition and infrastructure and
provide a report on this re-estimate to the Mayor and the Council.

(e) If the total amount of these re-estimated costs to the District
exceeds $165 million, the primary ballpark site *shall be deemed
financially unavailable by the District* pursuant to this title.
Pursuant to this title, the Mayor and the Sports and Entertainment
Commission *shall pursue replacement of the primary ballpark
site with a substantially less costly site* in the District, subject to
the approval of Baseball Expos, L.P., or its assigns or successors,
in accordance with the Baseball Stadium Agreement.

(*Id.* §107(d), (e) (emphasis added).)  The Legislation specifies that the "re-estimate" of costs for

land acquisition and infrastructure must include, among other things:

9

(1) *One separate appraisal of each parcel of land to be acquired, which shall be performed after the effective date of this title*;

(2) *An estimate of the environmental remediation costs*; and

(3) Legal expenses associated with land acquisition.

(c) For purposes of this section, infrastructure costs shall include the following:

(1) The District Department of Transportation's estimate for basic road and sidewalk improvements;

(2) The cost of expanding the Navy Yard Metro station to accommodate the additional usage anticipated by the stadium; and

(3) Water and sewer relocation costs.

(*Id.* §107(b), (c) (emphasis added).)

The fact that these two conditions are absolute triggers to any further use of the primary ballpark site was confirmed by Council Chairwoman Linda Cropp:

> The idea is a two step process: One, if in fact, this number is reached, the trigger is set off, the site is then deemed unavailable. It's unavailable. That's what the legislation says. It is unavailable. It's written in black and white – unavailable.

(Ex. 6, Council Proceedings, at 33.)

## B.    Defendants Violated the Ballpark Financing and Cost Trigger Legislation.

By letters dated February 3, 2005, Defendants informed Plaintiffs that the District "might" be interested in acquiring their property for a publicly-owned stadium complex. (Ex. 2, SLDA Decl. ¶ 10, Attach. D), (Ex. 4, Wyban Decl. ¶ 5, Attach. A), (Ex. 3, Square 706, L.L.C. Decl. ¶ 7, Attach. A.)  The letters referenced the re-estimate of acquisition costs but did not mention the obligation in the statute to conduct an appraisal of each parcel for the re-estimate, and did not mention that there was a cost cap beyond which the Defendants were not permitted

10

to acquire this property. The letters acknowledged that the re-estimate of acquisition costs must be completed "by law" no later than May 15, 2005. (*See id.*)

On March 30, 2005, the Chief Financial Officer Natwar M. Gandhi released a document titled "District of Columbia Office of the Chief Financial Officer Land Acquisition Cost Study, March 22, 2005" (*i.e.*, the "Report")(*See* Ex. 1). The associated transmittal letter states:

> [A]s instructed by the [Ballpark Financing and Cost Trigger Legislation], the Office of the Chief Financial Officer (OCFO) conducted a study to re-estimate the costs for land acquisition, environmental remediation, and infrastructure requirements. The study, based on data available through March 18, [2005,] finds that *the cost to the District to acquire roughly 13.8 acres of land, remediate the site, and provide Ballpark-related infrastructure improvements is approximately $161.4 million*, including $11.9 million in contingency costs. Based on this finding, the site would be deemed "financially available" pursuant to the Ballpark Act.

*Id.* (emphasis added.)

The Report does not comply with the Legislation. First, the Report does not include a fundamental component specifically required by the Legislation in order to be an estimate: a separate appraisal of each of the 63 parcels located on the primary ballpark site. It does not contain a single appraisal *of any* of the 63 properties. According to the Deputy Mayor of Economic Development, such appraisals could have been performed and were begun but not completed for use in the estimate. (*See* Ex. 6, Council Proceedings, at pp. 38:9-16; 39-40.) [5] Second, the Report omits key analyses, excludes relevant facts, and contains potential methodological shortcomings, all of which likely bias the land value downward. For example:

> (1)     sampling bias in the selection of comparable properties (*e.g.*, instead of choosing a representative sample of the 250+ sales from "comparable" neighborhoods during the selected time frame, Defendants found thirteen,

---

[5] Though the CFO claimed that he performed appraisals, both the Report and the Deputy Mayor of Economic Development acknowledge this was not the case. (Ex. 6, *Compare* Council Proceedings, at p. 46:22-24, 47:1-10 *with* p. 39-40.)

