# Appendix A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RUMBER *et al.*,              :
                             :
            Plaintiffs,       :    Civil Action No.:    04-1170 (RMU)
                             :
        v.                    :    Document Nos.:    13, 20, 22
                             :
DISTRICT OF COLUMBIA *et al.* :
                             :
            Defendants.       :

## MEMORANDUM OPINION

GRANTING THE PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT;
DENYING WITHOUT PREJUDICE THE DEFENDANTS' MOTION TO DISMISS; AND DENYING THE
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.    INTRODUCTION

This matter comes before the court on the plaintiffs' motion to file a third amended

complaint, the defendants' motion to dismiss the second amended complaint, and the plaintiffs'

motion for a preliminary injunction. The plaintiffs, owners and tenants of properties referenced

in local legislation as being subject to eminent domain, contend that the defendants are

unauthorized to exercise eminent domain and that the plaintiffs will be injured if and when the

defendants exercise eminent domain over their properties. The plaintiffs also argue that the

legislation at issue has changed significantly numerous times, including after the plaintiffs filed

their second amended complaint, thereby mooting the defendants' motion to dismiss the second

amended complaint and necessitating the plaintiffs' filing of a third amended complaint to reflect

the final version of the legislation. Because the court concludes that it is in the interests of

justice to permit the plaintiffs to file a third amended complaint, the court grants the plaintiffs'

motion to amend and denies without prejudice the defendants' motion to dismiss.  Because the

court concludes that the plaintiffs have failed to shoulder their hefty burden to justify injunctive

relief, the court denies the plaintiffs' motion for a preliminary injunction.

## II.   BACKGROUND

The District of Columbia ("D.C." or the "District") enacted a series of bills regarding the

eminent domain power of the National Capital Revitalization Corporation ("NCRC") and the

Skyland Shopping Center area in Southeast, D.C.  3d Am. Compl. ¶ 2.  The NCRC is a

corporation that is statutorily authorized to acquire property by eminent domain when such action

has been approved by at least two thirds of the Council.  D.C. Official Code § 2-2.1219.19.  The

power of eminent domain is delegated to the NCRC to assist it in achieving revitalization goals,

although the actual exercise of eminent domain requires Council approval.  *Id.*  On April 5, 2005,

the final version of the Act at issue, the National Capital Revitalization Corporation Eminent

Domain Clarification and Skyland Eminent Domain Approval Amendment Act of 2004

("Skyland Act"), D.C. Legisl. 15-286 (Act 15-679), became effective.  3d Am. Compl. ¶ 3.  The

Skyland Act reflects the Council's findings that, *inter alia*, Wards 7 and 8, including

neighborhoods surrounding the Skyland Shopping Center, are economically depressed and that

the Skyland Shopping Center is a blighting factor.  *Id.*  The Act approves exercising eminent

domain power to acquire and redevelopment that area.  *Id.*  On July 13, 2004, several of the

owners and tenants of properties subject to the eminent domain authorization set fort in the

Skyland Act (collectively, the "plaintiffs")[1] brought suit to enjoin the defendants from

commencing eminent domain proceedings. The plaintiffs claim that the legislation and the

potential exercise of eminent domain provided for therein violates the plaintiffs' Fifth

Amendment rights. *See generally* 3d Am. Compl. The plaintiffs have amended their complaint

twice and currently pending before the court is the plaintiffs' motion for leave to file a third

amended complaint. In the meantime, on December 10, 2004, the defendants filed a motion to

dismiss the plaintiffs' second amended complaint for lack of subject matter jurisdiction and

failure to state a claim on which can be granted. *See generally* Defs.' Joint Mot. to Dismiss.

Upon the requests of the plaintiffs, the court granted them three extensions of time to file their

opposition to the defendants' joint motion to dismiss. Minute Order (dated Jan. 3, 2005); Minute

Order (dated Jan. 27, 2005); Minute Order (dated Mar. 1, 2005). Shortly after the parties fully

briefed the defendants' joint motion to dismiss, on April 21, 2005, the plaintiffs' filed a motion

---

[1]     The plaintiffs are owners and tenants of properties located in the Skyland Shopping
Center and the adjoining neighborhood. The following plaintiffs are owners of property
located in the Skyland Shopping Center or surrounding neighborhood: Rose and Joseph
Rumber (Skyland Liquors, located at 2648 Naylor Road, S.E.), Graham and Verna Fields
(Fields Records and Alexis Hair Gallery, located at 2840 Alabama Avenue, S.E.),
Muhtar Ahmadi (New York Fried Chicken, located at 2716 Good Hope Road, S.E.), Duk
Hea Oh (Beauty World, located at 2842 Alabama Ave., S.E.), In Suk Baik (Alabama
Express Liquors, located at 2846 Alabama Ave., S.E.), and Ingak Lee (Hilltop Cleaners,
located at 2712 Good Hope Road, S.E.). The following plaintiffs are tenants or
merchants of property located in the Skyland Shopping Center or surrounding
neighborhood: Marion Fletcher (Fletcher's Beauty Salon, located at 2832 Alabama Ave.,
S.E.), Boubaker Ben Salah ((New York Fried Chicken, located at 2716 Good Hope
Road, S.E.), Muneer Choudhury (Blimpie franchise, located at 2636 Naylor Road, S.E.,
and notably signed a ten-year lease for this franchise), Quval Le (Beauty Nail, located at
2824A Alabama Ave., S.E.), Son Cha Kang (Hilltop Cleaners, located at 2712 Good
Hope Road, S.E.), Hartej Sinh (Check Cashing, located at 2812 Alabama Ave., S.E.), and
Ling Chen (manager at Kelly's Carryout, located at 2824 Alabama Ave., S.E., and her
parents may be the tenants of this establishment). Pls.' 3d Am. Compl; Pls.' Mot. for
Prel. Inj.

for leave to file a third amended complaint. The plaintiffs brought this matter with urgency

before the court when, on May 6, 2005, the plaintiffs filed a motion for a preliminary injunction,

claiming imminent harm on May 19, 2005. On May 13, 2005, by way of a telephonic

conference, the defendants represented to the court that no eminent domain proceedings would

commence before June 1, 2005. Pls.' Reply at 2. The court now addresses each motion in turn.

