UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )

ROSE RUMBER                                          )
2648 Naylor Road, S.E.                               )
Washington, D.C.  20020                              )
(202) 582-7500                                       )
                                                     )
JOSEPH RUMBER                                        )
2648 Naylor Road, S.E.                               )
Washington, D.C.  20020                              )
(202) 582-7500                                       )
                                                     )
MARION FLETCHER                                      )      Civil Action No. 04-1170 RMU
2832 Alabama Avenue, S.E.                            )
Washington, D.C.  20020                              )
(202) 583-4579                                       )
                                                     )
GRAHAM FIELDS                                        )
2840 Alabama Avenue, S.E.                            )
Washington, D.C.  20020                              )
(202) 582-1991                                       )
                                                     )
VERNA FIELDS                                         )
2840 Alabama Avenue, S.E.                            )
Washington, D.C.  20020                              )
(202) 582-1991                                       )
                                                     )
BOUBAKER BEN SALAH                                   )
2716 Naylor Road, S.E.                               )
Washington, D.C.  20020                              )
(202) 581-4800                                       )
                                                     )
MUNEER CHOUDHURY                                     )
2636 Naylor Road, S.E.                               )
Washington, D.C.  20020                              )
(202) 575-3535                                       )
                                                     )
PETER DESILVA                                        )
2648 Naylor Road, S.E.                               )
Washington, D.C.  20020                              )
(410) 268-8000                                       )
                                                     )
QUVAL LE                                             )

1

2824A Alabama Avenue, S.E.                    )
Washington, D.C.  20020                       )
(202) 582-2083                                )
                                              )
MOON KIM                                      )
2826 Alabama Avenue, S.E.                     )
Washington, D.C.  20020                       )
(202) 575-1612                                )
                                              )
DUK HEA OH                                    )
2842 Alabama Avenue, S.E.                     )
Washington, D.C.  20020                       )
(202) 583-7160                                )
                                              )
IN SUK BAIK                                   )
2846 Alabama Avenue, S.E.                     )
Washington, D.C.  20020                       )
(202) 582-9000                                )
                                              )
MUKHTAR AHMADI                                )
2716 Good Hope Road, S.E.                     )
Washington, D.C.  20020                       )
(202) 581-4800                                )
                                              )
SON CHA KANG                                  )
2712 Good Hope Road, S.E.                     )
Washington, D.C.  20020                       )
(202) 581-7646                                )
                                              )
                                              )
INGAK LEE                                     )
2712 Good Hope Road, S.E.                     )
Washington, D.C.  20020                       )
(202) 581-7646                                )
                                              )
HARTEJ SINGH                                  )
2812 Alabama Avenue, S.E.                     )
Washington, D.C.  20020                       )
(202) 582-3808                                )
                                              )
LING CHEN                                     )
2824 Alabama Avenue, S.E.                     )
Washington, D.C.  20020                       )
(202) 583-8888                                )
                                              )
            Plaintiffs,                       )

2



)
        v.                         )
)
THE DISTRICT OF COLUMBIA    )
Office of the Mayor              )
1350 Pennsylvania Avenue, N.W.  )
Washington, D.C.  20004      )
(202) 727-2980                 )
)
NATIONAL CAPITAL         )
  REVITALIZATION CORPORATION  )
1801 K Street, N.W.            )
Suite 1210                    )
Washington, D.C.  20006      )
(202) 530-5750                 )
)
             Defendants.      )
_____)

## AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

The plaintiffs, who are property owners and tenants in the Skyland Shopping Center and the adjoining neighborhood, bring this Complaint and allege as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory judgment and injunctive relief in support of the equal protection and property rights of the plaintiffs, which were abridged by the enactment of legislation of the District of Columbia and by the actions of the National Capital Revitalization Corporation ("NCRC").

2.      The legislation in question is a series of bills concerning Skyland Shopping Center. The first is Bill 15-829, the National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Emergency Amendment Act of 2004, Act No. 15-440 ("First Skyland Emergency Act").  The legislation authorizes, on an emergency basis, the NCRC to exercise eminent domain over the property at the Skyland Shopping Center and the surrounding neighborhood.

This Skyland Emergency Act was passed by the Council of the District of Columbia ("Council") on May 4, 2004, and signed by the Mayor on May 21, 2004. A second emergency bill, Bill No. 15-952, the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Congressional Review Emergency Amendment Act of 2004" was passed on August 2, 2004, and was set to expire on October 31, 2004 ("Second Skyland Emergency Act") The temporary bill, "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Temporary Amendment Act of 2004," Bill 15-830, was passed by the Council and became Law 15-193 on September 30, 2004. The permanent bill, the "National Capital Revitalization Corporation Eminent Domain Clarification and Skyland Eminent Domain Approval Amendment Act of 2004," Bill 15-752, is pending before the Committee on Economic Development of the Council of the District of Columbia.