eight of which are more than two years old, which makes such selections highly unusual)(*See* Exhibit 9, Declaration of Timothy J. Riddiough, ¶¶ 19-25 (hereafter Ex. 9, Riddiough Decl.);

(2)    the lack of consideration of the large increases in prices for both residential and commercial real estate from 2000 to the present (*See id.* ¶¶ 26-28.);

(3)    likely double counting of location adjustment factors and misapplication of other adjustment factors (*See id.* ¶¶ 29-35.);

(4)    methodological errors in the application of the income approach and adjustment for demolition and environmental remediation costs (*See id.* ¶¶ 36-38.); and

(5)    The complete lack of an explanation for the numerous adjustments is inconsistent with the Uniform Standards of Professional Appraisal Practice. (*See id.* ¶ 2 n.1.) [6]

Third, the Report does not explain why the District ignored the undisputed evidence that the cost of acquiring Plaintiff SLDA's property would likely cost ***three times*** the amount that the Report attributed to that parcel, a fact that the District learned well before the May 15, 2005 deadline for completing a valid re-estimate.

The Defendants admitted that the Report is flawed. On or about May 13, 2005, the Council held a hearing, in part, regarding the CFO's Report. (*See* Ex. 6, Council Proceedings, at pp. 34-57.) The CFO testified that he had neither the competence nor background to determine the market value of land for purposes of this re-estimate. (*See id.*, at p. 51:3-4.) The CFO repeatedly stated that "this is not the area of my expertise." (*Id.* at pp. 53:20-21; 54:4, 13, 23; 55:1.) Moreover, even though the Deputy Mayor of Economic Development testified that it was possible to obtain separate standard appraisals of each parcel, the CFO was unable to explain

---

[6] Prior to filing this action, Plaintiffs requested that Defendants provide any information, not currently public, that might explain some of these glaring deficiencies. (*See* Letter of Plaintiffs' Counsel to Attorney General Spagnoletti, dated June 28, 2005, Exhibit 15.) Defendants declined to provide such information or even  acknowledge if any such information existed.

why the Report did not contain them even though the Legislation specifically required him to conduct such appraisals. (*See id.* at pp. 38:9-16; 39-40; 46:22-24; 47:1-10; 48:9-24.)

*Fourth,* the Report does not contain an estimate of environmental remediation costs for the primary ballpark site as required by the Legislation. The figure that purports to represent those costs ($8,002,640) is neither technically defensible nor valid or reliable under professional standards applicable to such estimates. (*See* Declaration of Crinu Baila, Exhibit 10, Attach. C, pp. 1-2; 8-20.) At the most basic level, there is not even an explanation in the Report for how the environmental conditions identified were assigned a dollar value. (*See id.* p. 19.) As a result, there is no basis for concluding that the reported $8,002,640 should be relied on as an estimate of the environmental remediation costs for the site. (*See id.* p. 22.)

Finally, accepting the Report's questionable methodology and adjusting only for the staleness of the comparables reveals that the cost of land acquisition and infrastructure at the primary ballpark site would not be $161.35 million, but rather $204 million or more. (*See* Ex. 9, Riddiough Decl. ¶¶ 39-42.)

## C.    Defendants Are Proceeding to Acquire Plaintiffs' Property Despite the Report's Invalidity.

On April 8, 2005, well before the deadline for providing a valid re-estimate, Plaintiff SLDA advised the District that in November 2004, it had received a firm, arm's-length offer to purchase its property for approximately $26 million, contingent on its approval for "mixed-use," *i.e.*, without a baseball stadium. (*See* Ex. 2, SLDA Decl. ¶ 11, Attach. C, E.) To Plaintiff SLDA's knowledge, Defendants never adjusted their figure of $161.35 million to reflect this fact.

By letter dated April 25, 2005, the CFO responded to questions by the Council regarding the basis for and the legitimacy of the estimate, which was remarkably close to the financial cap

imposed by the Council. (Exhibit 11.) The CFO did not mention the information provided by

Plaintiff SLDA regarding its property being worth three times what the CFO suggested.

In mid-April, 2005, Defendants notified Plaintiffs that the District intended to acquire

Plaintiffs' property for a stadium, and had "received clearance" from the CFO to do so. (*See* Ex.

2, SLDA Decl. ¶ 13, Attach. F; Ex. 4, Wyban Decl. ¶ 6, Attach. B; Ex. 3, Square 706, L.L.C.