### III.   ANALYSIS

#### A.   The Plaintiffs' Motion to File a Third Amended Complaint

#### 1.   Legal Standard for a Motion for Leave to Amend the Complaint

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading once as a

matter of course at any time before a responsive pleading is served. FED. R. CIV. P. 15(a).

Additionally, Rule 15(a) allows a party to amend its pleading to add a new party.[2] *Id.*; *Wiggins v.*

*Dist. Cablevision, Inc.*, 853 F. Supp. 484, 499 (D.D.C. 1994); 6 FED. PRAC. & PROC. 2d § 1474.

According to our court of appeals, Rule 15(a) "guarantee[s] a plaintiff an absolute right" to

amend the complaint once at any time so long as the defendant has not served a responsive

---

[2]   A motion to amend a complaint to add a party may also implicate Federal Rules of Civil
Procedure 20 and 21, the joinder rules. *Oneida Indian Nation v. County of Oneida*, 199
F.R.D. 61, 72 (N.D.N.Y. 2000). Once a responsive pleading has been served, however,
the standard for adding a party is the same regardless of the rule under which the motion
is made: the decision lies within the discretion of the court. *Wiggins v. Dist.*
*Cablevision, Inc.*, 853 F. Supp. 484, 499 n.29 (D.D.C. 1994) (Lamberth, J.) (stating that
"[i]t is well established that after a responsive pleading has been served, the standards for
adding parties are the same whether the motion is made under Rule 15 or Rule 21");
*Oneida Indian Nation*, 199 F.R.D. at 72 (noting that "in practical terms there is little
difference between [Rules 15, 20, and 21] in that they all leave the decision whether to
permit or deny amendment to the district court's discretion"); 6 FED. PRAC. & PROC. 2d §
1474 (indicating that "the same basic standard for adding or dropping a party will apply
whether the pleader moves under Rule 15(a) or Rule 21").

-4-

pleading and the court has not decided a motion to dismiss. *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282-83 (D.C. Cir. 2000) (citing FED. R. CIV. P. 15(a)). If there is more than one defendant, and not all have served responsive pleadings, the plaintiff may amend the complaint as a matter of course with regard to those defendants that have yet to answer. 6 FED. PRAC. & PROC. 2d § 1481. Motions to dismiss and for summary judgment do not qualify as responsive pleadings for the purposes of Rule 15. *James V. Hurson Assocs.*, 229 F.3d at 283; *Bowden v. United States*, 176 F.3d 552, 555 (D.C. Cir. 1999); *U.S. Info. Agency v. Krc*, 905 F.2d 389, 399 (D.C. Cir. 1990).

Once a responsive pleading is served, however, a plaintiff may amend the complaint only by leave of the court or by written consent of the adverse party. FED. R. CIV. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962). The grant or denial of leave lies in the sound discretion of the district court. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). The court must, however, heed Rule 15's mandate that leave is to be "freely given when justice so requires." *Id.*; *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1083 (D.C. Cir. 1998). Indeed, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182. Denial of leave to amend therefore constitutes an abuse of discretion unless the court gives sufficient reason, such as futility of amendment, undue delay, bad faith, dilatory motive, undue prejudice, or repeated failure to cure deficiencies by previous amendments. *Id.*; *Caribbean Broad. Sys.*, 148 F.3d at 1083.

### 2. The Court Grants the Plaintiffs' Motion to File a Third Amended Complaint

The plaintiffs claim that amending their complaint is necessary because the permanent

Skyland legislation was adopted and became effective after they filed their second amended complaint, rendering their second amended complaint insufficient to represent the merits of their case. Pls.' Mot. for Leave to File a 3d Am. Compl. ("Pls.' Mot. for Leave") at 1. The defendants oppose the plaintiffs' motion on the grounds of futility because the changes in the third amended complaint do not remedy the legal defects of the second amended complaint. Defs.' Opp'n to Mot. for Leave at 2. Additionally, because the defendants' joint motion to dismiss has been fully briefed, the defendants claim that they would suffer undue prejudice and delay and that judicial efficiency would be thwarted if the plaintiffs could amend yet again. *See generally* Defs.' Opp'n to Mot. for Leave. The court errs on the side of affording the plaintiffs a full and fair opportunity to present the merits of their case. As indicated, subsequent to the plaintiffs' second amended complaint, D.C. enacted final Skyland legislation. Because the legislation altered the previous legislation relied on by the plaintiffs in prior briefing, the court, in its discretion, permits the plaintiffs to file a third amended complaint reflecting the final legislation. Accordingly, in the interests of justice, the court grants the plaintiffs' motion for leave to file a third amended complaint. Because the second amended complaint is now superseded by the third amended complaint, the court denies without prejudice the defendants' joint motion to dismiss the plaintiffs' second amended complaint. *Bancoult v. McNamara*, 214 F.R.D. 5, 13 (D.D.C. 2003).

## B. The Court Denies the Plaintiffs' Motion for a Preliminary Injunction

### 1. Legal Standard for Injunctive Relief

This court may issue interim injunctive relief only when the movant demonstrates:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)); *see also World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 64 (D.D.C. 2000). It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (per curiam). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted).

The four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor. *CSX Transportation, Inc. v. Williams*, --- F.3d ---, 2005 WL 1023044 (D.C. Cir. May 3, 2005) (citing *CityFed Fin. Corp.*, 58 F.3d at 747). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp.*, 58 F.3d at 747.