3.     By letter dated May 17, 2004, Mayor Anthony A. Williams transmitted to the Council a proposed resolution, which would authorize the creation of a "Retail Priority TIF Area" to support the redevelopment of over 200,000 square feet of retail activity known as the Skyland Project. The proposed resolution, Resolution 15-860, is titled, "Skyland Project Retail Priority Area Approval Resolution of 2004." According to Mayor Williams' letter, the Skyland Project will be located at the intersection of Alabama Avenue, S.E., Naylor Road, S.E., and Good Hope Road, S.E., in Ward 7, on the present Skyland Shopping Center. Plaintiffs respectfully request that this litigation apply to all of the Skyland legislation (collectively, the "Skyland Acts").

4.     Plaintiffs ask the Court for a declaratory judgment that the enactment and execution of the Skyland Acts constitute an unconstitutional taking of their property, in violation of the Fifth Amendment of the United States Constitution. Plaintiffs also ask the Court for a declaratory judgment that the Skyland Acts are in violation of the equal protection provision of the Fifth Amendment. In addition, plaintiffs request injunctive

relief, prohibiting the taking of their property through eminent domain, so that they may continue to enjoy their property rights and that those rights will not be threatened, abridged or harmed by the District of Columbia and the NCRC.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b).

**THE PARTIES**

7. Plaintiffs are property owners and tenants in the Skyland Shopping Center and its neighborhood.  The Skyland Shopping Center (hereinafter sometimes referred to as "Skyland") is an approximately 16.5 acre shopping center at the intersection of Alabama Avenue, Good Hope Road, and Naylor Road, S.E.

8. The Skyland Shopping Center has been fully leased for the last five years and many of the tenants have long-term leases. The present tenants include regional and national retailers, as well as a variety of neighborhood businesses, which could be described as "mom-and-pop" businesses.

9. Plaintiffs Rose and Joseph Rumber are the owners of Skyland Liquors, located at 2648 Naylor Road, S.E.  The Rumbers, who were long-time employees at the store, purchased it in August 2003.  They have used their home on Minnesota Avenue, S.E., to secure  monthly payments of $4,732 for the next twelve years.  If their property is taken, they will likely lose both their business and their home.  In addition, it is doubtful whether a liquor store could be relocated, because of the need for a liquor license and the difficulty and expense associated in obtaining a liquor license in the District of Columbia. Plaintiff Peter DeSilva owns the building and property on which Skyland Liquors does business.

10. Plaintiff Marion Fletcher is the tenant who owns Fletcher's Beauty Salon, located at 2832 Alabama Avenue, S.E.  She has been associated with this business for thirty-three years and worked her way up from hair operator to manager to shop owner in

5

eighteen years.

11.     Plaintiffs Graham and Verna Fields are the owners and tenants of Fields Records and owners of Alexis Hair Gallery, located at 2840 Alabama Avenue, S.E.  They have been property and business owners in Skyland Shopping Center since 1968.

12.     Plaintiff Boubaker Ben Salah is the tenant and plaintiff Mukhtar Ahmadi is the owner of New York Fried Chicken, located at 2716 Good Hope Road, S.E.

13.     Plaintiff Muneer Choudhury is the tenant at the Blimpie franchise, located at 2636 Naylor Road, S.E.  He has signed a ten-year lease for this franchise and has a substantial investment in this store.

14.     Plaintiff Quval Le is the tenant at Beauty Nail, located at 2824A Alabama Avenue, S.E.

15.     Plaintiff Moon Kim is the tenant at Beyda Beauty, located at 2826 Alabama Avenue, S.E.

16.     Plaintiff Duk Hea Oh is the owner of Beauty World, located at 2842 Alabama Avenue, S.E.

17.     Plaintiff In Suk Baik is the owner of Alabama Express Liquors, located at 2846 Alabama Avenue, S.E., and has been the owner since 1989.

18.     Plaintiff Son Cha Kang is the tenant at Hilltop Cleaners, located at 2712 Good Hope Road, S.E.

19.     Plaintiff Ingak Lee is the owner of Hilltop Cleaners, located at 2712 Good Hope Road, S.E.

20.     Plaintiff Hartej Singh is the tenant at Check Cashing, located at 2812 Alabama Avenue, S.E.

21.     Plaintiff Ling Chen is the manager at Kelly's Carryout and, upon information and belief, her parents are the tenants at Kelly's Carryout, located at 2824 Alabama Avenue, S.E.

22.     Defendant District of Columbia is a municipal corporation, which is the

city government of Washington, D.C.

23.     Defendant National Capital Revitalization Corporation is an instrumentality of the District of Columbia, established pursuant to D.C. Code § 2-1219.01 *et seq.*

## FACTUAL AND LEGAL BACKGROUND

24.     The Skyland Acts provided that "the Council, finding that the properties below are necessary and desirable for the public use, approves the exercise of eminent domain by the National Capital Revitalization Corporation" for the properties described below in paragraph 24.