Decl. ¶ 8, Attach. B.) The District advised Plaintiffs that it "requires possession" of the

properties by December 31, 2005, that an appraisal of Plaintiffs' property would be performed *in*

*the future*, and that Defendants would make an offer as early as July 2005. (*Id.*) The letter to

SLDA did not mention the offer that Plaintiff SLDA had provided to the Defendants several

weeks earlier. (*See* Ex. 2, SLDA Decl., Attach. F.)

Defendants are moving forward to confiscate Plaintiffs' property for the ballpark.

Plaintiffs learned that the District has hired an appraiser to value each property within the

primary ballpark site, including Plaintiffs' properties. MLB apparently has accepted bids from

parties interested in locating a baseball team that are premised on this location and Defendants

have already chosen an architect for the stadium and are now accepting bids for construction.

(Press Release, at http://www.dcsec.com/news/architects.html, Exhibit 12; Exhibit 13, Request

for Proposals, D.C. Major League Ballpark Construction Management Services, at

http://www.washdcsports.com/businessopps/pdfs/ballparkconstruction.pdf).[7] Absent judicial

intervention, Plaintiffs will lose their property within weeks. If Defendants make an offer to

acquire Plaintiffs' property tomorrow, it will be owned by them within days.

---

[7] David Nakamura & Debbi Wilgoren, *Court Ruling on Land Pleases D.C. Officials*, The
Washington Post, June 24, 2005, at A13, Exhibit 14. (*See* Eric Fisher, *Proposals Beat Forbes
Mark*, The Washington Times, June 1, 2005, at A1, Exhibit 15.) *See Washington Post v.
Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (holding that a court may take judicial notice of
the existence of newspaper articles in the Washington, D.C. area that publicize certain events).

Ever since Defendants announced their intent to acquire Plaintiffs' property, Plaintiffs have been unable to pursue any otherwise legitimate business interests on their property (*see* Ex. 2, SLDA Decl. ¶ 14), and SLDA has ceased receiving inquiries and offers to purchase its property. (*Id.*)  Plaintiff Wyban cannot lease his property or operate his bed and breakfast.  (*See* Ex. 4, Wyban Decl. ¶ 8.)

## ARGUMENT

To obtain preliminary injunctive relief, Plaintiffs must demonstrate that: 1) there is a substantial likelihood they will succeed on the merits of their claim; 2) they will suffer irreparable injury if the injunction is not granted; 3) an injunction would not substantially injure other interested parties; and 4) the public interest would be furthered by the injunction.  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (affirming preliminary injunction against the FDA where plaintiff successfully claimed that the FDA's regulation exceeded its authority under the relevant statute).

These four factors must be balanced.  *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) (granting preliminary injunction against former employee's solicitation of employer's clients).  Weakness in one or more of the four factors may be balanced against a particularly strong showing in one of the other factors.  *CSX Transp. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) (affirming preliminary injunction against enforcement of hazardous materials transportation ban in the District where the only harm to the plaintiff was monetary, but the likelihood of success was strong).  Therefore, injunctive relief may be granted where there is a "particularly" strong factor, even if there is a "relatively slight showing" of another factor.  *Id.*; *see also Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75, 81 (D.D.C. 2003) (granting preliminary injunction under the Sherman Act against an attempted

15

takeover of the board of directors by a competing regional airline, where likelihood of success

factor was relatively weak, but the likelihood of irreparable harm was strong).

> **A.    There is a Substantial Likelihood That Plaintiffs Will Succeed on the Merits of Their § 1983 and Constitutional Claims.**
>
> > 1.    Defendant Williams and the District Are Persons Acting Under Color of State Law.

42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Defendant Williams, as Mayor, is an official of the District of Columbia and is a

"person" under the statute. In this case, the Mayor executes "final policymaking authority" on

behalf of the District. *See Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir.

1997).

Municipalities and their officers are "persons" for purposes of Section 1983. *Monell v.*

*Department of Social Services of the City of New York*, 436 U.S. 658, 690 (1978) (holding

defendants with policymaking authority may be held liable for Section 1983 violations) (quoting

*Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989)). The District of Columbia is a

municipal corporation. *See* D.C. Code Ann. § 1-102(a) (1981). Therefore, the District of

Columbia may be sued under Section 1983 as a "person." *O'Callaghan v. District of Columbia*,

741 F. Supp. 273, 276 (D.D.C. 1990) (District of Columbia "undeniably" a person within

meaning of Section 1983); *see also Wellington v. District of Columbia*, 851 F. Supp. 1, 7 (D.D.C.