Moreover, the other salient factor in the injunctive-relief analysis is irreparable injury. A movant must "demonstrate at least 'some injury'" to warrant the granting of an injunction. *CityFed Fin. Corp.*, 58 F.3d at 747 (quotation omitted). Indeed, if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the

other factors. *Id.*

Because interim injunctive relief is an extraordinary form of judicial relief, courts should

grant such relief sparingly. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). As the Supreme

Court has said, "[i]t frequently is observed that a preliminary injunction is an extraordinary and

drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the

burden of persuasion." *Id.* (citation omitted). Therefore, although the trial court has the

discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly. In

addition, any injunction that the court issues must be carefully circumscribed and tailored to

remedy the harm shown. *National Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977

(D.C. Cir. 1990) (citation omitted).

### 2. Substantial Likelihood of Success on the Merits

The plaintiffs' primary arguments in their quest to enjoin the defendants from

implementing and enforcing the Skyland Act are that: (1) D.C. is not considered a state for

eminent domain purposes, Pl.'s Mot. at 2-4; (2) D.C. improperly delegated eminent domain

power to the NCRC, *id.*; and (3) the NCRC does not have the power to cause businesses to close

or relocate because its purpose, by statute, is to retain and expand businesses and to provide

incentives and assistance to promote economic development, *id.* at 4-7.

The defendants counter that the plaintiffs fail to show that they are entitled to the

extraordinary relief of a preliminary injunction or that this court even has subject matter

jurisdiction. Defs.' Opp'n at 5-8. As to subject matter jurisdiction, the defendants contend that

this case is not ripe because there has not yet been a taking by eminent domain. *Id.* at 5. The

defendants are correct that the Fifth Amendment proscribes the taking of private property for

-8-

public use without just compensation, as opposed to the mere taking of property. Stated differently, the Takings Clause "does not prohibit the taking of private property, but instead places a condition[, compensation,] on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987). In the instant case, because there has been no taking, and thus no denial of just compensation, the plaintiffs' action is premature.[3] *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194-95 (1985). Furthermore, it is uncontested that D.C. provides a mechanism for property owners to seek compensation through condemnation proceedings, should the defendants initiate such proceedings. *See e.g.*, *D.C. Fed'n of Civic Assocs. v. Airis*, 275 F.Supp. 533, 537 (D.C. Cir. 1967). Significantly, however, "[t]he property owner[s] cannot claim a violation of the Just Compensation Clause until [they have] used the procedure and been denied just compensation." *Williamson County*, 473 U.S. at 195; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) (stating that "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit

---

[3]     The court further notes that "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *Armstrong v. United States*, 364 U.S. 40, 48 (1960) (quoting *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508-10 (1923) (citing cases)). An intuitive prerequisite to constitutionally required just compensation is that the one seeking compensation have a cognizable interest in the property at issue. *See generally* U.S. CONST. AMEND V. D.C. provides adequate procedures for just compensation for takings through condemnation proceedings. D.C. Official Code §§ 16-1311, 16-1314. Upon a governmental taking and denial of just compensation, that is, upon a ripe takings claim, the parties claiming compensation for property must initially establish that they indeed have a cognizable property interest in the property at issue. *See generally id.*; *Ruckleshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984) (stating that "[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law") (quotations and citations omitted) (alteration in original).

for compensation can be brought against the sovereign subsequent to the taking"). Also, if the condemnation proceedings are commenced, the plaintiffs will then have the opportunity to raise their constitutional challenges in the state court. *JMM Corp. v. D.C.*, 378 F.3d 1117, 1121 (D.C. Cir. 2004).

The plaintiffs also characterize their claims as equal protection violations. *See generally* 3d Am. Compl. This theory fails for the same reasons stated above. A takings claim, even one in the cloak of an equal protection claim, does not amount to a constitutional violation until the state has denied just compensation. *Williamson County*, 473 U.S. at 195. The plaintiffs additionally claim that the defendants violated their due process rights. *See generally* 3d Am. Compl. But again, there has been no taking of private property, there has been no denial of just compensation, and the threatening action in this case is the commencement of condemnation proceedings (which proceedings are in fact the mechanism by which D.C. would ensure that property is *not* taken without due process of law). *See* D.C. Official Code 16-1311; *Barman v. Parker*, 348 U.S. 26, 36 (1954) (stating that "[t]he rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking"); *see generally Davidson v. New Orleans*, 96 U.S. 97 (1877).

The defendants further contend that the plaintiffs have failed to meet their burden in establishing the likelihood of prevailing on the merits of their claim regarding authorization and delegation of eminent domain. Defs.' Opp'n at 8-11. The defendants are again correct. While it is true that the District of Columbia is not a "state" for all purposes under the sun, *see, e.g.*, *JMM Corp. v. D.C.*, 378 F.3d 1117, 1124 n.18 (noting that D.C. "has not [] been treated as a state for all purposes[,]" but nonetheless holding that D.C. is a state for *Younger* abstention purposes),

-10-

D.C.'s eminent domain power is well-established, *D.C. Fed'n of Civic Assocs. v. Airis*, 275 F.

Supp. 533, 539 (D.D.C. 1967) (stating that "the [D.C.] Government has power to acquire real

property [] by purchase and if it does not succeed in acquiring them by purchase, then by

condemnation"); *see also* D.C. Official Code § 16-1311.

Furthermore, the plaintiffs have failed to demonstrate that D.C. improperly delegated

eminent domain authority to the NCRC. Without reciting in painstaking detail the history of our

nation's capital and its relationship with Congress to date, the court briefly summarizes the

highlights compelling to this suit. In 1973, Congress enacted the District of Columbia Self-

Government and Governmental Reorganization Act (the "Home Rule Act"), Pub. L. No. 93-198,

87 Stat. 774, codified at D.C. Official Code §§ 1.201.01, *et seq.* The Home Rule Act grants D.C.

legislative authority within D.C., subject to limitations not implicated by this suit. Home Rule

Act Art. III, Sec. 302. The Supreme Court has already spoken on and approved Congress's

authority to delegate such law making power to the Council. *Dist. of Columbia v. John R.*

*Thompson Co., Inc.*, 346 U.S. 100 (1953) (holding in an analogous context that per Article I, § 8,

c. 17 of the U.S. Constitution, Congress has the authority to delegate its lawmaking authority).