25.     The Skyland Acts provided that the Council approved the exercise of eminent domain by the National Capital Revitalization Corporation ... for the following parcels, lots and squares:

> Square 5632, Lot 1; Square 5632, Lot 2; Square 5632, Lot 3; Square 5632, Lot 4; Square 5632, Lot 5; Square 5632, Lot 802; Square 5633, Lot 800; Square 5633, Lot 801; Square 5641, Lot 0010; Square 5641, Lot 0011; Square 5641, Lot 0012; Square 5641, Lot 0012 [sic]; Square 5641, Lot 0891; Square 5641N, Lot 0012; Square 5641N, Lot 0013; Square 5641N, Lot 0014; Square 5641N, Lot 0015; Square 5641N, Lot 0016; Square 5641N, Lot 0017; Square 5641N, Lot 0018; Square 5641N, Lot 0019; Square 5641N, Lot 0020; Square 5641N, Lot 0021; Square 5641N, Lot 0022; Square 5641N, Lot 0023; Square5641N, Lot 0024; Square 5641N, Lot 0025; Square 5641N, Lot 0026; Square 5641N, Lot 0027; Square 5641N, Lot 0028; Square 5641N, Lot 0029; Square 5641N, Lot 0030; Square 5641N, Lot 0031; Square 5641N, Lot 0033; Parcel 02130052; Parcel 02130060; Parcel 02130061; Parcel 02140062; Parcel 02140088; Parcel 02140104; Parcel 02140182; Parcel 02140187; Parcel 02140189; Parcel 02140190; and Parcel 0214016 and for any other parcel located within the geographic area bounded by a line **BEGINNING** at a point at the intersection of the northerly line of Good Hope Road, S.E., with the northerly line of Alabama Avenue, S.E., and running thence Northwesterly along said line of Good Hope Road, S.E., extended, to intersect a point on the east line of Naylor Road, S.E.; thence Northwesterly along said line of Naylor Road, to a point at the northwesterly corner of Lot 801 in Square 5633; thence Northeasterly along the northerly line of said lot & square, to a point at the westernmost corner of Parcel 213/52; thence continuing northeasterly along the northerly line of said Parcel 213/52, to a point at

7

the southwesterly corner of Parcel 213/60; thence northwesterly along the arc of a curve, deflecting to the right, along the westerly line of said Parcel 213/60, to a point at the northernmost corner of said Parcel 213/60; thence Southeasterly along the easterly lines of said Parcels 213/60 and 213/52, to a point at the northwesterly corner of Lot 33 in Square North of Square 5641; thence Easterly along the north property lines of said Lot 33, and Lots 16 through 31, both inclusive, in Square North of Square 5641, to a point at the northeast corner of said Lot 31 in said square; thence South along the east line of said Lot 31 in said square, to a point at the southeast corner thereof; thence Westerly along the south lines of said Lots 31, 30, 29, 28, 27, 26, 25, 24, 23 and 22 in said square, to a point at the southwest corner of said Lot 22, to intersect a line drawn Northwesterly from the northeast corner of Lot 12 in Square North of Square 5641; thence Southeasterly along said line drawn and the east lien of said Lot 12 in said square, to a point at the southeast corner thereof, to a point that intersects a line drawn Northwesterly from the northeast corner of Lot 13 in Square 5641; thence Southeasterly along said line drawn and the east line of said Lot 13 in said square, to a point at the southeast corner thereof, thence Southwesterly along the south property lines of Lots 13 and 12 in Square 5641, to a point that intersects a line drawn Northwesterly from the northeast corner of Lot 819 in Square 5641; thence Southeasterly along said line drawn and the east line of said Lot 819 in said square, to a point at the southeast corner of said Lot 819 in said square, on the north line of Alabama Avenue, S.E.; and thence southwesterly along the arc of a circle, deflecting to the right, along said line of Alabama Avenue, to the point of beginning.

26.     In a letter dated May 3, 2004, from Theodore N. Carter, President and Chief Executive Officer, NCRC, to Councilmember Harold Brazil, Chairperson of the Committee on Economic Development of the Council of the District of Columbia, Mr. Carter stated:

> Second, the amendment ensures that the Skyland project can be undertaken in a timely manner.  As I emphasized in my testimony, NCRC will not exercise eminent domain until there is a commitment from an anchor tenant.  In addition, eminent domain may not ever be required depending upon the results of the negotiations conducted with the property owners.  However, the existing legislation does not specify when the Council needs to approve the exercise of eminent domain.  NCRC wanted the Council to authorize the redevelopment of the area and approve this project before acquisition of the Skyland parcels began, not after.  We believe that advance approval for this authority will make it more likely that it will never be used.

27.     A joint hearing was conducted on June 17, 2004, before the Committee on

Economic Development and the Committee on Finance and Revenue of the Council of the District of Columbia. A Statement of the Office of the Deputy Mayor for Planning & Economic Development was presented at that hearing (the "Deputy Mayor's Statement"). The Statement included the following explanation about the proposed Skyland project: "The proposed tenant mix includes a deep discount retailer like a Target, another so-called 'big box' anchor, 90,000 square feet of space that would suit smaller retailers and a sit-down family restaurant. The proposed layout features both community space and over 900 parking spaces. You can see here the latest site plan that now is its [sic] conceptual stages. The community will have an opportunity to participate in a planning session to rank their preferred retailers on the site."