1994).

Wrongful action taken "under color of state law" is "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941) (holding the precursor of Section 1983 to apply to the violation of voting rights in a primary election). Defendants are pursuing a policy of confiscating Plaintiffs' property claiming to be "clothed" in the Ballpark Financing and Cost Trigger Legislation and, therefore, are acting under color of state law.

    2.    <u>Defendants' actions violate Plaintiffs' federally-protected rights.</u>

Defendants' failure to comply with the Ballpark Financing and Cost Trigger Legislation has violated (1) the "Public Use" doctrine of the Fifth Amendment, and (2) Plaintiffs' rights to substantive due process. Defendants have violated the "Public Use" doctrine because no valid public purpose, as that term is defined by the Legislation, exists for the taking of Plaintiffs' property. Defendants have violated Plaintiffs' rights to substantive due process because (a) Plaintiffs have a property or liberty interest that triggers due process protections, and (b) Defendants' conduct is arbitrary in the constitutional sense in that it bears no rational relationship to a legitimate public purpose.

This specific cost issue is at the heart of the Council's determination that no valid public purpose would be served by locating the ballpark on Plaintiffs' property. For purpose of preliminary relief, the fundamental factual "merits" question is whether Defendants failed to provide a valid re-estimate of the acquisition costs for the primary ballpark demonstrating that the acquisition costs will not exceed $165 million. If Plaintiffs can show that Defendants failed to provide the requisite estimate, then Defendants' efforts to seize Plaintiffs' properties do not

serve any valid public purpose as determined by the Council and thus, are arbitrary and irrational.[8]

>   3.   Plaintiffs are likely to succeed on their claim that Defendants have violated the Fifth Amendment Public Use Doctrine.

The 5th Amendment to the U.S. Constitution prohibits "private property [from being] taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment applies directly to the District of Columbia. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Absent a valid public purpose, private property may not be seized. The Supreme Court has held that the concept of "public use" encompasses more than simply "use for the public." *Fallbrook Irrigation Dist. v. Bradley*, 164 U.S. 112, 158-64 (1896). In determining whether a valid public use exists, however, "each case must turn on its own facts." *See Berman v. Parker*, 348 U.S. 26, 32 (1954). In *Kelo v. City of New London*, 545 U.S. ___ (2005), the Supreme Court reiterated that in such challenges, courts should determine whether the legislature has put forth a proper "public purpose" for the taking, and that broad deference should be given to the legislature's stated public purpose behind eminent domain proceedings. This decision "reflect[ed the Court's] longstanding policy of deference to legislative judgments" in defining a public purpose for legislation. *Kelo*, slip op. at 4.

In the Ballpark Financing and Cost Trigger Legislation, the Council put forth its public purpose: building a ballpark on Plaintiffs' property will benefit the public if a valid re-estimate of the cost of acquiring and developing the ballpark site shows that such cost will not exceed

---

[8] Construing the statutory phrase "re-estimate the costs... for land acquisition" is a question of law subject to *de novo* review. *See U.S. v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002). No deference to an agency interpretation is necessary or appropriate where, as here, the agency lacks any special expertise. *See Southern Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 526 (D.C. Cir. 1977). The CFO repeatedly admitted that he has no experience in land valuations. (*See* Council Proceedings, at pp. 53:20-21; 54:4, 13, 23; 55:1, Ex. 6.)

$165 million. Plaintiffs are likely to succeed in showing that such an estimate has not been provided and all indications are that had it been, it would have far exceeded $165 million. Therefore, Plaintiffs are likely to prevail in their claim that Defendants' seizure of Plaintiffs' property is not justified by the public purpose put forth by the Council.

The wide gap between what the Legislation requires and what the Report provides is shocking and explains why the Report was able to claim a figure just under the statutory cap, even though an accurate figure would be much higher. By requiring "separate appraisals of each parcel of land," the Council intended to base its public purpose decision on a realistic estimate of land acquisition cost that Defendants are likely to pay and that has some basis in reality and some reasonable level of reliability. *See* discussion of Council Proceedings, *supra* at p. 6-7. Defendants concede they ignored this requirement. Indeed, in April 2005 letters to Plaintiffs, Defendants acknowledge that appraisals would be done in the future. (*See, e.g.,* Ex. 2, SLDA Decl. ¶ 13, Attach. F.) Defendants' knowing failure to even prepare appraisals for each parcel as the law requires renders their "estimate" inadequate as a matter of law. *See* discussion, *supra* at 12.