The Home Rule Act further authorizes the Council to "create, abolish, or organize any office,

agency, department or instrumentality of the government of the District and to define the powers,

duties, and responsibilities of any such office, agency, department or instrumentality." D.C.

Official Code § 1-204.04(b).

On April 5, 2005, the Skyland Act became effective. D.C. Legisl. 15-286 (Act 15-679).

D.C. previously delegated its power of eminent domain to the NCRC to assist it in achieving

revitalization goals, although the actual exercise of eminent domain requires Council approval.

-11-

D.C. Official Code § 2-1219.19(b). The Skyland Act reflects the Council's approval for the Skyland Shopping Center redevelopment project as well as its findings regarding the necessity of redevelopment. D.C. Legisl. 15-286 (Act 15-679). The plaintiffs have not set forth an argument substantiated by anything other than their personal thoughts that the partial delegation of eminent domain authority to the NCRC or the that the Skyland Act are contrary to law. To the plaintiffs' misfortune, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones . . . a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." *U.S. v. Zannino*, 895 F.2d 1, 18 (1st Cir. 1990); *see U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (stating that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)"); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

The plaintiffs' final, seemingly aimless dart is that the NCRC does not have the power to cause businesses to close or relocate because its purpose, by statute, is to retain and expand businesses and to provide incentives and assistance for economic development. Pls.' Mot. at 4-7. The defendants contend that the plaintiffs have not established a likelihood of prevailing on the merits of their claim that the taking is contrary to the NCRC's statutory purpose. The court again agrees with the defendants. The plaintiffs failed to establish an inconsistency between the redevelopment of the Skyland Shopping Center and the relocation of some or all of the businesses there and the NCRC's statutory purposes of, *inter alia*, retaining and expanding businesses, attracting new businesses, inducing job creation, and removing slum and blight. The legislative findings are that the current conditions at the Skyland Shopping Center are an

impediment to the economic revitalization of this area of D.C. D.C. Legisl. 15-286 (Act 15-679). The Council determined that the redevelopment of this area and, if necessary, the use of eminent domain to accomplish redevelopment is indeed consistent with the purposes of the NCRC and the legislation which creates it. *Id.* This court's line of reasoning is in accord with the D.C. Circuit's decision in *Donnelly v. Dist. of Columbia*, 269 F.2d 546 (D.C. Cir. 1959). In *Donnelly*, the D.C. Circuit approved an analogous condemnation of commercial property "in the name of 'redevelopment.'" 269 F.2d at 547. Further undermining the plaintiffs' position is *Berman v. Parker*, 348 U.S. 26 (1954), which speaks to numerous issues present in this case. The Supreme Court upheld the constitutionality of an Act wherein Congress created the District of Columbia Redevelopment Land Agency and granted it the power the "acquire and assemble, by eminent domain and otherwise, real property for the redevelopment of blighted territory in the District of Columbia and the prevention, reduction, or elimination of blighting factors or causes of blight." *Id.* at 29 (internal quotation marks omitted). The Act in *Berman* further "directs the National Capital Planning Commission . . . to make and develop a comprehensive or general plan of the District, including a land-use plan." *Id.* (internal quotation marks and citation omitted). The court acknowledges that it is Congress that enacted the redevelopment agency in *Berman*. But, as previously stated, once Congress enacted the Home Rule Act, it delegated its lawmaking authority to the Council, in accordance with Article I, § 8, c. 17 of the U.S. Constitution. Also

-13-

set forth in *Berman* is the role of the courts in defining the limits of the police power.[4]
Specifically, "[s]ubject to specific constitutional limitation, when the legislature has spoken, the
public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not
the judiciary, is the main guardian of the public needs to be served by social legislation, whether
it be Congress legislating concerning the District of Columbia . . . or the States legislating
concerning local affairs . . . This principle admits no exception merely because the power of
eminent domain is involved." *Id*. at 32 (citations omitted).

  This court is mindful of the Supreme Court's instruction that "[i]f those who govern the
District of Columbia decide that the nation's Capital should be beautiful as well as sanitary, there
is nothing in the Fifth Amendment that stands in the way." *Id*. at 33. "The role of the judiciary
in determining whether that power is being exercised for a public purpose is an extremely narrow
one." *Id*. at 32. The Skyland Act states numerous findings of blight in the area of the Skyland
project. The court concludes that the legislation at issue does not exceed the realm of
redevelopment limitation for public welfare. *See id*. at 33 (noting that "[t]he concept of the
public welfare is broad and inclusive") (citation omitted). Accordingly, for all these reasons, the

---

[4]  The *Berman* court explained that:
> Public safety, public health, morality, peace and quiet, law and order--these
> are some of the more conspicuous examples of the traditional application
> of the police power to municipal affairs. Yet they merely illustrate the
> scope of the power and do not delimit it . . . Miserable and disreputable
> housing conditions may do more than spread disease and crime and
> immorality. They may also suffocate the spirit by reducing the people who
> live there to the status of cattle. They may indeed make living an almost
> insufferable burden. They may also be an ugly sore, a blight on the
> community which robs it of charm, which makes it a place from which men
> turn. The misery of housing may despoil a community as an open sewer
> may ruin a river.
> 348 U.S. 26, 32-33 (1954) (internal citation omitted).

-14-

court determines that the plaintiffs have failed to meet their burden of substantial likelihood of success on the merits.