28. The Deputy Mayor's Statement described the timeline for the Skyland development, as follows: "There are two phases to the Skyland redevelopment. NCRC would lead the first phase and the private development team would lead the second phase. NCRC and the District would still control the activities of the second phase. The private development team is composed of the Rappaport Companies, Harrison-Malone Development, LLC, the Washington East Foundation and Marshall Heights Community Development Organization. During the first phase, NCRC would acquire the land, clean it, relocate the tenants, demolish the existing buildings and convey a clean site to the private development team. During the second phase, the private development team would build, lease, market and operate the new Skyland. NCRC expects to purchase the first parcels in the fall of 2004. NCRC expects to begin demolition and site work in the summer of 2006. The new Skyland is expected to open its doors in late 2007."

29. The Deputy Mayor's Statement indicated that "(t)he new Skyland offers three kinds of benefits: better neighborhood amenities, new jobs and new tax revenues."

30. The Deputy Mayor's Statement described the benefits of the proposed project as including: about 300 construction jobs, 300 net new permanent jobs and about $4.8 million in taxes annually, of which about $3.3 million would be net new taxes.

31.     Upon information and belief, plaintiffs submit that the dollar amount projected by the District of Columbia and NCRC needed to acquire the Skyland properties and develop the new Skyland is wholly inadequate and uncertain.

32.     Upon information and belief, the proposed budget of $2.4 million for the relocation of tenants is wholly inadequate.

33.     Upon information and belief, the budget for land assembly and site preparation has been estimated at $24.9 million. Upon information and belief, the Office of the Deputy Mayor and the NCRC will spend well over $25 million in land assembly and site preparation and then sell that property to a private development entity for between $4 million and $5 million.  Upon information and belief, such an acquisition would be a windfall to the private development entity of well over $20 million, at the expense of the plaintiffs, other property owners and tenants, and D.C. taxpayers..

34.     Upon information and belief, on June 17, 2004, and thereafter, the NCRC sent a "Notice of Interest" letter to persons who own property in and around Skyland. The Notice of Interest stated that "On May 4, 2004, the District of Columbia City Council ... authorized the acquisition of the Skyland parcels, by eminent domain if necessary, by the National Capital Revitalization Corporation ...  Such acquisitions will occur for the purposes of redeveloping Skyland into a first class retail center."

35.     The Notice of Interest letter stated that within the next sixty to ninety days, real estate brokers would be calling to schedule a meeting to discuss the terms and conditions whereby NCRC may acquire the property without exercising its eminent domain authority.

36.     The Notice of Interest letter stated that, if there is a business at the site, the property owner may also be eligible to receive certain relocation assistance.  This relocation assistance would include payment for actual moving expenses and payment for reestablishment expenses up to $10,000.

37.     Upon information and belief, the compensation available to tenants would

be as provided by the Uniform Relocation Assistance and Real Property Acquisition Policy Act of 1970 (URA), 42 U.S.C. §§ 4621-4638 and the District of Columbia Municipal Regulations (DCMR), Title 10, Chapter 22.  Upon information and belief, the URA does not provide for a hearing to determine relocation benefit claims.  Under the pertinent regulation, 49 C.F.R. § 24.304(a)(6), the maximum allowed for reestablishment expenses is $10,000.

38.     Upon information and belief, plaintiffs submit that any reimbursement for relocation, including reestablishment expenses up to $10,000, is wholly inadequate. Plaintiffs, including tenants, cannot reestablish their businesses elsewhere for $10,000.

39.     Upon information and belief, plaintiffs, including tenants, submit that relocation of their businesses may not be possible or feasible. If plaintiffs are unable to find another suitable location in which they can operate their businesses, then any monetary compensation will not be adequate to cover the loss of having their own businesses. Plaintiffs submit that, among other things, the pride, satisfaction and emotional reward of being a business owner or manager cannot be adequately compensated in mere monetary terms.

40.     Upon information and belief, the plaintiffs represent the type of individuals who have contributed to our country and our community through their initiative and entrepreneurial efforts. In addition, they comprise a diverse group, which is a characteristic to be encouraged in our society.  If the plaintiffs are forced to relocate or close their businesses, their efforts and initiative will be diminished if not completely destroyed.

41.     Plaintiff In Suk Baik, in a letter dated April 22, 2004, to the D.C. Council concerning the eminent domain legislation, stated that:

> My family came to America from Korea almost 20 years ago, have worked hard to adapt in the changing block of Alabama Avenue, S.E., Washington, D.C., for 15 years.  I have passionate appreciation for the freedom of opportunity and enterprise available in this adopted country.  That instilled

11

in me a sense of responsibility to provide customers the best service possible.  To achieve your dream by sheer hard work and persistence.  That everything is possible, having owned a property is one of those "American Dreams."  In America, I own my property until I decide to sell it, but not forced to give it up.

42.     On or about June 16, 2004, NCRC sent a letter to the tenants of Skyland Shopping Center ("June NCRC Letter").  The June NCRC Letter stated that "Over the course of the next few months, the National Capital Revitalization Corporation ("NCRC") will be submitting a written offer to buy the building at the Skyland Shopping Center ("Skyland') where you operate your business.  The building is at a site where NCRC, in partnership with the government of the District of Columbia, has made plans for a new redeveloped shopping center.  NCRC is making progress with the Skyland redevelopment plans and we are now working on a Skyland relocation plan to assist all eligible affected businesses."