In addition to consciously excluding the most important and statutorily-mandated component of this estimate, the Report cannot be deemed a valid re-estimate in light of the many extraordinary deficiencies in the methodology that was apparently used. This conclusion was reached by two preeminent experts: one in the area of real estate valuation and the other in environmental remediation cost estimation. (Exhibit 9 and 10.)

Rather than comply with the Legislation by conducting separate parcel-by-parcel appraisals, the Report creates a fictional "aggregate market value of the subject property" as the basis for its land acquisition cost estimate. However, not even this inappropriate analysis

provides a true measure of what it might cost Defendants to acquire the 63 parcels. (*See* Ex. 9, Riddiough Decl. ¶ 2.) The CFO made numerous "adjustments" to the "aggregate market value of the subject property," without providing virtually *any information* to assess whether the adjustments are reasonable or not. (*Id.* ¶¶ 12-17.) For example, the Report states that it made a "modest" time adjustment. However, no explanation is given for how "modest" this "adjustment" was. No number is given, nor is the methodology explained. (*See id.*)

These flaws are used to suggest that the cost of acquiring the 63 parcels of land will be roughly equivalent to what Defendants call the "aggregate market value" of the property as a whole. But, even Defendants' fictional "aggregate market value" figure understates the costs of acquiring this property to a significant and shocking degree. Thus, correcting just one of the flaws in Defendants' Report – their use of stale rather than current comparable sales data – reveals that the land acquisition costs alone could well reach $42 million dollars more than reported. (*See* Ex. 9, Riddiough Decl. ¶¶ 39-42 and Attachments thereto.) That error alone conceals the fact that the overall costs are likely to reach $204 million or more, far in excess of the $165 million cap imposed by the Council. There are numerous other errors and omissions demonstrating that the Defendants' cost figure is irrational and arbitrary, and is far below what a valid estimate of acquisition costs is likely to be:

    (1)    sampling bias in the selection of comparable properties (*e.g.*, instead of choosing a representative sample of the 250+ sales from "comparable" neighborhoods during the selected time frame, Defendants found thirteen, eight of which are more than two years old, which makes such selections highly unusual)(*See* Ex. 9, Riddiough Decl. ¶¶ 19-25.);

    (2)    the lack of consideration of the large increases in prices for both residential and commercial real estate from 2000 to the present (*See id.* ¶¶ 26-28.);

    (3)    likely double counting of location adjustment factors and misapplication of other adjustment factors (*See id.* ¶¶ 29-35.);

(4)    methodological errors in the application of the income approach and adjustment for demolition and environmental remediation costs (*See id.* ¶¶ 36-38.); and

(5)    The complete lack of an explanation for the numerous adjustments is inconsistent with the Uniform Standards of Professional Appraisal Practice. (*See id.* ¶ 2 n.1.)

(*See* Ex. 15, Riddiough Decl. ¶¶ 18-38.)

4.    <u>Defendants are violating Plaintiffs' substantive due process rights protected by the Fifth and Fourteenth Amendments to the United States Constitution.</u>

The Fifth Amendment to the U.S. Constitution states in relevant part, "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The touchstone of due process is protection of the individual against arbitrary action of government." *Dent v. West Virginia*, 129 U.S. 114, 123 (1889). Due process contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Substantive due process violations are actionable under Section 1983. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

In determining whether there has been a substantive due process violation, the Court must first determine whether claimants have a valid property or liberty interest that triggers due process protection. *See Reeve Aleutian Airways, Inc. v. U.S.*, 982 F.2d 594 (D.C. Cir. 1993) (citing *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538-41 (1985)). By definition, "actual ownership of real estate, chattels, or money" constitutes a valid property interest for purposes of the 5th and 14th Amendments. *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972). Plaintiffs are seeking to prevent the seizure of property they currently own. Additionally, Plaintiffs are seeking to protect their liberty interests in being free from unauthorized interference by Defendants that prevents Plaintiffs from using their property in the pursuit of

otherwise legitimate and lawful personal and business interests. (*Id.*) (holding that liberty interests include "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life…and generally to enjoy those privileges long recognized…as essential to the orderly pursuit of happiness by free men"). Thus, there is no question that significant constitutional rights are at stake here.