### 3. Irreparable Injury

The plaintiffs contend that if an injunction is not issued then the defendants will commence condemnation proceedings pursuant to the eminent domain power, and the plaintiffs will be forced to close or relocate their businesses, which will result in their businesses and livelihood suffering irreparable harm. Pls.' Mot. at 8. The plaintiffs claim that this harm of the threatened closing or relocation of their business is imminent. Pls.' Reply 2-3. The defendants counter that the plaintiffs have not demonstrated irreparable harm. Defs.' Opp'n at 14-16. Specifically, the defendants argue that there is no support for the plaintiffs' claims that if the defendants take the property, they will not provide the plaintiffs with just compensation or relocation benefits (any payments required by the Constitution or by federal and D.C. law). *Id.* at 14. Moreover, the defendants contend that even if there were a threat of non-payment of compensation, the issue is one of money, not an irreparable injury. *Id.*

First and foremost, no condemnation proceedings have commenced. As previously stated, if and when condemnation proceedings are commenced pursuant to the eminent domain power, the court has no reason to believe anything other than that any plaintiffs with a protected property interest will have the opportunity to present their arguments and will receive just compensation for any financial loss. Also, as the defendants indicate, relocation payments are required under law for certain types of projects in which D.C. or federal funds are used. Defs.' Opp'n at 14 (citing Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. 4601 *et seq.*). At this point, the court has no reason to doubt the defendants will

-15-

abide by all pertinent regulations in good faith to provide relocation assistance to the plaintiffs

entitled to such benefits. *See* Defs.' Opp'n at 15 (recounting the defendants efforts to assist the

plaintiffs with relocation, including an invitation to owners and tenants to a alas, a "kick-off"

meeting on July 22, 2004, to discuss relocation matters and communication between a relocation

company retained by the NCRC, Diversified Property Services, Inc., to assist the plaintiffs).

Reinforcing the court's confidence that the process is proceeding justly, none of the plaintiffs

have been given any notice to vacate or any other deadline for vacating, or have been denied

relocation assistance. *Id.* Even if the NCRC acquires the properties through eminent domain,

that does not necessarily mean that affected businesses need to relocate immediately, nor have

the defendants expressed an intention to do so. *Id.* at 15, Ex. 2 (Winterwep Decl.) at ¶ 5. If

payment is due to the plaintiffs for any impact, a court will determine the amount and the

plaintiffs will be paid accordingly.   In short, the court agrees with the defendants and precedent

that the mere prospect of having property taken by eminent domain is not an injury sufficient to

support judicial intervention. *Williamson County*, 473 U.S. at 194-95; *Patel v. City of Chicago*,

383 F.3d 569 574 (7th Cir. 2004).

It is well-settled that economic loss alone will rarely constitute irreparable harm.

*Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985);

*Barton v. District of Columbia*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001). "Mere injuries,

however substantial, in terms of money, time and energy necessarily expended in the absence of

a stay, are not enough. The possibility that adequate compensatory or other corrective relief will

be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of

irreparable harm." *Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*, 259 F.2d 921, 925

(D.C. Cir. 1958). While the court notes that there are exceptions to this general rule, *see e.g.*, *Wisconsin Gas Co.*, 758 F.2d at 674; *In Hamlyn v. Rock Island County Metro. Mass Transit District*, 960 F. Supp. 160, 162 (C.D. Ill. 1997) (citing *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1994)); *Williams v. State Univ. of N.Y.*, 635 F. Supp. 1243, 1248 (E.D.N.Y. 1986) ("the plaintiff must quite literally find himself being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm."). Nonetheless, because this case involves an eminent domain proceeding, which includes procedures to protect the rights of those with a property interest, and the court has no reason to believe that the defendants will not follow applicable law, the court concludes that this business-related economic damage falls into the realm of the availability of adequate compensatory or corrective relief being available at a later date. *See e.g., Virginia Power*, 259 F.2d 921. Accordingly, the court determines that the plaintiffs have not demonstrated irreparable harm.

### 4.    No Substantial Injury to Interested Parties

The plaintiffs next contend that issuance of the injunction would only speculatively or minimally injure the defendants, whereas non-issuance of the injunction would irreparably injure the plaintiffs. Pls.' Mot. at 8-9. The plaintiffs believe that it is "difficult to articulate what harm the defendants might suffer" if the target date for eminent domain proceedings were delayed. *Id.* at 9. But, curiously, the plaintiffs assert that their harm is uncertain because they do not know what will happen after the commencement of eminent domain proceedings and what benefits they stand to reap. *Id.* The defendants disagree, claiming that an injunction would injure the defendants as well as the community. Defs.' Opp'n at 17. In support of this contention, the defendants submitted an affidavit of Ted Risher, a Senior Development Manager at the NCRC,

-17-

who is the Project Manager for the Skyland project. Mr. Risher provides a glimpse into the relevant circumstances surrounding the Skyland project as follows: the NCRC has been preparing the Skyland project for three years; has a schedule calling for significant construction on the site for Spring 2006, which it has to work back from (and must accomplish site control and deal with tenant issues before commencing construction within that time frame); and is under contract to acquire approximately 30 percent of the land from owners voluntarily. Defs.' Not. of Suppl. Aff. in Opp'n to Mot. for Prelim. Inj. (Risher Aff.) at ¶¶ 14-15. Against that backdrop, the defendants set forth the harm ensuing from an injunction as: (1) frustrating the schedule of the project; (2) signaling the defendants' financial resources, prospective tenants, and the community that they lack the control necessary to complete the project; (3) terminating the NCRC's ability to successfully complete revitalization projects that they are chartered to perform due to individual business owners' or land owners' ability to halt the projects; (4) frustrating the agreements between the NCRC and the owners that voluntarily entered contracts to transfer title; (5) endowing the plaintiffs with unfair leverage due to a "veto power over the price and timing of development"; (6) undermining the intent of the legislature in enacting the Skyland Act; and (7) obstructing the community's decade long demands to revitalize the area. Risher Aff. ¶¶ 13-16.

The plaintiffs fail to persuade the court that other parties will not be substantially injured, namely, the defendants, other owners and tenants not party to this suit, and the community. In fact, in balancing the equities as set forth by the parties, the court's scale weighs the potential harm to the defendants in issuing the injunction as more severe than the potential harm to the plaintiffs if condemnation proceedings were permitted to commence. Thus, the court determines that an injunction will substantially injure other parties.