43.     The June NCRC Letter also stated that the tenant may be eligible to receive certain relocation assistance.  This relocation assistance would include payment for actual moving expenses and payment for reestablishment expenses up to $10,000.

44.     The June NCRC Letter to the tenants stated that a meeting to discuss relocation issues had been tentatively scheduled for July 22, 2004.  The letter further stated that "you are advised not to move before we have a chance to discuss your eligibility for relocation assistance.  Additionally, your business will not be required to move without at least 90 days' advance written notice."

45.     The property owners and tenants are facing extreme uncertainty concerning their property and businesses. The property owners may be required to sell their property, but do not know when that forced sale would occur. The tenants are facing the requirement of moving their business upon receiving 90 days' written notice. They are unable to make plans about their property and businesses and they have no assurance that they will even be able to stay in business. Any effort or funds expended in improving or maintaining the property appears wasted and unlikely to generate any return on

12

investment.

46.     The property owners and tenants have been harmed by the uncertainty generated as a result of the passage of the Skyland Acts. The harm is caused, among other things, by the lack of information, the damaging public rhetoric about Skyland, the creation of an unstable business environment at Skyland, the lack of a substantive and feasible relocation plan and the changing management at NCRC.  On this last element of causation, according to The Washington Post, the NCRC has gone through several leadership changes.  One chief executive stepped down in 2002, the next two successors served about six months each and chief executive Theodore N. Carter resigned in August 2004.  See Dana Hedgpeth and Neil Irwin, "Carter Steps Down as NCRC's Chief Executive," The Washington Post, August 11, 2004, at E2.

47.     Upon information and belief, tenant leases typically contain an eminent domain clause. The clause provides that tenants receive essentially no compensation or anything else, except for possibly relocation expenses and payment for non-removable trade fixtures and other equipment installed by the tenant, in the event of an eminent domain taking.  As a result, any eminent domain proceeding will leave the tenants with virtually no compensation and no benefit as a result of such action.

48.     In a letter dated July 26, 2004, to property owners, NCRC stated that it had retained Millennium Real Estate Advisers to conduct real property appraisals of the property at Skyland Shopping Center.  The letter stated that NCRC had commissioned the appraisal in preparation for making an offer to purchase the property.

49.   Upon information and belief, in a letter dated August 23, 2004, to Skyland property owners, Millennium Real Estate Advisers stated it would be conducting real estate appraisals on behalf of NCRC. The inspections were scheduled for August 25, 2004, and August 26, 2004.

50.     The tenants have been contacted by Diversified Property Services, Inc., concerning relocation plans.  They have been given a booklet from Diversified Property

Services, Inc., titled, "Relocation Assistance for Displaced Businesses."

51.     The booklet states, "As the owner of a displaced business, you are eligible to receive relocation assistance under the provisions of Public Law 91-646, otherwise known as *The Uniform Relocation Assistance and Land Acquisition Policies Act of 1970 (URA)*, as amended." The booklet advises that the owner may select one of two methods for receiving monetary payments - the actual cost method and the fixed payment reimbursement.

52.     The booklet states that the actual cost method provides for reimbursement for moving expenses. It also provides for costs incurred in searching for a new location. The search costs are limited to a maximum payment of $1,000. There is also a reestablishment allowance, which has a maximum payment of $10,000.

53.     The booklet states that certain types of expenses are not reimbursed under the Uniform Relocation Act. The nonreimbursable expenses include costs for physical alterations to the real property at the replacement site, loss of goodwill, loss of profits, loss of trained employees, purchase of capital assets such as office furniture, machinery, equipment or trade fixtures. This list of nonreimbursable expenses is not an exclusive list.

54.     The booklet states that the fixed payment provides fore payment of up to $20,000. That amount is all-inclusive and additional payments for moving costs, search expenses, personal property losses or a reestablishment allowance are not permitted.

55.     Upon information and belief, the relocation assistance is completely inadequate. There is no assurance that Diversified Property Services, Inc., will be able to find a replacement location for the tenants. Even if a comparable replacement location can be obtained, the tenants will have to attempt to restart their business and seek new customers.

56.     Upon information and belief, Diversified Property Services, Inc., has suggested that the tenants move to Prince George's County, Maryland. The forced

14

relocation to Maryland from the District of Columbia would destroy or severely hinder the customer relationships and business contacts established by being in business for many years.  Many of the customers use Skyland because of its proximity to their residences.  Those customers would be lost if the businesses are forced to move to Maryland.  The economic benefit from those merchants, including tax revenue and jobs, would be transferred from the District of Columbia to Maryland.

57.     Councilmember Jim Graham wrote to Anthony Freeman, NCRC, in a letter dated October 15, 2004. He noted that NCRC CEO Ted Carter had made a pledge in response to Councilmember Graham's question at an D.C. Council Economic Development Committee on April 28, 2004.  That pledge was that "NCRC will not begin land acquisition until we have secured a retailer commitment." In the October 15, 2004, letter, Councilmember Graham stated that "I am concerned that the NCRC may have taken actions that do not comport with this pledge.  I am advised that, even though there is still no tenant, property owners have received various notices from the NCRC concerning the proposed taking of their properties.  Indeed, in September 2004, I was told the NCRC contacted tenants about the relocation of their businesses.  Therefore, I would like clarification about what exactly the NCRC is doing, both in regards to property owners and tenants, and if there are any retail anchors that have committed to the Skyland site.  Please provide me with copies of any NCRC notices sent to Skyland tenants."