The Court must then determine whether the Defendants have engaged in conduct that is "arbitrary in the constitutional sense." *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). As the Supreme Court recently and unanimously stated in *Lingle v. Chevron*, 554 U.S. ___ (2005), governmental action "that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." Slip op. at 12. "If a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. *No amount of compensation can authorize such action.*" *Lingle*, slip op. at 13-14 (emphasis added). This Circuit has said that:

> Once a property interest is found, however, the doctrine of substantive due process constrains only egregious government misconduct. We have described the doctrine as preventing only "grave unfairness," *Silverman v. Barry,* 845 F.2d 1072, 1080 (D.C.Cir.1988), and identified two ways in which such unfairness might be shown: "Only [1] a substantial infringement of state law prompted by personal or group animus, or [2] a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983." *Id.* See also *Tri County Industries v. District of Columbia,* 104 F.3d 455, 459-60 (D.C. Cir.1997); *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 465-67 (7th Cir.1988) (noting the "uncanalized discretion" inherent in substantive due process review and thus, given the otherwise resulting federal judicial intrusions on state and legislative authority, the need to limit its role to extreme cases).

*George Washington University v. District of Columbia*, 318 F. 3d 203, 209 (D.C. Cir. 2003).

Where executive action is at issue, and the executive has the opportunity to deliberate before

acting, evidence that the official was "deliberately indifferent" qualifies for relief under Section

1983. *County of Sacramento v. Lewis*, 523 U. S. 833, 853 (1998). There are numerous examples

of government conduct that rise to the level of constitutional deprivation. *See, e.g., Texas v.

Thomas*, 70 F.3d. 390 (5th Cir. 1995) (state official infringes on liberty interest by trying to

destroy business by telling customers that business owner is a habitual law-breaker.

There is little doubt that Defendants' conduct deliberately violates the express terms of

the Legislation. Defendants admit as much; however these violations are not technical. They

flout the precise reason why the law was passed. Further, the consequences are hardly minor.

Defendants conduct is directly resulting in the physical confiscation of Plaintiffs' property.

Instead of developing a valid estimate to see what it will cost the District to acquire the primary

ballpark site as the law required, Defendants took the five months and spent $500,000 to craft an

estimate that would not exceed the $165 million limit. That estimate, by their own admissions,

bears no conceivable relationship to what the District will have to pay to acquire the site, and in

fact significantly understates that figure.

The specific and undisputed facts demonstrate just how deliberate Defendants' flouting

of the law is, and how their actions are in pursuit of a purpose that the Council determined was

not legitimate. The law gave Defendants five months to prepare an estimate of the costs to the

District of acquiring the primary ballpark site. It specifically required that they use individual

*parcel-by-parcel land appraisals for each property* to be acquired in order to calculate

acquisition costs. Defendants engage in this kind of exercise on almost a daily basis.

Defendants' owns representatives acknowledged they were well aware of how to conduct such

appraisals, had plenty of time to do so, and could provide no reason why they failed to do so. (Exhibit 6, pp. 38:9-16; 39-40; 46:22-24; 47:1-10; 48:9-24.) That parcel-by-parcel process would have resulted in an appraised value that Defendants must acknowledge represents what they would pay for the land. Defendants could simply have added those appraised values together to determine the true aggregate cost to the District of acquiring the property.

Defendants did not do that. They turned the entire process on its head. Instead of appraisals of each property to determine the cost of acquisition, they created a fictional "aggregate market value of all properties" that their own representatives said are not based on individual appraisals, and have nothing to do with what it will cost the District to acquire the properties and that cannot be used as a means of determining each parcel's value. The evidence indicates that they selected numbers and assumptions that permitted them to develop a figure that did not exceed $165 million. They deliberately ignored what they knew to be more reliable and current data from over 250 sales. They consciously selected only certain "comparable" properties and made assumptions that conveniently resulted in a "value" that was unrealistically low. Correcting just one error sends their $161.35 million figure to $204 million.