-18-

### 5.    Public Interest Furthered by Injunction

The plaintiffs next argue that the public will be well-served by the court addressing the role of the NCRC and whether the NCRC's purpose of retaining and expanding businesses located within D.C. is being achieved and the scope of the delegation of the power of eminent domain. Pls' Mot. at 9. The defendants vehemently disagree for essentially the reasons spelled out above regarding the potential harm to other parties. The court already determined those reasons to be compelling in favor of the defendants. The defendants further note that it is the plaintiffs' burden to demonstrate that stopping the Skyland project serves anyone's interests, for the defendants contend that the plaintiffs themselves will be harmed by the court issuing an injunction because it would increase the uncertainty regarding the plaintiffs' businesses. Defs.' Mot. at 17.

The Skyland Act itself speaks to the public interest of the project that the plaintiffs seek to enjoin. The defendants persuaded the court that an injunction would significantly threaten the success of this project, which the legislature has enacted for the public welfare. "Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." *Berman*, 348 U.S. at 35-36 (citations omitted). Accordingly, the court concludes that the injunction would not further the public interest, but rather, would severely impede it.

## IV. CONCLUSION

For all these reasons, the court grants the plaintiffs' motion for leave to file a third amended complaint, denies without prejudice the defendants' motion for leave to file a third amended complaint, and denies the plaintiffs' motion for a preliminary injunction. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 31st day of May 2005.

RICARDO M. URBINA
United States District Judge

# Appendix B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SOUTHEAST LAND DEVELOPMENT
ASSOCIATES, L.P., et al.,

              **Plaintiffs,**

    v.

THE DISTRICT OF COLUMBIA,
et al.,

              **Defendants.**

Civil Action No. 05-1413 (RWR)

## DECLARATION OF MARK H. TUOHEY III

Mark H. Tuohey III declares and states:

1.     I am the chairman of the District of Columbia Sports and Entertainment Commission ("Commission"). I am a member of the District of Columbia Bar and a partner in the firm of Vinson & Elkins, 1455 Pennsylvania Avenue, N.W., Washington, D.C. 20004.

2.     I participated in the negotiation and drafting of the agreement of September 29, 2004 between and among the government of the District of Columbia, the Commission, and Baseball Expos, L.P., to bring a major league baseball team to Washington, D.C., and to provide for a new baseball stadium to be owned by the District of Columbia at the baseball stadium site in southeast Washington and leased by the new baseball team. The Agreement was premised on the new stadium being built on this specific site. See Baseball Stadium Agreement, September 29, 2004 at Section 4.01 and Exhibit B. A copy of the Agreement is attached hereto. Also attached are two letters dated December 14, and December 20, 2004 (the "BSA Letters") sent to me by Baseball Expos, L.P. that clarify certain terms of the Agreement. I signed the Agreement on behalf of the Commission and am familiar with its contents and with the contents of the BSA Letters.

3.     The preliminary injunction sought by the plaintiffs in the above-captioned case, if granted, would jeopardize the future of major league baseball in Washington. It would also be detrimental to the interests of many persons in this community, including youth who are the beneficiaries of certain community and charitable commitments made by major league baseball in accordance with the Agreement and the BSA Letters that would be lost if the Agreement cannot be carried out according to its terms

4.     The Agreement contains a number of deadlines, which are interrelated.  If these deadlines are not met in accordance with the Agreement, the baseball team will have the right to terminate the Agreement and leave Washington, D.C., for another city.  The relationship between these deadlines is such that the failure to meet any of them may have a domino effect on the others, leading to the collapse of the Agreement.

5.     The key deadlines are contained in Article VII of the Agreement, as follows:

a.   Under Section 7.02, entitled "Control of Buildable Site", among other obligations by not later than December 31, 2005, the Commission must provide the baseball team with "reasonable evidence" that, among other things, "(i) the Commission has acquired fee simple title or leasehold rights to the Baseball Stadium Site sufficient under commercial standards for the timely construction, completion, occupancy and usage of the Baseball Stadium as contemplated by [the] Agreement; (ii) the Commission's property interests in the Baseball Stadium Site will be subject to no liens, encumbrances or restrictions that could interfere with usage of the properties for their intended purposes."

b.   Under Section 7.04, entitled "Execution of the Lease and the Construction Administration Agreement", it is provided that by not later than December 31, 2005, the Commission and the team shall execute and deliver the Lease and Construction Administration Agreement.  The Lease is a lease of the Baseball Stadium Site and the portion of the infrastructure (such as facilities services and transportation linkages necessary to support the Baseball Stadium) located on the site.  The Construction Administration Agreement means an agreement to be entered into by the Commission, the District Government and the Team in respect of the Baseball Stadium and the infrastructure.

c.   Under Section 7.04, if site control of the Baseball Stadium Site cannot be obtained by December 31, 2005—as a result of the injunction sought in this case or for any other reason—the obligations of the Commission and the District under the Lease and the Construction Administration Agreement cannot be carried out, and construction of the baseball stadium cannot begin.

d.   The present schedule calls for construction of the stadium to commence no later than the first quarter of 2006.  Construction is expected to take at least 24 months.  Any delay in the commencement of construction will have to be added on to the back end of the schedule, at additional cost to the Commission and the District.

e.   Section 7.06, entitled "Funding", provides that by not later than December 31, 2005 the revenues from the sale of the District bonds as set forth in Section 5.01 of the Agreement shall be deposited to pay the costs of the

baseball stadium and the infrastructure.  An injunction as sought by the plaintiffs, in my judgment, would make the sale of the bonds within the specified time period extremely difficult and more expensive for the District.

    f.  Section 7.07, entitled "Project Completion", requires the Commission to use "reasonable best efforts" to complete the baseball stadium and the infrastructure and make them available to the team for the play of major league baseball not later than March 1, 2008.