58.     The officials of the District of Columbia government, including members of the D.C. Council, have singled out the class of owners and tenants at Skyland with the objective of taking their property and placing them in a bad public light.

59.     Members of the D.C. Council have singled out the class of owners and tenants at Skyland and proposed to take the Skyland property to benefit their own interests, including their reelection efforts.  A Washington Post article stated that "Committee Chairman Harold Brazil (D-At Large), who faces potentially stiff competition in his reelection bid this fall, expressed strong support for giving the

15

revitalization corporation the expanded powers it is seeking. So did council member Kevin P. Chavous (D-Ward 7), who represents Hillcrest and Skyland and has been harshly criticized for not doing more to move the project forward. 'This is so important to the lifeblood of our community,' said Chavous, who, like Brazil, is running for reelection this fall. 'We are going to make this happen.'" See Debbi Wilgoren, "Shopping For a New SE Retail Center," The Washington Post, May 2, 2004, at C1.

60.     The actions of Councilmember Chavous were discussed in another Washington Post article, which stated that "Vincent Spalding, president of the Hillcrest Community Civic Association ... credited Chavous with fighting hard to get the city the power to use eminent domain to redevelop Skyland Shopping Center. 'Kevin saw the needs and worked with the community to get that done,' Spalding said." David Nakamura, "Chavous Challenges Notion He's Lost Touch," The Washington Post, September 8, 2004, at B3.

61.     D. C. Councilmembers Brazil and Chavous, who had pushed the Skyland legislation through the D.C. Council, were defeated in the primary election conducted on September 14, 2004.

62.     At a press briefing on August 11, 2004, D.C. Mayor Anthony Williams discussed the taking of the Skyland property. Upon information and belief, Mayor Williams discussed the recent ruling by the Michigan Supreme Court, which overturned a previous ruling that had permitted taking of property for economic development. The court held that the taking was unconstitutional, because it was for a private use, which would benefit private rather than public purposes. Upon information and belief, Mayor Williams stated "Because what's happened is we're seeing an erosion of what is a taking and what is regulation, more and more things are considered a taking and not just regulation, ... And that's troubling. And then when it's a taking the restrictions on when you can take property are becoming more and more severe. Now all that's just a long drawn out longwinded preface to say that in the Skyland situation you have nothing really

16

unique.  ...  But the whole purpose and the whole strategy of economic development is to bring that economic activity up to a higher level.  ...  I can get you thousands of cases where there were ongoing economic interests that were displaced by the new scenario. The question, you know, in public policy, is are they adequately compensated and that we will ensure happens.  I happen to think that it's really disgraceful.  The place looks like a mess, you know.  I go everywhere in the neighborhoods east of the river and what do I hear?  We want the same kind of quality shopping, right, that everybody else in the country's getting right here in the district and here we are trying to bring the same kind of quality, economic viability and activity to our neighborhoods that everybody else has and all we're getting is resistance, and I think it's really sad."

63. Kathy Chamberlain, Chair, Advisory Neighborhood Commission ("ANC") 7B, and vice president of Hillcrest Community Civic Association, was quoted in The Washington Times concerning the proposed development.  She stated that the community "pressured the City Council to pass the legislation because there is no other way to accomplish this redevelopment.  We've been trying to work with the business owners [at Skyland] for years."  According to the article, she stated that some Skyland merchants will be invited back to the new shopping center.  "They're not all banished.  It will depend on what types of retail will work.  Perhaps one of the hair salons would be invited to come back, for example.  ...  We deserve retail opportunities that are of a better quality than what's up there now."  See Guy Taylor, The Washington Times, September 26, 2004, at A9.

64. The Skyland merchants and Ward 7 residents held a rally on September 25, 2004, to show their support for Skyland in its present form, without redevelopment.

65. The existing Skyland Shopping Center has the support of the neighborhood.  There have been petitions in the stores to show support for the existing Skyland.  Upon information and belief, there are approximately 3,600 signatures on the petitions.

17

66.     Prior to the passage of the Home Rule Charter in 1973, the District of Columbia had been delegated a restricted power of eminent domain in D.C. Code § 16-1311.  That statute now provides in part that real property may be condemned in the District of Columbia when the real property is needed by the Mayor for "sites of schoolhouses, fire or police stations, rights-of-way for roads, highways, streets and alleys or parts thereof, rights-of-way for water mains or sewers, or any other authorized municipal use."

67.     The condemnation statute, D.C. Code § 16-1311, was amended in 1983.  The phrase, "or any other authorized municipal use," was added to replace the previous phrase, "or for any other municipal use authorized by Congress."  This amendment was added by D.C. Law 4-201, the "Street and Alley Closing and Acquisition Procedure Act of 1982."  Upon information and belief, this amendment was designed to eliminate the need for the District of Columbia to obtain specific congressional authorization for a condemnation other than those expressly permitted in the statute.