Defendants' conduct is gravely unfair. This is not a routine land use case in which Plaintiffs are seeking approval to use their property for a particular purpose where Defendants are given broad authority to approve or disapprove the request, and the source of Defendants' authority is clear. Rather, this case involves the fundamental question of whether Defendants have the authority in the first instance to completely confiscate Plaintiffs' property. The Legislation gives Defendants no authority to decide whether confiscating Plaintiffs' property is for a valid public use. That is a decision made by the Council in the Legislation. It is indefensible, arbitrary and gravely unfair if Defendants can deliberately violate the Legislation in

24

order to give themselves the authority to confiscate Plaintiffs' property to build a stadium under *exactly* the circumstances that the Legislation prohibits.

### B. Defendants Are Directly Causing the Deprivation of Plaintiffs' Rights.

A governmental entity is liable under Section 1983 when the entity itself is a "'moving force' behind the deprivation." *Polk County v. Dodson*, 454 U.S. 312, 326 (1981) (*quoting Monell v. Dept. of Social Services*, 436 U.S. 658, 690, 694 (1978)). A showing that "the entity's 'policy or custom' . . . played a part in the violation of federal law" will provide a basis for relief under Section 1983. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (*quoting Monell*, 436 U.S. at 694); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

Defendants have sent Plaintiffs at least two letters indicating the Defendants are embarking on a policy of confiscating Plaintiffs' property for a ballpark. (*See* Ex. 2, SDLA Decl. ¶ 10, 12, Attach. D and E.) Moreover, Defendants have accepted bids and selected the architects to design the baseball stadium on Plaintiffs' property. *See* discussion pp. 14-15, *supra*. It is beyond dispute that the Defendants claim to be acting pursuant to the Ballpark Financing and Cost Trigger Legislation. It is Defendants' policy and actions – and only Defendants' actions – that are the "moving force" behind the constitutional deprivations that are occurring and that will continue to occur absent judicial intervention.

### C. Plaintiffs Will Suffer Irreparable Injury in the Absence of the Requested Relief.

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). Accordingly, the Court should look to the nature of the violation and the relief

possible in order to determine whether the presumption applies. In this case, Plaintiffs seek only equitable relief. As the Supreme Court stated in *Lingle*, "if a government action is found to be impermissible—for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process—that is the end of the inquiry. *No amount of compensation can authorize such action*." *Lingle*, slip op. at 14 (emphasis added). This is precisely the circumstances presented in this case.

> **D.    Other Interested Parties Will Not Suffer Substantial Harm if the Injunction is Granted, and Granting the Preliminary Injunction is in the Public Interest.**

"In many cases, the analysis of the public's interest mirrors the analysis of the interests of other related parties." *Hamilton Bank, N.A. v. Office of Comptroller of the Currency*, 227 F. Supp. 2d 1, 16 (D.D.C. 2001); *see also Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 883 F. Supp. 755, 765 (D.D.C. 1995) (injunction granted in dispute between union and railroads; analysis of injury to other interested parties was considered with the public interest analysis). This occurs most often when the government is a party. *See Hamilton Bank*, 227 F. Supp. 2d at 16.

Granting preliminary relief will not harm any third party and is in the public interest. The violations of Plaintiffs' constitutional rights are directly caused by Defendants' failure to abide by the Council's determination that it is not in the public interest to build a ballpark on Plaintiffs' property. Granting an injunction to prevent the Defendants from proceeding to spend more than this cap is clearly consistent with the public interest as determined by the Council in the Legislation. Moreover, granting the injunction will not defeat the Council's other interest — bringing baseball to the District. The Legislation specifically directs the Defendants to consider other, less expensive sites and the requested preliminary injunction does not preclude them from doing so now.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court sign the Proposed Order and issue a preliminary injunction enjoining Defendants from proceeding with the acquisition of property on the primary ballpark site as defined in the Legislation, until such time that a court may be able to decide the merits of the underlying case.


Dated: July 15, 2005                          Respectfully submitted,

                                              KIRKPATRICK & LOCKHART NICHOLSON
                                              GRAHAM LLP

                                              _Barry M. Hartman_

                                              Barry M. Hartman (D.C. Bar No. 291617)
                                              Charles L. Eisen (D.C. Bar No. 003764)
                                              Christopher E. Dominguez (D.C. Bar No. 460141)
                                              1800 Massachusetts Avenue, N.W.
                                              Washington, D.C.  20036
                                              (202) 778-9000
                                              (202) 778-9100 (fax)

                                              _Counsel for Plaintiffs_