6.      Failure to meet the deadlines set forth in Sections 7.02, 7.04, 7.06, and 7.07 enables the team to terminate the Agreement under Section 8.03 if any of the deadlines in 7.02, 7.04, 7.06, or 7.07, is missed by more than 24 months.  Section 8.04 provides, in pertinent part:  "It is agreed that time is of the essence with respect to such deadline dates."  The effect of this provision is that the team could choose to leave the District.

7.      The remedies for failure to meet these deadlines, in addition to termination by the team, can be drastic.  For example, under Section 8.04(c) as modified by the BSA Letters, if the deadline under Section 7.07 for completion of the stadium is not met, the team shall be entitled to recover from the Commission "any compensatory damages suffered by the Team," to be determined by a complicated formula, which would cost the District many millions of dollars.

8.      The losses to the District, its residents, and particularly its youth from a departure of the team from Washington, D.C., are by no means limited to the money damages provisions of the Agreement.  Section 6.12 and the BSA Letters impose a whole series of "Community Benefit Obligations" on the team, as follows:

    a)  establishing, funding and promoting a charitable foundation to benefit primarily youth and other residents of the District.
    b)  maximizing benefits for youth and other residents of the District from a variety of charitable organizations and programs already run by Major League Baseball.
    c)  requesting and encouraging its advertisers to contribute to the foundation described in subsection a above.
    d)  requesting and encouraging its players and other team personnel to contribute financially and through appearances and other means to the foundation and other organizations benefiting youth and other residents of the District.
    e)  providing discounted and free ticket programs designed to keep major league baseball games affordable for youth in partnership with the D.C. charities.
    f)  taking affirmative steps to promote the employment of District residents in the teams' operations and affording local, small, and disadvantaged businesses in the District an equal opportunity to compete for business in the supply of goods and services to the team.
    g)  if the franchise is sold within a specified period, paying a substantial amount to the Commission.

These "Community Benefit Obligations" would disappear if the team left the District.

9.      Loss of the team would also result in a loss of at least one hundred and fifty million dollars in rent payments to the District, under the Rent Schedule, Exhibit E to the Agreement, and the loss of jobs and business opportunities for District residents.  In addition, the drastic economic effects on the area around the new stadium would include the defeat of current plans for development of the surrounding community, a decline in property values for those who have invested in the area in reliance on the construction of the new stadium, and an adverse impact on the District's credibility planning for its future.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on July 22. 2005.

_____
Mark H. Tuohey III

THE BASEBALL AGREEMENT IS EXHIBIT 5 TO PLAINTIFFS' APPLICATION
FOR A PRELIMINARY INJUNCTION.

IT IS INCORPORATED BY REFERENCE INTO THE DECLARATION OF MARK H.
TUOHEY, III, SO AS TO AVOID UNNECESSARY DUPLICATION



December 14, 2004

Mr. Mark Tuohey
Chairman
D.C. Sports & Entertainment Commission
1455 Pennsylvania Avenue NW
Washington DC 20004-1008

Dear Chairman Tuohey:

Over the past several months we have enjoyed working with the D.C. Sports & Entertainment Commission, the Office of the Mayor and representatives of the D.C. Council to bring baseball back to Washington. Based upon the strength of the District's proposal and the trust that has developed among the parties, we entered into the Baseball Stadium Agreement and recommended the relocation of the team to Washington D.C. In reliance on and in accordance with the Baseball Stadium Agreement, Major League Baseball approved the relocation on December 3, 2004. The Nationals are now fully in motion making preparations to begin playing baseball in Washington in April. It will be an exciting time for us and for baseball fans in the Nation's Capital.

We are certainly aware that the City's legislation is scheduled for final approval on December 14th and that Chairman Cropp raised a number of matters she hoped could be made more definitive. We have gone over those items carefully, and we understand and appreciate Chairman Cropp's attention to the public interest.

To ensure the long term success of Major League Baseball in the Washington D.C. community, we believe it is essential that the Washington Nationals be a responsible and generous citizen of the District of Columbia. In that spirit, it has always been and will continue to be our sincere intention to cooperate with the District.

We can make the following substantial commitments on the assumption that the legislation will be fully consistent with the Baseball Stadium Agreement:

1.  If the District wants to pursue alternative private financing, we will have no objection so long as the terms are in compliance with the Baseball Stadium Agreement.

2.  Chairman Cropp was interested in increasing the number of days the Commission could use the new ballpark beyond the twelve allotted in the Baseball Stadium Agreement.

WASHINGTON NATIONALS  °  RFK STADIUM  °  2400 EAST CAPITAL STREET SE  °  WASHINGTON DC 20003

Although national experience indicates that twelve is more than will be used, we are willing to increase the number by 50% for a five-year trial period with up to eight dates during the season and the remainder during the November 1 to March 1 off-season subject to the limitations of Section 6.03 of the Baseball Stadium Agreement.

3.  In the Baseball Stadium Agreement we agreed to have an affordable ticket program. In accordance with Section 6.12 of the Baseball Stadium Agreement, starting with the 2005 season, we will make a 3-year commitment to (a) have at least one-half million regular season tickets per year priced in the range of $7 to $10 per ticket, (b) assure that at least 25,000 regular season tickets per year will be allocated to an affordable ticket program at between $3.50 and $5.00 per ticket, and (c) distribute 8,000 free regular season tickets each year to appropriate D.C. charities that will make such tickets available to underprivileged youth accompanied by adult mentors.

4.  The Baseball Stadium Agreement requires the team to encourage its players and other team personnel to make personal appearances. Pursuant to Section 6.12 of the Baseball Stadium Agreement, in each of our first three seasons we will work with our players and our coaches to make at least 50 separate public appearances in the District in support of education, youth sports and/or other public service activities.

5.  We agreed in Section 6.12 of the Baseball Stadium Agreement to maximize benefits for youth and the residents of the District of Columbia from Major League Baseball's charitable organizations and programs. Pursuant to that commitment, Major League Baseball and the Major League Baseball Players Association's "Baseball Tomorrow Fund" recently committed $100,000 for the renovation of the baseball field at Ft. Greble Recreation Center. In addition, Major League Baseball has developed plans to expand the District's "Reviving Baseball in Inner Cities" Program and provide additional support for the "Field of Dreams" Elementary School Program.