68.     Upon information and belief, a municipal corporation has no inherent power of eminent domain.  The power of eminent domain must be delegated to the municipal corporation by the legislature.  Congress is the legislature that can delegate the power of eminent domain to the District of Columbia.  In the 1983 amendment, the District of Columbia Council passed an amendment to the D.C. eminent domain statute and expanded the authority of the District of Columbia to condemn real property.

69.     Upon information and belief, the District of Columbia had not been delegated the authority by Congress to amend the District of Columbia Code to permit the District of Columbia to exercise a broader power of eminent domain.  In spite of the lack of delegated authority, the District of Columbia Council passed the 1983 amendment that broadened the power of the District of Columbia to use eminent domain and that eliminated the requirement that Congress authorize use of the eminent domain power for purposes other than those expressly provided by statute.

18

70.     The NCRC was created in 1998 by D.C. Law 12-144.  The power of eminent domain was delegated by statute to the NCRC by the D.C. Council in D.C. Code § 2-1219.19.

71.     Upon information and belief, the delegation of the power of eminent domain to the NCRC from the D.C. Council was not authorized by Congress.  Upon information and belief, the District of Columbia cannot redelegate the power of eminent domain to the NCRC without the express authorization by Congress that the D.C. Council has to power to redelegate the power of eminent domain.

72.     D.C. Code § 16-1311 authorizes the use of eminent domain for, in addition to specified purposes, "any other authorized municipal use."  The Skyland Acts provided that "the Council, finding that the properties below are necessary and desirable for the public use, approves the exercise of eminent domain by the National Capital Revitalization Corporation" for the designated properties.  Upon information and belief, the public use described in the Skyland Acts cannot be construed to be a municipal use, as described in D.C. Code § 16-1311

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Taking in Violation of the Fifth Amendment of the United States Constitution)

73..    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 72 as if set forth fully herein.

74.     The Skyland Acts are unconstitutional in that they violate the prohibition in the Fifth Amendment of the United States Constitution against the taking of private property for public use without just compensation.

75.     The Skyland Acts violate the Fifth Amendment by permitting the taking of plaintiffs' property without a valid identified public use or any specific legislative finding concerning the public use anticipated for the property. The projected public use of the

Skyland project and the alleged benefit thereby accruing to the public are wholly speculative and without documentary support. The projected use is a private use and not a public use. The Skyland Acts contain no statutory assurance that the proposed plan will occur or that the public will benefit from the taking.

76.     The Skyland Acts fail to consider the benefits to the public of the present use of the property at the Skyland Shopping Center and the harm that would be suffered by the public in the event of the loss of the Skyland Shopping Center, including the loss of tax revenue, during the time period from the demolition of the Skyland Shopping Center until the time when any new use might occur. As a result, the claim that the taking is for a public use is not supported by the facts or any legislative finding.

77.     Because of their speculative nature, the projected purposes of economic benefit, alleviating unemployment and revitalizing the economic base of the community do not constitute. public use under the takings clause of the Fifth Amendment.

78.     The Skyland Acts violate the Fifth Amendment by permitting the taking of plaintiffs' property for the advantage of other private interests. The taking of the Skyland property is to be followed by turning over the cleaned-up land to a private development entity. The private development entity will receive a windfall of about $20 million, because it will be permitted to purchase the property for $4-5 million after the District of Columbia and NCRC have spent well over $25 million on site preparation costs. The Skyland Acts violate the Fifth Amendment by taking private property for a private use or purpose.

79.     The Skyland Acts violate the Fifth Amendment by permitting the taking of plaintiffs' property beyond the property needed to accomplish the claimed public use. Because the claimed public use is wholly speculative, there is no factual support to establish which parcels and lots are needed to accomplish that claimed public use.

80.     Plaintiffs will suffer irreparable harm and damage to their persons and property unless the defendants are enjoined from taking their property through eminent

domain.

81.     Any state remedies for this taking are unavailable, inadequate or futile.

SECOND CLAIM FOR RELIEF
(Taking and Due Process Violations of the Fifth Amendment
of the United States Constitution)

82.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1
through 81 as if set forth fully herein.

83.     The Skyland Acts are unconstitutional in that they violate the prohibition
in the Fifth Amendment of the United States Constitution against taking of private
property for public use without just compensation and the Due Process Clause by
threatening plaintiffs with the exercise of eminent domain. The plaintiffs are in an
untenable position, because they have been notified that their property is subject to
eminent domain without any firm development plan that would serve the public and
constitute a public use or any timetable during which eminent domain might occur.  The
planned taking is for a private use and not for a public use.

84.     The passage of the Skyland Acts has harmed the plaintiffs and severely
reduced the value of their property and leases, as well as the ability of plaintiffs to
conduct business.  With the anticipated forced sale of their property and closure of their
businesses, plaintiffs cannot conduct business in the usual manner and cannot justify
expenditures for maintenance and improvements. The uncertainty of the time frame
during which eminent domain might occur also constitutes a taking, in that the
uncertainty by itself has reduced the value of plaintiffs' property and restricted plaintiffs'
ability to conduct business in a normal manner.