6.  We appreciate Chairman Cropp's concern about cost overruns and late completion. Everyone suffers if they occur and so we have a mutual interest in avoiding them. Although the D.C. Sports & Entertainment Commission controls the construction process, we nevertheless agreed in the Baseball Stadium Agreement to bear a fair share of financial losses arising from late completion when neither of us is at fault. And we agreed to be responsible for cost overruns caused by design changes and construction change orders made at our request. The Baseball Stadium Agreement establishes a Project Coordination Team to coordinate our efforts in dealing with items of mutual concern. The Nationals will have a representative on that Coordination Team. Among other things we expect that it will deal with matters such as insurance programs, construction contracts and surety arrangements that will provide the District and us with substantial financial protection against overruns and late completion risks. For example, we expect to work with the Commission to develop construction documents that shift

2

substantial risk and responsibility to the general contractor for cost overruns and late completion.

7.     The Baseball Stadium Agreement requires the District, the Commission and the Nationals to enter into a Construction Administration Agreement that will contain the detail on how the risks of late completion are allocated. To help respond to Chairman Cropp's concerns about the extent of District/Commission exposure to late completion damages, we are willing to include in the Construction Administration Agreement a provision that allows the Commission to pay any amounts that may become due to the Nationals under Section 8.04(c)(iii) of the Baseball Stadium Agreement by abating, to the extent necessary, the license fees for the use of RFK Stadium after March 1, 2008 and reducing the rent at the new ballpark by $1 million in the first year and $1.25 million in each of the second and third years or such higher amounts as the Commission determines. Any unpaid amounts owing to the Nationals under Section 8.04(c)(iii) would accrue interest at 5% per annum (non compounded) and be due upon the earlier of a termination under Section 8.03 of the Baseball Stadium Agreement or the end of the third lease year at the new ballpark. Furthermore, we are willing to include a provision in the Construction Administration Agreement that would cap the maximum liability to the Nationals under Section 8.04(c)(iii) of the Baseball Stadium Agreement at $19 million per year in respect of each of the two years of potential exposure.

8.     The Nationals are excited to announce yet another community initiative. Promptly after the enactment of the legislation, the Nationals will create a foundation to help carry out the community benefit programs promised in the Baseball Stadium Agreement. The foundation will invite the Chairman of the D.C. Sports & Entertainment Commission to appoint a person to the foundation board. To jumpstart the funding of the foundation we will play an exhibition game at RFK on April 3rd of next year and donate the entire net gate and concession proceeds to the foundation. We will also join with our players in hosting a "Red, White and Blue" gala and auction to be held in the District early in the first season and donate all of the net proceeds to the foundation.

Thank you again for all of your efforts to bring baseball back to Washington. The new ballpark will be a wonderful investment in the District, and the Nationals will do their part to make everyone proud of it.

Very truly yours,

Baseball Expos, L.L.P.

By: _Tom Cselgo_

By _____
_Attorney-in-fact_

3



December 20, 2004

Mr. Mark Tuohey
Chairman
D.C. Sports & Entertainment Commission
1455 Pennsylvania Avenue NW
Washington DC  20004-1008

Dear Chairman Tuohey:

On December 14th the Nationals acknowledged that the District may pursue alternative private financing so long as the obligations and economics under the Baseball Stadium Agreement were preserved.  Since that time we have been part of ongoing efforts to deal with some of the remaining concerns of the Council.  On the assumption that the final legislation will be fully consistent with the Baseball Stadium Agreement, we are willing both to assist with a risk mitigation program and to relieve the Commission and the District of some exposure to liability under Section 8.04(c)(iii) of the Baseball Stadium Agreement.  Section 8.04(c)(iii) deals with compensatory damages in cases where the completion deadline is missed notwithstanding the Commission's reasonable best efforts to meet the deadline.

We deliver this letter as a further accommodation and in the spirit of cooperation.  Contingent upon the enactment of legislation on December 21st consistent with the Baseball Stadium Agreement as modified by this letter, we confirm our December 14th letter with the exception that paragraph 7 thereof is replaced by the following:

"7.     To reduce the exposure of the Commission and the District, the Nationals are willing to include the following provisions in the Construction Administration Agreement:

(a) The Nationals will work with the Commission to implement a risk management program to reduce the Commission's exposure to cost overrun and late completion risk. Specifically the Nationals will share 50/50 with the Commission the cost of a program that includes: (i) a mutually selected independent insurance consultant engaged to advise on the procurement of construction period insurance and the cost effective allocation of late completion risk in the Commission's construction documents; (ii) mutually selected construction period insurance, plus such special insurance against the risk of late completion as the Nationals may reasonably request; and (iii) a mutually selected value engineering

002.1314741.1

consultant engaged to advise the Project Coordination Team on mitigation of cost overrun risk.

(b) To the extent that the Nationals are entitled to compensatory damages under Section 8.04(c)(iii) as a result of a force majeure event for which there is insurance coverage under paragraph (a)(ii), the Nationals' recourse to the Commission and the District for the recovery of such damages will be limited exclusively to the proceeds of the insurance.

(c) To the extent that the Nationals are entitled to compensatory damages under Section 8.04(c)(iii) for any reason other than the one described in paragraph (b), the Nationals' recourse to the Commission and the District for the recovery of such damages (after giving effect to any insurance or other third party recoveries) will be limited exclusively to a right of offset against license fees at RFK Stadium for 2008 in respect of damages from the first year following the missed deadline. Damages under Section 8.04(c)(iii) in respect of a second year following the missed deadline would be capped and payable as described in our letter of December 14th."

We make these commitments to foster good will and build a strong public/private partnership in what we hope will be our new hometown.

Very truly yours,

BASEBALL EXPOS, LLP

By: _____

_____
Attorney-in-fact

002.1314741.1