85.     The projected purposes of economic benefit, alleviating unemployment
and revitalizing the economic base of the community do not constitute. public use under
the takings clause of the Fifth Amendment.

86.     Plaintiffs have suffered and are continuing to suffer great emotional stress

21

and anxiety, because of the threat of eminent domain and the uncertainty and lack of control over their lives and businesses. Plaintiffs have taken pride in their own achievements and hard work and are suffering great stress and humiliation because their property and businesses have been uniquely singled out and targeted for taking and demolition by the District of Columbia and the NCRC.

87.     The passage of the Skyland Acts has, upon information and belief, created doubt, confusion and uncertainty among the customers and employees of plaintiffs, thereby harming plaintiffs' ability to conduct business.  The passage of the Skyland Acts and the related statements made about Skyland by District of Columbia and NCRC officials were achieved without due process for the plaintiffs and in derogation of their businesses and their reputations.

88.     Any state remedies for this taking are unavailable, inadequate or futile.

THIRD CLAIM FOR RELIEF
(Equal Protection Violation of the Fifth Amendment of the United States Constitution)

89.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 88 as if set forth fully herein.

90.     The Skyland Acts are unconstitutional in that they violate the equal protection provision of the Fifth Amendment of the United States Constitution.

91.     Officials of the D.C. government have targeted the group of Skyland owners and tenants for unequal treatment. The officials have abused their authority to seek personal political gain at the expense of the Skyland owners and tenants. The officials have acted maliciously in describing Skyland in negative and derogatory terms, in order to gain favor with voters and others who want Skyland redeveloped at the expense of the District. In the absence of any firm development plans, the D.C. officials have persisted in targeting the group of Skyland owners and tenants. These actions put Skyland businesses and many merchants' livelihood at risk, thereby placing them in a

22

disfavored position compared to other businesses in the District of Columbia.

92.     Upon information and belief, the comments of Kathy Chamberlain, Chair, ANC 7B, and vice president of Hillcrest Community Civic Association, show the contempt with which the Skyland merchants are held by persons in positions of authority. Ms. Chamberlain stated that the City Council was pressured to pass the legislation.  She stated that not all the merchants would be "banished" and "perhaps one of the hair salons would be invited to come back."  She stated that "we deserve retail opportunities that are of a better quality than what's up there now."

93.     Upon information and belief, any state remedies are unavailable, inadequate, untimely and/or futile.

FOURTH CLAIM FOR RELIEF
(Acting without proper statutory authority
and delegation of authority from Congress)

94.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 93 as if set forth fully herein.

95.     The District of Columbia Council passed the 1983 amendment to D.C. Code § 16-1311 without authority from Congress to expand the eminent domain power of the District of Columbia.  The District of Columbia Council granted broader eminent domain power to the District of Columbia without delegation of authority by Congress to broaden the power of eminent domain.

96.     The District of Columbia Council redelegated the power of eminent domain to the NCRC in D.C. Code § 2-1219.19.  The District of Columbia Council has not been authorized by Congress to redelegate the power of eminent domain to the NCRC.

**RELIEF REQUESTED**

WHEREFORE, plaintiffs pray that this Court:

A.     Enter an order declaring that the Skyland Acts are unconstitutional and in

23

violation of the takings provision of the Fifth Amendment of the United States Constitution;

B.      Enter an order declaring that the designation of the properties listed in the Skyland Act as necessary and desirable for the public use is invalid and without factual support;

C.      Enter an order declaring that the Skyland Acts are unconstitutional and in violation of the equal protection provision of the Fifth Amendment of the United States Constitution;

D.      Enter an order declaring that the actions of defendants in their efforts to take the property of the plaintiffs are in violation of the Fifth Amendment of the United States Constitution;

E.      Enter an order declaring that D.C. Code § 16-1311 is invalid in that the 1983 amendment, contained in D.C. Law 4-201, was passed by the District of Columbia Council without delegation of authority from Congress to broaden the power of eminent domain.

F.      Enter an order declaring that D.C. Code § 2-1219.19 is invalid in that it was passed by the District of Columbia Council without delegation of authority from Congress to redelegate the power of eminent domain.

G.      Order injunctive relief by prohibiting the District of Columbia and the NCRC from proceeding or undertaking any additional steps toward taking possession of plaintiffs' property through the power of eminent domain;

H.      Order injunctive relief by prohibiting broadening the power of eminent domain in the District of Columbia by the District of Columbia Council as without statutory authority;

I.      Order injunctive relief by prohibiting exercise of the power of eminent domain by the NCRC as without statutory authority;

J.      Award plaintiffs damages suffered as a result of the actions of the

24

defendants in their efforts to take possession of plaintiffs' property;

K.     Award plaintiffs reasonable attorney's fees and costs incurred in maintaining this action;

L.     Award such other relief as the Court deems just and proper.

Respectfully submitted,

_____
Elaine Mittleman
D.C. Bar # 317172
2040 Arch Drive
Falls Church, VA  22043
(703) 734-0482

Counsel for Plaintiffs