UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SOUHTEAST LAND DEVELOPMENT                )
ASSOCIATION, et al.,                      )
                                          )   Docket No. CA 05-1413
          Plaintiffs,                     )
                                          )
     v.                                   )
                                          )   Washington, D.C.
DISTRICT OF COLUMBIA, et al.,             )   August 5, 2005
                                          )   11:30 a.m.
          Defendants.                     )

                TRANSCRIPT OF PRELIMINARY INJUNCTION
          BEFORE THE HONORABLE RICHARD W. ROBERTS,
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

    For the Plaintiffs:        KIRKPATRICK & LOCKHART NICHOLSON
                               GRAHAM, LLP
                               Barry M. Hartman, Esq.
                               Christopher E. Dominguez, Esq.
                               Charles Lee Eisen, Esq.
                               1800 Massachusetts Avenue, NW
                               Suite 200
                               Washington, D.C.  20036
                               202.778.9000

    For the Defendants:        OFFICE OF THE ATTORNEY GENERAL
                               FOR THE DISTRICT OF COLUMBIA
                               Daniel A. Rezneck, Sr. Asst.
                               Attorney
                               Michael J. Krainak, Asst. Attorney
                               441 4th street, NW
                               Washington, DC  20001
                               202.724.5691

    Court Reporter:            Scott L. Wallace, RDR, CRR
                               Official Court Reporter
                               Room 6814, U.S. Courthouse
                               Washington, D.C. 20001
                               202.326.0566


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1    **FRIDAY MORNING SESSION,  AUGUST 5, 2005**

2    (11:35 a.m.)

3        THE DEPUTY CLERK:  Civil action 05-1413, *Southeast Land*

4    *Development Association, et al., versus the District of Columbia,*

5    *et al.*

6        Counsel, would you please state your names and who you

7    represent for the record.

8        MR. HARTMAN:  Barry Hartman, representing plaintiffs --

9    Kirkpatrick & Lockhart Nicholson Graham, representing plaintiffs.

10        MR. EISEN:  Charles Lee Eisen from Kirkpatrick & Lockhart

11    Nicholson Graham, also representing the plaintiffs, Your Honor.

12        MR. DOMINGUEZ:  Christopher Dominguez, also representing

13    the plaintiffs.

14        THE COURT:  All right.  Good morning.

15        MR. REZNECK:  Good morning, Your Honor.  Daniel Rezneck of

16    the Office of the Attorney General representing the defendants,

17    Your Honor.

18        THE COURT:  Good morning.

19        MR. REZNECK:  Michael Krainak, also with the Office of the

20    Attorney General.

21        THE COURT:  All right.  Good morning.

22        I thought I would allow you all a half hour each side

23    unless you all have discussed something shorter or, hopefully,

24    not need something longer.

25        If not, why don't we go ahead and hear from the

1    plaintiffs.

2         MR. HARTMAN:  May it please the Court, good morning.

3         First I would like to introduce our clients who are in the

4    courtroom, Mr. John Gerstenfeld and Ashley Gerstenfeld with the

5    Southeast Land Development Associates; Mr. Ken Wyban, who owns

6    property in that location, and Mr. Eric Myers, who also owns

7    property in the location at issue.

8         THE COURT:  Good morning.

9         MR. HARTMAN:  Good morning.  Your Honor, the issue before

10   the Court today is whether the defendants should be preliminarily

11   enjoined from entering into any obligation to purchase or acquire

12   what's known as the Primary Ballpark Site where our clients own

13   property because they lack the authority to undertake that

14   action, and because, if relief is not granted pending a further

15   hearing by this Court, it is entirely likely and probable that

16   relief will never be able to be granted to them.

17        THE COURT:  You're saying to enjoin the defendants from

18   entering into any obligation at all?  I take it you mean to

19   completely put the brakes on the entire process of developing a

20   ballpark stadium.

21        MR. HARTMAN:  Your Honor, I'm referring to the specific

22   language in the statute that we're talking about, which is to

23   acquire by purchase or otherwise any of the property.  If they're

24   doing internal things within their own office, I'm not sure

25   that's covered by the statute.  We're focusing on one section of

1    the statute only.

2            THE COURT:  And so in practical terms, though, I'm trying

3    to understand how you would be drafting the proposed order that

4    you would have me enter.  Would it restrain the defendants solely

5    from what, engaging in negotiations with your clients about the

6    purchase of the property?

7            MR. HARTMAN:  I actually have a draft order, Your Honor,

8    with language that I can show you and explain it.

9            THE COURT:  Why don't you just tell me.

10           MR. HARTMAN:  Well, if I may get it.

11           We would word the draft order as follows:  "To enjoin the

12   defendant, the District of Columbia and the Mayor and each of

13   them and their officers and agents; they shall not enter into any

14   obligation to acquire or purchase any property on a site bounded

15   by" -- the Primary Ballpark Site -- "for the purposes set forth

16   in the Ballpark Omnibus Financing and Revenue Act of 2004."

17           That's the only relief we're seeking now until a further

18   hearing on the merits.

19           THE COURT:  I take it, though, some obligations the

20   District might enter into would involve hiring planners,

21   construction people, demolition people, environmental remediation

22   people, a whole host of other kinds of folks to do a wide variety

23   of things in connection with -- excuse me -- trying to develop a

24   stadium.  So that's why I'm trying to understand the scope of

25   what the --

1    MR. HARTMAN: That's an interesting point, Your Honor. In

2   the recent Skyline case -- *Skyland* case that the defendants

3   cited, the defendants argued that the public interest should deny

4   an injunction and they cited situations like people who had

5   already sold their property voluntarily; they cited contracts and

6   other obligations they were entered into. And we do have a

7   concern that they will continue to engage in activities relating

8   to the ballpark and then come in here at a permanent injunction

9   hearing and say, Your Honor, it's not in the public interest to

10   stop this because look at all the things we've done. So we do

11   have some concerns about that.

12       THE COURT: So that you are intending that any such order

13   shut down all of those activities?

14       MR. HARTMAN: We would like an order to shut down all of

15   those activities, but we also recognize that for purposes of

16   relief in the statute at issue, the statute at issue only

17   authorizes them to acquire or purchase any property. That's the

18   section of the statute that causes us harm.

19       THE COURT: But your order that you're telling me about

20   doesn't say prevent them from acquiring the property. It says

21   enter into any obligation in connection with acquiring the

22   property.

23       MR. HARTMAN: That's what the statute says; that's

24   correct.

25       THE COURT: Go ahead.

1        MR. HARTMAN:  So we believe that's the issue before the

2    Court today, between now and when a further hearing could be

3    held:  Should injunctive relief be afforded?

4        Let me make several preliminary observations before going

5    into our argument as to why we believe we are entitled to

6    injunctive relief.  Just 60 days ago, the United States Supreme

7    Court said:  "A permanent physical invasion, however minimal the

8    economic cost it entails, eviscerates the owner's right to

9    exclude others from entering the property, perhaps the most

10   fundamental of property interests," and that just compensation is

11   not an adequate remedy where the action violates the public use

12   or due process clause.

13       Those are quotations from the *Lingle versus Chevron* case

14   which we cited in our brief.  And I bring them up first because

15   we want to set the stage for what's at issue here.  We are not

16   arguing about just compensation; we are arguing about the

17   authority to go forward and we're arguing a fundamental property

18   right.

19       Number two, Your Honor, this circuit has never rejected

20   jurisdiction in a case such as this.  And in fact in 2002, the

21   Seventh Circuit in the *Daniels* case, which we'll talk about

22   later, not only heard, but ruled on a case that is on all fours

23   with this case without a doubt.  A plaintiff brought an

24   injunction action not seeking monetary damages, arguing that the

25   agency had exceeded the legislatively determined public use when

1  it took action with respect to their property.  The Court not

2  only found jurisdiction, but ruled in their favor.

3       So --

4       THE COURT:  Let me just ask you, are you addressing a

5  jurisdictional point now in connection with the motion to dismiss

6  or --

7       MR. HARTMAN:  No.  We're ultimately objecting to the

8  merits.  I'm simply setting the stage for the arguments on the

9  merits.  This is not an unprecedented case on the merits or

10 otherwise.

11      With that in mind, let me go to our arguments as to why

12 preliminary injunctive relief is appropriate.  There are four

13 elements, as we know from all the briefs, that we all agree on.

14 First is substantial likelihood of success on the merits; the

15 second is irreparable injury and whether or not there's an

16 adequate remedy at law; the third is what harms can occur to the

17 defendant and the balance of equities there; and the fourth is

18 where lies the public interest.

19      And on all four, Your Honor, we believe we will prevail.

20      Let me begin with a brief statement of the case unless

21 Your Honor is sufficiently familiar with it.

22      THE COURT:  I'd actually be more interested in hearing

23 your arguments on the four elements.

24      MR. HARTMAN:  Okay.

25      THE COURT:  Hopefully, if you could zero in on the

1    likelihood of success on the merits and the irreparable harm,

2    those are probably the most interesting ones.

3         MR. HARTMAN:  Very well, Your Honor.

4         THE COURT:  All right.

5         MR. HARTMAN:  With respect to likelihood of success on the

6    merits, we have three counts in our case.  Count 1 alleges a

7    violation of substantive due process.  Count 2 alleges a

8    violation of the public use clause of the Fifth Amendment under

9    1983.  And Count 3 alleges a violation of the public use clause

10   of the Fifth Amendment pursuant to the Constitution, regardless

11   of section 1983.

12        THE COURT:  Can you direct me to anywhere in your motion

13   that explains the standards that I must use in determining a

14   substantive due process violation in this case?

15        MR. HARTMAN:  Yes, Your Honor.  In our brief we discuss

16   this and this has been, obviously, a subject of dispute between

17   the parties.  There are a number of different standards that have

18   been articulated.  The one that we referred the Court to is from

19   the *George Washington University* case and if you would like, I'll

20   refer you to that page of our papers.

21        THE COURT:  And I'm not really trying to take up your

22   time.  If you want to go ahead and argue it substantively, I'll

23   be happy to hear you.

24        MR. HARTMAN:  The standard that's set out is worded in a

25   number of different ways.  In the context of substantive due

1    process, the standard has been worded, under the *George*

2    *Washington* case, as being a "grave violation with serious

3    consequences."

4    Now, there are other cases that use the term "arbitrary

5    action in a Constitutional sense."  There are other cases that

6    might use the word "horrendous action," but at the end of the

7    day, if we go back to one of the first cases, which is the

8    *Sacramento* case, the question is whether there is any even

9    remotely rational relationship between the actions being taken by

10   the defendants and the legitimate public goal.

11          And in this case we submit, Your Honor, if we are correct,

12   which we believe we are, that they do not have the authority

13   under the statute to use this property as a baseball park because

14   they cannot produce and did not produce the requisite estimate to

15   do so, then there's no possible rationale that would justify them

16   taking this property for a baseball stadium.  They're not allowed

17   to.

18          And that -- I'm sorry.

19          THE COURT:  Go ahead.

20          MR. HARTMAN:  And that should be sufficient for a

21   substantive due process violation, but in this case, it's even

22   more significant.  We're not talking about violating some

23   tangential provision of a statute.  The Omnibus Act -- the

24   Omnibus Ballpark Act -- its very purpose when you read that and

25   the Emergency Cost Trigger legislation is to -- we want to bring

1    baseball to Washington.  That's fine.

2          But the Council said not if it costs too much.  And they

3    went further and said, after extensive debate, we want you to go

4    do a cost estimate and if it's more than $165 million, you can't

5    go forward at this site.  You must look at other sites.  That was

6    the core of the entire statute.

7          And what happened here is they didn't do that and they

8    can't do that.  And if they're going to violate the core of the

9    statute like that, with the consequence being they're going to

10   take our property -- there's no other basis on which they can

11   take our property unless they violate that statute or act in

12   accordance with that statute -- that should constitute a

13   substantive due process violation.

14         THE COURT:  Tell me this.  Suppose the District would be

15   acting -- the executive branch of the District would be acting

16   *ultra vires* by using, I guess, what you are pointing to as the

17   CFO's report that -- let's assume it does not comport with the

18   directions that the Council set forward.

19         Help me understand why a local executive's failure to

20   follow what you say a local legislature created by way of

21   instructions would create any federal interest that would warrant

22   this Court's attention.

23         MR. HARTMAN:  Because the direct result of that is the

24   confiscation of property under the Fifth Amendment without

25   authority.

1    THE COURT:  Well, why is it that that argument about a

2    local executive acting *ultra vires* with respect to the local

3    legislature is not one that can be duked out in local court?

4        MR. HARTMAN:  Because there's no way to duke it out in

5    local court.  The defendants themselves have precluded -- let me

6    back up, Your Honor.

7        The most direct way for the issue -- purely that issue of

8    whether or not they're acting in accordance with the law is to

9    file an action saying they violated their own law.  That's what

10   the -- in the *JNM* case, all the other cases -- the *GW* case --

11   there were actions filed under an existing organic statute that

12   challenged the actions under that statute.  They've argued in

13   Superior Court we don't have a private right of action under that

14   statute and they won.  There's no private right of action under

15   the Omnibus Act to enforce it.

16       Now, we're not here just because of that.

17       THE COURT:  Then why isn't that the answer, then?

18       MR. HARTMAN:  Excuse me.

19       THE COURT:  Why isn't that the answer?  Why isn't that the

20   end of it if your argument is a local executive has violated a

21   local statute or local direction of the Council?

22       MR. HARTMAN:  Because it's not just that he violated it,

23   it's how he violated it.

24       THE COURT:  Well, I guess you're required to establish a

25   federal basis for being here in advancing your claim.  And you've

1    identified, essentially, the Fifth Amendment and clauses in the

2    Fifth Amendment, in addition to 1983, which really adopts, as a

3    basis of the right, the Fifth Amendment, right?

4         MR. HARTMAN:  Yes.

5         THE COURT:  All right.  So now, the Fifth Amendment

6    takings clause, I guess, presents several scenarios.  We've

7    got -- certainly we've got the takings clause and the due process

8    clause.  The takings clause prevents transfer by the government

9    from private owners to private owners for purely private

10   interests, right?

11        MR. HARTMAN:  Your Honor, I respectfully disagree with

12   that.

13        THE COURT:  All right.

14        MR. HARTMAN:  The takings clause authorizes the government

15   to take private property for a public purpose if they pay just

16   compensation.  But --

17        THE COURT:  Well, what I said was you cannot as a

18   government take private property, give it to another private

19   person and the only interests involved there are private.  You

20   can't further a private interest by making a private-to-private

21   transfer, at minimum.

22        MR. HARTMAN:  Yes, correct, at minimum.

23        THE COURT:  The clause does a number of things.  I'm just

24   trying to walk through them.

25        MR. HARTMAN:  That's correct.

1        THE COURT:  That's one thing.  The other thing that the

2   clause prevents is having private property taken for public use

3   unless you pay for it fairly or justly.

4        MR. HARTMAN:  No, it also prevents -- maybe we're using

5   semantics, Your Honor.  It prevents the taking of private

6   property for something that is not a valid public use.  It may be

7   private or otherwise.  And the *Daniels* case is the best example

8   of that.  If they take property that is not for the public use as

9   determined by the legislature, that violates the Fifth Amendment.

10  That's exactly what *Daniels* held in the Seventh Circuit.

11       THE COURT:  Well, because *Daniels* -- the legislature,

12  wherever it was in Indiana, didn't give specific directions to

13  that land use commission the way they had given it to the other

14  body, where there were a lot of specific directions about

15  determining blight.

16       But I'm just trying to get back to your basis for having a

17  Fifth Amendment violation proven here and the likelihood of your

18  success on the merits of establishing a Fifth Amendment claim.

19  And I'm simply trying to go through at least certain minimum

20  things that the Fifth Amendment allows or prohibits.

21       We've agreed that under the Fifth Amendment, D.C. can't

22  take private property, give it to other privates -- owners for

23  purely private reasons.  We agree on that?

24       MR. HARTMAN:  Yes.

25       THE COURT:  D.C. can't take private property, use it for

1   valid public uses without paying for it fairly?

2        MR. HARTMAN:  Yes.

3        THE COURT:  All right.  There's also the due process

4   component.  They can't take property without due process at all.

5        MR. HARTMAN:  That's correct.

6        THE COURT:  Now, this is not a case that involves a

7   private-to-private transfer, right?

8        MR. HARTMAN:  We're not arguing that today, Your Honor,

9   no.  Correct.

10        THE COURT:  All right.  Well, let me ask you this.  With

11   respect to the just compensation clause, just to put things off

12   the table that aren't necessarily there, if the Mayor's people

13   failed to offer the price that your clients want, presumably you

14   can begin -- make them begin some kind of condemnation

15   proceedings where your clients can show that the price is unfair,

16   right?

17        MR. HARTMAN:  Are we assuming there's a valid public use?

18   That's not an issue?

19        THE COURT:  Well --

20        MR. HARTMAN:  I'm not sure --

21        THE COURT:  -- putting that aside for the moment, I'm not

22   trying to combine lots of things; I'm trying to break them down

23   for the moment.

24        If your clients don't get the price that the Mayor

25   wants -- there's no agreement; the negotiations collapse; you

1    think that the price that the government's trying to offer you is

2    unfair, but they want to go ahead and take your property anyway,

3    they can't just do it. They've got to proceed in some kind of

4    condemnation proceeding, where you get a chance -- your clients

5    get a chance to prove why the prices aren't fair and it should be

6    higher in order to establish just compensation.

7         MR. HARTMAN:  That's correct, except they can just do it.

8         THE COURT:  What?

9         MR. HARTMAN:  They can just do it. If they decide they

10   don't like the price that we offer -- and I'm assuming for my

11   answer, Your Honor, that there's a valid public use; that's not

12   the issue right now; we're just talking about just compensation.

13        THE COURT:  Right.

14        MR. HARTMAN:  If they make an offer and we don't like it,

15   they can go into court the next day, file a complaint and

16   declaration of taking -- they own the property. It's over. The

17   only issue is just compensation.

18        THE COURT:  Okay. And that's the only thing they can't

19   refuse to do. They can take the property, but they can't refuse

20   to pay you fairly for it.

21        MR. HARTMAN:  They can take it, get -- assuming a public

22   purpose, correct.

23        THE COURT:  And there is your client's opportunity to show

24   that the price is just unfair and it ought to be more.

25        MR. HARTMAN:  If price is the only issue, correct.

1          THE COURT:  All right.  So we've got -- and there's

2    nothing procedurally infirm about your being able to do that in a

3    condemnation proceeding and there's nothing that is horrendous or

4    shocks the conscience about the condemnation proceeding process,

5    I take it?

6          MR. HARTMAN:  We have no objection to that process for

7    purposes of showing just compensation; that's correct.

8          THE COURT:  All right.  So putting aside, then, the just

9    compensation issue and the substantive due process issue with

10   that process, let me move forward, then, to see if they do go

11   forward, they do take your land, but they give your clients the

12   price that your clients do want, there's really no just

13   compensation issue anyway?

14         MR. HARTMAN:  Assuming they have the authority to do that,

15   correct.

16         THE COURT:  All right.  But let me ask you, if they go

17   ahead and build a ballpark for whatever price is offered, as I

18   understand it, we've got a publicly owned park used by the public

19   at that point; is that correct?

20         MR. HARTMAN:  Factually, that's correct.  Well, yes;

21   basically, yes.

22         THE COURT:  I take it, then, that what would be left is if

23   the price was unfair or you didn't like the price, we'd end up

24   with a claim that they bought the land for more than the

25   legislation allowed -- legislature allowed?

1    MR. HARTMAN:  Again, assuming a public purpose is there.

2    THE COURT:  Now, explain to me how that makes out the

3    Fifth Amendment violation.

4    MR. HARTMAN:  With respect, Your Honor, I'm not sure

5    that -- that's not the theory that we're propounding.  We're

6    propounding this theory.  The Fifth Amendment says you may

7    take -- you may take property if you pay just compensation if

8    there's a public purpose.  The question is what's a public

9    purpose.

10    The Supreme Court has said let's see what the legislature

11    says the public purpose is and if that's valid and we're going to

12    defer to that, that's the end of the story.  Go get your

13    compensation.

14    So the question is:  What is the public purpose of this --

15    of this legislation?  And we look to what the legislature, the

16    Council said the public purpose was.  And it's not just to build

17    a ballpark.  And the suggestion that we should only look at that

18    preamble and nothing else in making that determination is not

19    only inconsistent with the *Daniels* case, which we cited, but also

20    with the *Miata* case in this circuit.

21    THE COURT:  I take it you're arguing that the Emergency

22    legislation in some way vitiated the findings in the initial

23    legislation, the Ballpark Act, where the Council clearly made the

24    finding that building a stadium is in the public interest?

25    MR. HARTMAN:  I'm saying they have to be read together.

1    And the Ballpark Act itself, although it's not stated in the

2    preamble, in the operative provisions has the same limitations.

3             THE COURT:  Forgive me.  Say that again.

4        MR. HARTMAN:  I'm sorry.  The -- the two acts obviously

5    were passed together and the two acts work together.  And several

6    provisions of the Emergency Act are actually in the Omnibus Act.

7             The Omnibus Act has the prohibition that says you can't

8    build a ballpark here -- you can't go forward to buy this

9    property for a ballpark if the estimate is not below

10   $165 million.  So it's inextricably linked.

11            And for example, if you look at the *Miata* case in this

12   circuit, the courts haven't just looked at the preamble and said

13   that's the end of the discussion.  You look at the entire

14   statute.  And even in *Kelo*, the Court notes with respect to

15   *Berman*, which is, of course, the case that came out of the

16   District many, many years ago and, by the way, was brought in

17   Federal District Court not as a takings case, said if the purpose

18   in *Berman* -- if the public purpose in *Berman* had been more

19   narrowly drawn, they might not have been able to justify the

20   taking under the Fifth Amendment.

21            So we have to decide how narrow or broad is the purpose

22   that the Council determined should exist here.  And with respect,

23   Your Honor, the interpretation -- the decision on that point has

24   to be made by looking at the whole statute, not just one section

25   of a preamble.  And if you read that statute as a whole, there is

1   no doubt, and it's confirmed by the legislative history, that the

2   purpose was to build a stadium if it's not too expensive because

3   it will provide great benefits to the public.  And they were very

4   specific about that.

5         We're not disputing whether a -- if they had passed a law

6   that had just that preamble and didn't have all this stuff about

7   a cost estimate, we wouldn't be here today.  We wouldn't be here

8   today.  If they said a public -- a ballpark is in the public

9   interest, Mr. Mayor; we would like it to be at this location; go

10  forth in peace and let's do it, we would not be here.

11        But that's not what they said.  And we don't know how that

12  act can be read without taking that core provision into account.

13  It's a whole separate section on doing a cost estimate and

14  looking for another site.

15        THE COURT:  Is there anything in the language of either

16  side -- either one of the statutes that vitiates the finding that

17  it would be a municipal use to build a public stadium regardless

18  of the cost?

19        MR. HARTMAN:  That it would be a municipal use?

20        THE COURT:  Correct.

21        MR. HARTMAN:  I would argue, Your Honor, that it says we

22  only consider it to be a valid municipal use in this

23  circumstance, if it doesn't cost too much.

24        THE COURT:  I know what your argument is.  There's

25  nothing -- I'm asking you if there's anything that vitiates the

1   clear legislative finding that the stadium would be a municipal

2   use aside from the cost issue.

3           MR. HARTMAN:  I have a hard time answering that question

4   by ignoring the operative provisions of the statute.  If one were

5   to read just -- I believe that those operative provisions vitiate

6   that finding and modify it.  That's really what they say.

7           THE COURT:  And is that your view also with respect to the

8   preamble's finding that a publicly owned and publicly used

9   stadium would contribute to the social well-being of the city?

10          MR. HARTMAN:  Yes.

11          THE COURT:  All right.  Go ahead.

12          MR. HARTMAN:  In fact, Your Honor, if you'd like, there

13  are several provisions of this statute -- both statutes -- that,

14  if read together, exactly make our point.

15          If one were to look to the *Daniels* case, for example, in

16  *Daniels*, the public purpose for the statute in the preamble was

17  to prevent vacant buildings from creating a problem, but then in

18  the operative provisions, there were specific terms that were

19  defined.  For example, in order to find that an area was

20  blighted -- it was in the public interest to prevent blight in

21  the Indiana statute under *Daniels*.  There is no question about

22  that.  That's what it said.

23          Then the legislature said to the planning commission,

24  before you can go forward, you have to make sure there's a

25  finding of blight and here's how you have to do it.  You have to

1    do, among other things, a cost estimate of land acquisition.  And

2    if you don't do those things, you can't make a finding of blight.

3        And that's exactly what happened.  They didn't do those

4    things and the Seventh Circuit said this is not consistent with

5    the public purposes determined by the legislature.

6        It's exactly the same case.  So it boils down to, then, as

7    to whether or not we're going to interpret public use and purpose

8    by looking only at the preamble of a statute and nothing else, or

9    whether we're going to read the entire statute, all the language

10   exactly as it's written, and say it will serve a public purpose

11   and be of economic benefit and social benefit if it's not going

12   to cost too much.

13       And not only do they define what costs too much money, but

14   they went further and that's what makes this an unusual case.

15   They said to determine these costs, you must look at -- you must

16   do a separate appraisal for each parcel of land being acquired.

17   That's the core of figuring out what the cost of this thing is

18   going to be.  And they never did it.

19       THE COURT:  Well, you're saying they never did it, but

20   what can you show me that establishes that "parcel" means what

21   you are saying it means?

22       MR. HARTMAN:  Well, Your Honor, they admit they never did

23   it.  They said this cannot be used as an appraisal of each parcel

24   of land.

25       THE COURT:  "Parcel" is the key question there.  I take it

1   they did not do a separate appraisal of each square and lot, by

2   their own admission?

3       MR. HARTMAN:  By their own -- they did not do a separate

4   appraisal of each of the 63 parcels at issue in this case.  And

5   that was never a question because, as we pointed out in the

6   legislative history, the Deputy Mayor was asked, why can't you do

7   an individual appraisal of each of these parcels?

8       THE COURT:  You're disputing whether it was an appraisal

9   as opposed to a cost estimate?

10       MR. HARTMAN:  That's correct.

11       THE COURT:  All right.

12       MR. HARTMAN:  That's correct, because the statute says

13   "appraisal."

14       THE COURT:  Go ahead.

15       MR. HARTMAN:  It says the cost estimate shall have these

16   components in it:  A separate appraisal of each parcel.  And they

17   admitted they didn't do that.  That's not just a technical

18   violation of a statute, Your Honor.  That's a violation that goes

19   to the core of what this project is all about and the core of

20   what the Council said they want the benefit of this project to

21   be.

22       And it's just so abundantly clear that that's what this

23   purpose is all about that it's difficult for us to understand how

24   they can say cost is just a minor concern; we can build a

25   ballpark because it's in the interest of everybody because the

1    Council said so.

2        We refer the Court again to the *Miata* case, which we

3    cited, where in order to determine the public purpose, the Court

4    didn't just look to one section of a statute; it looked to the

5    entire statute, but not just to find little, minor things -- to

6    see what portions of that statute define what was supposed to

7    happen here and I should say, Your Honor -- I believe it was in

8    that case -- give a great example of something that wasn't used

9    for a private purpose, but it was in that middle ground.  It

10   wasn't private and it wasn't a valid public purpose; it was an

11   arguably public purpose, but not one that the legislature said

12   was authorized.  And if *Kelo* teaches us one thing, it teaches us

13   it's the legislature that decides what the public purpose is.

14       Now, the legislature may well give the executive

15   discretion to make some of those decisions.  And in fact in this

16   case, with the exception of this property, that's precisely what

17   the legislature did.  They said on this property, you do an

18   estimate.  And if this estimate isn't below this figure, you must

19   look at alternative sites.

20       It's entirely up to the defendants what alternative sites

21   they look at.  They were given that discretion, but they were not

22   given the discretion -- in fact it was -- the language says "this

23   site shall be deemed infeasible" if that estimate doesn't come

24   in.  There's no discretion to be exercised there at all.  As a

25   matter of law, it's not considered feasible within the meaning of

1    the statute.  And if it's not considered feasible, given the way

2    the statute's written, it can't possibly be consistent with the

3    public use of the statute, which says build a stadium if it isn't

4    too expensive.

5         Have I answered your questions on that point, Your Honor?

6         THE COURT:  Let me invite you to move to the next set of

7    prongs since you've, I think, taken about 25 minutes.

8         MR. HARTMAN:  Okay.  Irreparable harm and adequate remedy

9    at law.

10        The Supreme Court has made it clear that the public use

11   and due process clauses, if they're violated, do not -- just

12   compensation as a matter of law is not a valid remedy.  So we're

13   back to our question of what kind of case is this.  It's a

14   challenge to the public use determination of the District, how it

15   had implemented that public use determination; not to whether we

16   will receive just compensation, assuming they made a proper

17   determination.

18        This circuit has said in considering these cases the legal

19   remedy must be "full and adequate."

20        So the question is what's going to happen in the real

21   world if we're not -- we don't proceed here or the Court denies

22   an injunction, they take our property and we're left in an

23   eminent domain proceeding, what happens?  Can we effectively get

24   relief in that proceeding?

25        And the answer is without a doubt no.  And the reason is

```
 1    this:   In an eminent domain proceeding under the District

 2    statute, once a declaration of title is filed, title transfers

 3    indefeasibly to the defendants.  We can't get it back.  And while

 4    they cite the Catlin decision for the proposition that we could,

 5    that was not under the current D.C. statute; that was under a

 6    statute that actually removed the provision that allowed Catlin

 7    to say maybe you can get it back.

 8         But in any event, Your Honor, it's impractical because by

 9    the time it gets through that process, no matter what anybody

10    does, the only title our clients will get back is far right field

11    in a parking lot if they're lucky.  That's it.  We can't turn the

12    clock back once that stadium is going to be built.  I can't

13    imagine the Court would say it's in the public interest to tear

14    it down once it's already there.

15         THE COURT:  How much time would pass between the transfer

16    of title and the existence -- the completion of a stadium?

17         MR. HARTMAN:  Well, that depends on when they transfer

18    title.  They could transfer title tomorrow.  They could give us

19    an offer today and if we don't accept it, they could file a

20    complaint and declaration of takings tomorrow -- on Monday and

21    the title's transferred.

22         And now we're in that proceeding.

23         THE COURT:  And my question was what is the best estimate

24    about when the construction would be completed?  You were talking

25    about you cannot reverse the process because if you did reverse
```

1    the title switch process, you'd end up with getting title to

2    right field.  I was asking you when is right field going to be

3    up.

4         MR. HARTMAN:  Maybe two years, but the point is in *Catlin*

5    under the statute, it's not clear at all that the Court can order

6    title to be returned -- that that Court can order it.  It's

7    indefeasibly vested in them.  And *Catlin* indicates they cannot

8    order title to be returned.

9         And if you look at the two or three cases where it has

10   been done in the just compensation process, one of which is

11   *Catlin* and one of which is *Miata*, the Court actually said in

12   *Catlin*, we're not addressing the issue of what happens after

13   title transfers and before it's determined that there's no public

14   use if there's irreversible damage caused to the property; that's

15   not before us today.

16        So the result is -- the result is that we don't really

17   know, but it doesn't matter.  However, it is the case, according

18   to them -- I think the affidavit of Mr. Wolf -- that construction

19   is supposed to begin in the first quarter of next year.

20        THE COURT:  Of 2006?

21        MR. HARTMAN:  Yes.

22        THE COURT:  All right.  What -- how far have the

23   negotiations gone?  Where are we in the process of negotiation?

24        MR. HARTMAN:  What negotiations?

25        THE COURT:  What have your clients heard from the District

1    so far?  Where are we now?

2          MR. HARTMAN:  The District has made no offer.

3          THE COURT:  So no negotiations have even begun yet?

4          MR. HARTMAN:  They sent us a letter saying they're going

5    to take our property by the end of the year; they're going to

6    make an offer by mid-July and then we heard later July.  We've

7    heard nothing.

8          But, Your Honor, I respectfully suggest it doesn't matter.

9    They don't have the authority to pay us because they don't have

10   the authority to use this property.  They can't pay us even

11   voluntarily.  They have no authority

12         THE COURT:  Go ahead.

13         MR. HARTMAN:  It would be like there was no statute.

14   Could they build a baseball stadium and take our property if

15   there was no statute?

16         The answer to that is a resounding no.  That's why they

17   had to go to the legislature and get the statute after they

18   entered their agreement with Major League Baseball.

19         So if our substantive arguments are correct that they

20   don't have the authority as granted by the legislature to take

21   this property, they can't pay us voluntarily because they can't

22   build a stadium there.

23         And in fact, they don't have authority under the Ballpark

24   Act to pay money for a place where the stadium isn't going to be.

25         THE COURT:  Let me just ask you this:  If the -- if you

1    lose on the question about authority, is there any -- is there

2    any legal authority for the proposition that the real property

3    taken by eminent domain cannot be justly compensated for by some

4    payment of money?

5         MR. HARTMAN:  If we submit they have the authority, then

6    it's purely a just compensation issue and it belongs properly in

7    the eminent domain process because it's just a question of money.

8    It's not a question of authority.

9         THE COURT:  Go ahead.

10        MR. HARTMAN:  So the question, then, Your Honor, is what

11   happens if the Court doesn't issue an injunction between now and

12   when the next hearing is or hearing on the merits.  And the

13   answer is twofold.

14        First, let's talk about what we know.  We know they're

15   planning on taking our property.  We know they have the authority

16   to do it in a matter of a day if they choose to.  We know that

17   they claim to be under great stress and pressure to take this

18   property and they want to have it right away, so between now and

19   whatever the next hearing is, they could file a complaint and

20   declaration of taking and the property's gone.

21        Then there's going to be a proceeding going on in the

22   eminent domain court, where we're not going to be able to get the

23   property back anyway.

24        That's what we know.  We also know that, according to

25   Mr. Wolf, they're not telling us when they're going to do these

1　things.  We have no idea.  We know that it has to be within a

2　certain time period, but they won't tell us.

3　　　　They've told us what they haven't done and we don't

4　dispute they haven't done it yet, but they could do it tomorrow

5　or the next day or the next day.  And they're going to do it.

6　And once it's done -- again, Your Honor, once they take that

7　property, there's no way for us to challenge -- to get the title

8　back.

9　　　　So we therefore have no other way of proceeding.  And we

10　respectfully suggest if they're going to say, as we wish they

11　would, we will not be moving to acquire or purchase property at

12　this site until we have a hearing on the merits or a motion to

13　dismiss hearing or whatever other hearing is going to be had,

14　that would satisfy our need for a preliminary injunction.

15　　　　But they won't agree to that.  And I should also point

16　out, Your Honor, it's not just a question of whether they're

17　going to take our property.  If they go out and acquire property

18　voluntarily from people, then they'll come into Court, as they

19　did in *Skyland*, and say, Your Honor, this train has left; look at

20　all these people we already bought property from voluntarily.

21　　　　So they'll use this time period in order to increase their

22　efforts to avoid injunction later on.  And they really shouldn't

23　be allowed to do that if we're going to preserve the status quo.

24　　　　THE COURT:  Identify which office you're really talking

25　about when you talk about "they," when you say "they refuse."

1    MR. HARTMAN:  The District of Columbia, the Office of

2    Property Management is the one, I believe, who sent us the

3    letters.

4        THE COURT:  All right.

5        MR. HARTMAN:  I believe that's under the Deputy Mayor's

6    office, the office that has the authority to proceed with the

7    land acquisition.  That's who actually implements it, I believe.

8    Mr. Rezneck can correct that if that's wrong, but I believe it

9    is.

10       THE COURT:  All right.

11       MR. HARTMAN:  So the result is if we don't have some

12   relief today, they can essentially take our property on Monday if

13   they choose to.  And again, if they are willing to agree to wait

14   until we can have a hearing on the merits or some other

15   dispositive hearing, that's the only relief we've requested.  We

16   asked them to do that and they wouldn't agree to do it.

17       With respect to the remaining two elements, balancing

18   equities -- I think we talked about that a little bit.  Our

19   clients are facing right now the prospect that their property

20   could be taken at any time.  Our clients cannot use their

21   property now.  It's basically frozen.  One of our clients is

22   trying to lease an apartment; he can't do it.

23       But more importantly, between now and an injunction, they

24   can simply take the property.  They can simply take the property.

25   And if they take the property, we can't get it back.

1          THE COURT:  I'm sorry.  You said one of your clients is

2     looking to lease an apartment, but can't do it.  You're really

3     saying that it's difficult to do or is there something that

4     blocks him from doing it?

5          MR. HARTMAN:  Well, as a practical matter, he can't lease

6     the apartment because nobody is going to sign a lease when they

7     think the property's not going to be around.  He's tried and

8     can't.

9          But we're not suggesting that's the only harm here.  The

10    real harm here between now and a hearing is whether they're going

11    to take action to acquire our property or other properties so

12    that either we can't get title back or they can then come in and

13    argue, hey, we bought all these other properties, Your Honor,

14    even though we may not have had authority, but, you know, let us

15    go forward anyway.

16         THE COURT:  Again, the authority question aside, suppose

17    all that happens and suppose your clients lose economic

18    opportunity with their property between now and whenever the

19    resolution of this is; presumably, if that happens, money can

20    compensate them for whatever economic loss they had suffered in

21    the interim.

22         MR. HARTMAN:  If there's authority, yes.

23         THE COURT:  Go ahead.

24         MR. HARTMAN:  But our concern about that is the harm until

25    that decision can ultimately be made.  And we emphasize, Your

1    Honor, that in determining whether there's authority, you have to

2    look at the entire statute.  It's difficult to see how a statute

3    could be read with -- this particular statute could be read in

4    that way.  And again, in *Kelo*, the Court makes that abundantly

5    clear, that it can be narrowly drawn.  It was in the *Daniels*

6    case; it was in the *Miata* case; it was in the *Catlin* case.

7          And the Courts respected that and none of them looked

8    simply at the preamble.  They looked at the entire statute.  If

9    this was not so clear, we wouldn't be here.  If the violations

10   were not so blatant, we wouldn't be here.  And we, therefore,

11   request that Your Honor grant a preliminary injunction, at least

12   until such time as there's a hearing on the merits or further

13   hearing in this case.

14          Are there any other questions, Your Honor?

15          THE COURT:  Did you have any argument about the public

16   interest?

17          MR. HARTMAN:  Yes.  Well, the public interest argument is

18   really -- goes back to the statute, which even in defendant's

19   brief they acknowledge, to determine what the public interest is,

20   look at the statute.  They quote Judge Urbina, who looked at the

21   statute in that case.  We invite the Court to do the same:  Look

22   at the statute.

23          In that *Skyland* case, the statute was very general and had

24   no conditions or anything that were tied to a determination of

25   public purpose, not that limited the Mayor's discretion in that

1  regard.  But in this case, there are very specific provisions

2  tied directly to the public benefit and purpose that this was

3  going to serve.

4      And it's not just -- as *Kelo* said, you don't just say,

5  well, it's going to be used as a stadium; that's a public

6  purpose -- public use.  You look at the broader public purpose to

7  be served by the legislation, according to the legislature, to

8  give it its proper deference.

9      And in this case, the purpose is to provide a baseball

10  stadium in the District that will provide economic and social

11  benefits to District residents as long as it's not going to cost

12  too much.  And they define what that meant in the operative

13  provisions of the statute and prohibited it from going forward in

14  this location if that wasn't met.

15      And the result of what they're doing directly triggers

16  their authority to acquire our property and take our property.

17  That directly constitutes a violation of the Fifth Amendment of

18  the Constitution.  And this Court's interest should be in

19  protecting the Fifth Amendment rights when there's no other

20  remedy available.

21      So we urgently request that the Court grant preliminary

22  relief at least until such time as we can have an argument on the

23  merits or the motion to dismiss to make sure that they don't come

24  in on Monday or Tuesday or Wednesday or Thursday, file a

25  complaint and take our property or go purchase all the properties

1   around us and then argue, you know, let us go forward anyway.

2       That's all we ask is to preserve that status quo until we

3   can do that.

4       THE COURT:  All right.

5       MR. HARTMAN:  Thank you very much.

6       THE COURT:  Thank you.  Mr. Rezneck.

7       MR. REZNECK:  Good morning, Your Honor.

8       THE COURT:  Good morning.

9       MR. REZNECK:  Daniel Rezneck from the Office of the

10  Attorney General.

11      I want to take on directly some of the statements that

12  have been made here and some of the questions that Your Honor put

13  because I think that there are pretty clear answers to all of

14  them.

15      The relief sought, which Your Honor asked about at the

16  beginning, is most inequitable here because what they are seeking

17  is an injunction -- not just any effort to exercise eminent

18  domain over their properties, but even to acquire their

19  properties voluntarily if there was a willing seller and we're a

20  willing buyer.

21      And furthermore, they would enjoin us from making any

22  offers to any other property owner on the site, whether or not

23  such a person is a plaintiff in this case, so that you can have a

24  willing seller and a willing buyer and they could agree on the

25  terms, we could make an offer, they could be negotiated, and we

1  would be enjoined, according to what they want, from doing that.

2  That seems to me to go so far beyond the boundaries of any

3  equitable relief that it astounds me, quite frankly.

4      Mr. Hartman referred to the standstill agreement he said

5  he wanted us to enter into with them and that we wouldn't.  The

6  standstill agreement was what he's seeking by this injunction;

7  namely, that we couldn't even make an offer to a willing seller

8  on that site who's not a litigant in this lawsuit.  That's

9  what -- he just wanted us to stop the whole thing in mid course,

10  in its tracks, as it were, and, in effect, interfere even with a

11  willing buyer-willing seller relationship, so that request was

12  about as inequitable as the relief that you've heard here.

13      Now, I just wanted to dispose of one case because it

14  permeates their -- it permeates their papers so much and I went

15  and read it pretty carefully and keep citing it here -- the

16  Daniels case from the Seventh Circuit.  And I just want to point

17  out to the Court a number of very clearly distinguishing

18  features.

19      First of all, Daniels was not a preliminary injunction

20  case.  It didn't involve any such issue.  But there are many more

21  fundamental distinctions of the case than that.  In Daniels,

22  there was no legislative determination of public use.  Here we

23  have a clear legislative determination by the Council of public

24  use.  Mr. Hartman refers to it as a "preamble."  I don't know

25  what that is supposed to mean, but it's a finding, the very first

1    section of the statute, and it's a clear legislative finding of

2    public use here.

3         THE COURT:  In the *Daniels* case, I guess you're talking

4    about the commercial redevelopment part, not the agency that was

5    making determinations --

6         MR. REZNECK:  As I recall it, what had happened was the

7    determination to take over this restrictive covenant or to

8    abrogate this restrictive covenant was made by some local

9    planning commission and it had no statutory authority to make

10   public use determinations.  The legislature had it and the

11   legislature hadn't made them and it simply, in effect, delegated

12   authority to this local planning commission to do what it wanted

13   to, in effect.

14        And in addition, there was no issue of standing; there was

15   no issue of injury, in fact or imminent; there was no issue of

16   finality in the *Daniels* case such as there is here, because there

17   a final decision had been made by the planning commission to

18   abrogate this covenant and the only issue that the Court really

19   had to deal with was whether they had to go to the state courts

20   first or could go to the Federal Court once they had a final

21   decision.  And the Seventh Circuit said, well, we don't think you

22   have to go to the state courts under these circumstances.  But

23   the element of finality, as I think Your Honor has already

24   discerned, is totally lacking here because nothing has happened

25   yet.  We haven't even made an offer.

1    THE COURT:  Well, can you tell me, where are we?  What is

2    going on?  What's happening and what is -- is it true there has

3    been a resistance to telling the plaintiffs about what the

4    schedule is, the timetable is, who's doing what, when?

5    MR. REZNECK:  Certainly not on my part.  I think I

6    indicated to Mr. Hartman in one of the many conferences that

7    we've had that our clients had no intention of making an offer to

8    his clients during this period of time, this first week in

9    August.  And as Your Honor knows from reading the statutes, the

10   eminent domain statute can't even be invoked until there have

11   been unsuccessful negotiations; in other words, we have to make

12   an offer.  The letters that were sent to his client said we're

13   going to make you an offer, we hope in July; it didn't

14   materialize in July; we want you to consider it; we want you to

15   make a counteroffer; we want you to assemble materials that would

16   support a counteroffer; we'll have a negotiation.

17   None of that has occurred here.  The letters that have

18   been sent to his clients explicitly state there's no direction to

19   vacate to anybody.  They do say that we would like to get the

20   property by the end of the year because that's what the baseball

21   agreement requires.  We have to have site control by the end of

22   the year.

23   THE COURT:  But what you heard was a fear of the worst

24   case scenario.  Without having some explanation or commitment to

25   a specific schedule, they fear the letter saying "Here's our

1   offer" could come out on Monday morning and saying "We want your

2   answer by this evening; if we don't get an acceptable, I guess,

3   counteroffer, we're going to go take your property."

4          MR. REZNECK:  We don't do business that way, Your Honor.

5          THE COURT:  Well, what can you tell me -- what can you put

6   on the record?

7          MR. REZNECK:  The offer, as I understand it, comes from

8   the Deputy Mayor for Economic Development, who formally makes it.

9   And we would obviously rather go through negotiation than to

10  invoke eminent domain because eminent domain itself is a legal

11  proceeding in which they can invoke all the defenses that they

12  have.  I'll come to that in just a moment because I think that

13  Your Honor should not be misled about that.  They can challenge

14  authority for this in the eminent domain proceeding.

15         We have no reason in the world to want it to come to that

16  if we can make a deal.  And I know they've made some statements

17  that they'll never sell and so on, but I don't think that's very

18  realistic in terms of the business world and I think if a

19  realistic offer is made and evaluated, that we can have a

20  meaningful negotiation.  I would hope -- I can't give you an

21  exact timetable, but I would hope and expect that it would take

22  place during August.

23         THE COURT:  Okay.  Well, what more can you give me?

24  Because that's the fear that the plaintiffs have expressed just a

25  moment ago, that they're not getting any kind of satisfaction

1   about knowing when something is going to be happening other than,

2   "Well, we don't do business that way" and, "Well, we hope things

3   aren't going to be rushed."

4        Is that all that you can --

5        MR. REZNECK:  I would have to consult with the client as

6   far as the timetable, Your Honor.  All I can say is I think that

7   it wouldn't be in our economic self-interest to do what they're

8   suggesting, it seems to me.  It would be much easier if we could

9   buy this property in a voluntary purchase with a willing buyer

10  and a willing seller.  And we would like to do that with all of

11  these.

12       THE COURT:  What kind of a representation can you make to

13  make it plainer to the plaintiffs that no precipitous action is

14  going to be happening within some particular time frame?  Can you

15  tell them at minimum that in the next 10 days, there's not going

16  to be any kind of a forced taking?

17       MR. REZNECK:  You mean an eminent domain, for example?

18       THE COURT:  Whatever you want to put on the record.  I

19  don't want to put words in your mouth.

20       MR. REZNECK:  The statute, of course, envisions a number

21  of ways for acquiring the property.  It talks about buying it,

22  leasing it and it mentions condemnation as one of a number of

23  ways of doing it.

24       Can I consult with my colleagues, who are the business

25  people on that?

1    THE COURT: Sure. While you do that, see what, if

2    anything, you and he can give the plaintiffs at this moment and

3    give me to address the concern that was expressed that they just

4    have no information from the District and fear that something

5    could happen tomorrow.

6    MR. REZNECK: It isn't going to happen tomorrow. My

7    colleague, who is in much closer touch with the business people

8    on this than I am because I'm just the litigator here, says that

9    the District anticipates a 30-day negotiation period in all

10   cases. In other words --

11   THE COURT: You said "in all cases"?

12   MR. REZNECK: Yes. If it makes an offer, we'll negotiate

13   for 30 days.

14   THE COURT: With all property owners in the affected site;

15   is that what you mean?

16   MR. REZNECK: Yes, that's correct. And there isn't going

17   to be any eminent domain until that process comes to an end.

18   Now, if they want to slam the door in our faces and say we don't

19   even want to hear your offer, which would seem to me to be an

20   extraordinary thing to do -- I grew up taking a course in equity

21   that said he who seeks equity should do equity. And I can't

22   believe that they would do that.

23   But short of that, it seems to me that we're looking at a

24   negotiating period through this month and I don't think there's

25   any anticipation of any eminent domain proceedings until

1    September, I think, would be the earliest date.

2         THE COURT:  Has anyone told the plaintiffs that before

3    today, that the anticipation is that there would be at minimum a

4    30-day negotiation period?

5         MR. REZNECK:  I don't know if I mentioned that to Barry in

6    our conversations or not, but I'm certainly willing to say it

7    now.  I told him that we weren't going to do anything immediately

8    and I think he accepted that, certainly, but we didn't get into a

9    discussion of the mechanics or the dates.  But I'm willing to

10   state that here and now.

11        If I could respond to a couple of the other issues --

12        THE COURT:  Go ahead.

13        MR. REZNECK:  -- I'd like to deal with the questions that

14   you raised.  You raised the question about the test for

15   substantive due process.  My understanding of the law on that,

16   and it comes from the Supreme Court cases, is that the test for

17   substantive due process is:  Does it shock the conscience?  This

18   was the test that was enunciated in the *Rochin* case, where they

19   pumped the guy's stomach, and was recently reaffirmed in a case

20   called *County of Sacramento v. Lewis.*

21        In the Courts of Appeals you have some literary license, I

22   guess I would call it.  Some of the cases say, well, if it's

23   horrendous, then it would violate substantive due process.  I

24   think that's a brief way of saying shocking the conscience.

25        The test is whether it's unconscionable.  And I have a

1    hard time seeing, in all candor, that a debate here over cost

2    re-estimates could rise to the level of unconscionability.    I

3    just don't see anything in this case that would support that

4    Dr. Gandhi, who's been very successful as a CFO, has engaged in

5    unconscionable conduct in any context that I'm aware of.

6         I guess on their takings claim, I really would like to

7    address this notion that they somehow have something called

8    either a private or a public use claim which is somehow different

9    from a Fifth Amendment takings claim under the Constitution.    And

10   I don't see any warrant for that.    Certainly the Constitution --

11   this is one of the shortest articles, I think, in the Bill of

12   Rights.

13        THE COURT:    It says "nor shall private property be taken

14   for public use without just compensation."

15        MR. REZNECK:    Without just compensation.    And they're

16   trying to -- either it's a matter of changing the label and

17   saying ours isn't a just compensation case, it's a public use

18   case, and therefore, none of the rules that have been evolved

19   over the decades for just compensation cases apply, which seems

20   to be their argument, or that there is this kind of -- I regard

21   it as an essentially metaphysical distinction between the two.

22        This is a clause that, it seems to me, has to be read in

23   its entirety.    And I would note for Your Honor, because I think

24   it's quite pertinent on this, that they were good enough to put

25   Judge Urbina's opinion in the -- I'm sorry -- the second amended

1    complaint, which Judge Urbina was passing on in the *Rumber* case.

2    We put in Judge Urbina's opinion as an exhibit and in their most

3    recent filing, they put in the second amended complaint.

4         And if the Court will read that, you'll see the very first

5    claim that's made is a claim that the taking was for private

6    rather than public use.  The same argument is being made here.

7    That made absolutely no difference to Judge Urbina's analysis.

8    He applied the law under the "takings clause," as he called it,

9    and he found, for that and a number of other reasons, that there

10    was no likelihood of success on the merits.

11         So he certainly did not accept any such distinction, which

12    seems to me to be a mysterious one anyway.  It seems to me that

13    by changing the label -- you know, you call it a private use case

14    or a public use case or something different than a just

15    compensation case -- you can't change the substance of it.  It's

16    a takings case and --

17         THE COURT:  I guess, just to be fair, though, they're

18    focusing not on just compensation; their argument has to do with

19    whether there's a valid public use that's been articulated by the

20    legislature that's being complied with by the executive.

21         MR. REZNECK:  Yes.  I understand that and that's the

22    second point I wanted to come to --

23         THE COURT:  Go ahead.

24         MR. REZNECK:  -- because I also regarded that as a what I

25    call a "metaphysical distinction."  And I don't mean to be

1    flippant about this, but what they said, as I understand it, is

2    that if the costs were below $165 million, it would be a public

3    use.  Nobody -- they would have no case.  Nobody could contest

4    it.

5          It's clearly a public use under the finding made by the

6    Council, a legislative finding under the Supreme Court decisions.

7    I noted that in the recent case which has kicked up such a fuss,

8    this *Kelo* case, Justice O'Connor, who led the dissenters, refers

9    to a stadium as a paradigm example of a public use, so I don't

10   think there can be any doubt about that.

11         THE COURT:  Is there any authority for the proposition

12   that a legislature would not be able to identify a stadium that

13   costs too much as not a public use?

14         MR. REZNECK:  Not that I'm aware of, Your Honor.  I've

15   searched for that and I haven't found anything that suggests that

16   if the expenditures were to exceed that number, that there would

17   be a transformation or transmutation of a public use into a

18   nonpublic use.

19         THE COURT:  Well, I guess I'm asking the question

20   differently.  Suppose the City Council said clearly, we identify

21   building a stadium for 165 million or less as something in the

22   public interest and will be a public use.  If we construct a

23   stadium or had to construct a stadium for anything in excess of

24   that, we identify that there is not to be any municipal use,

25   public interest or valid benefits accruing to the public in any

1    way, shape or form.  Suppose they said that.

2           MR. REZNECK:  I understand exactly what you're saying and

3    maybe they would like the statute to read that way, but it

4    doesn!t read that way.  There's nothing in that statute, in that

5    legislative finding that suggests that through some

6    transmutation, that the public use suddenly becomes a private use

7    if that number is exceeded.

8           It seems quite clear to me on the face of the statute that

9    the Council was concerned with cost containment.

10          THE COURT:  But you do concede that the legislature could

11   legitimately say something like what I've said --

12          MR. REZNECK:  Yeah, I've --

13          THE COURT:  -- to remove the public use validity?

14          MR. REZNECK:  I've never seen an example of that, but I

15   suppose they could -- they could define, limit, condition public

16   use and they haven't done it here.  That's my point.  If you look

17   at that first section of the statute, there are no words of

18   limitation, conditioning; there's nothing that would say that the

19   thing -- while it's a public use now is somehow not a public use

20   if something else happens.  And the cost re-estimating statute

21   doesn't say that either.

22          THE COURT:  I thought your argument, though, is that even

23   if the second -- even if the cost re-estimating statute could be

24   read to have some limitation on what they meant, that is

25   different from what we must assess with respect to a potential

1   Constitutional violation and how we have to assess this as a

2   Fifth Amendment violation first is something else.

3        MR. REZNECK: Well, certainly -- and again, to return us,

4   I guess, to the *Daniels* case --

5        THE COURT: Well, before you do that, why would it be

6   unfair, as a matter of statutory interpretation, to read the

7   statute exactly the way they said?

8        MR. REZNECK: Because it doesn't say that. It seems to me

9   that we go by the plain words of the statute. This is not a case

10  of ambiguity. I could see if there was an ambiguity, one might

11  argue that, but there doesn't seem to me to be any ambiguity.

12       The legislative finding of public use is very firm and

13  explicit. I think Your Honor's aware of it. I don't need to

14  quote it. It identifies the ways in which this is going to be a

15  public use and of benefit to the District in terms of economic

16  development and employment opportunities. There's nothing in

17  this cost estimating statute that undercuts that or suggests that

18  those public benefits, public purposes, public uses would be

19  undercut if the cost estimate exceed the 165 million.

20       I wanted to point out one other thing because, you know,

21  since this issue has been raised, I've been reading the thing

22  pretty carefully. There's another reference, interestingly, to

23  governmental and public purpose. That's in the provision for the

24  issuance of bonds, revenue bonds. And it's in section 103(d) and

25  it declares that the bonds are -- the bonds are declared to be

1  issued for essential public and governmental purposes and the tax

2  exemption for people who buy those bonds is dependent on that.

3       Now, if that should be undercut in some way -- if the

4  result here should be that the public purpose or purpose use

5  determination is not what it is clearly meant to be on the face

6  of the statute, I don't know what happens to the ability to sell

7  those bonds to people who want tax exempt bonds.

8       I just point that out as an illustration that there's a

9  lot more in this statute maybe than meets the eye, but it's all

10 consistent.

11      THE COURT:  You cited section 103 -- what section?

12      MR. REZNECK:  I think it's in 103(d).

13      THE COURT:  D as in David?

14      MR. REZNECK:  D as in David, yeah.

15      And I think it makes it pretty clear that the tax exempt

16 status of those bonds is dependent on the finding of public use

17 or purpose, which is reiterated in that section just as it was

18 set forth in detail in the first section.

19      I probably won't have time to get into the balance of the

20 equities, but I would refer you to Mr. Tuohey's declaration in

21 that regard where he spells out in very great detail the

22 potential harms to the District from an injunction.

23      Now, they say in their papers, well, he's a great lawyer,

24 but he's not a bond person or a financial person.

25      Well, this isn't rocket science, Judge.  It seems to me

1   that if you're dealing with a situation in which an investment is

2   inherently risky, you're going to have trouble selling your bonds

3   or at least you're going to have to increase the interest rates

4   very substantially.  I mean, that's, I think, not a subject for

5   fair dispute.

6          THE COURT:  Indulge me in a hypothetical, though.  Suppose

7   section 103(d) had read something like "the bonds are declared to

8   be issued for essential public and governmental purposes as long

9   as the cost of the construction doesn't exceed 165 million."

10         MR. REZNECK:  That would be a different case, wouldn't it?

11  But that's not what it says.  I mean, where would the authority

12  come to amend the statute in that fashion?  Only from the

13  Council.

14         THE COURT:  True.  But suppose the Council had put that in

15  there.  Where would we be?

16         MR. REZNECK:  Well, we would have a different issue,

17  obviously, as to whether they were redefining public use then,

18  but they didn't do that.  In other words, that finding is

19  precisely consistent with the finding in section 101, the very

20  first part of the statute.

21         I would like to deal also with the suggestion here that

22  they somehow have no right of relief even if it should come to an

23  eminent domain proceeding.  I believe that's directly contrary to

24  the law because I think under Rule 71, if a proceeding were

25  brought in Superior Court, it would be under Rule 71 with

1    Superior Court rules, which is identical, virtually verbatim, to

2    Federal Rule 71.  And I think it's very clear that when title is

3    taken by the filing of a condemnation complaint, that it is a

4    defeasible -- it's a defeasible title.  That's what *Catlin* says;

5    that's what all the cases following it say.  I know nothing that

6    would say that the District wouldn't follow that.

7         I think they cited one sentence in dictum in some D.C.

8    Court of Appeals case which did not involve a challenge to title,

9    defeasibility.  That's all they have on it.  One of their other

10   cases -- one of their own cases --

11        71(a), Your Honor; I'm sorry if I misspoke.

12        One of their own cases, the *Loughran* case that they cited,

13   makes it very clear that there is a right to a judicial

14   determination of the validity of the taking and the Court said

15   here:  "We're of the opinion that the United States cannot by a

16   judgment on the declaration of taking defeat the right of a

17   property owner to contest in a judicial proceeding the validity

18   of the taking."  And that would apply, I'm sure, equally in the

19   District of Columbia in an eminent domain proceeding, so --

20        THE COURT:  Are you able to direct me to a subsection of

21   Rule 71(a) that makes clear that transfer of title is not

22   changeable or indefeasible?

23        MR. REZNECK:  It doesn't deal with title, but what it does

24   say is that the United States must plead authority -- must plead

25   its authority for the taking.  That's in the complaint.  And the

1  defendant may raise as a defense any objection to that, including

2  the authority of the government.  That would be included within

3  that.  We cited cases in our papers that show that the Federal

4  Courts have uniformly recognized the right of defendants to

5  challenge the authority of the government to a taking.  And

6  that's what would happen here, I think, if this were brought in

7  the Superior Court.

8       So this goes to the irreparable injury point, of course,

9  Your Honor.  They have an adequate -- a plain and adequate remedy

10 at law in just compensation for the value of their property and

11 in the preservation of their right to raise that defense in such

12 a proceeding and to argue that no, this was a private use, not a

13 public use; the government had no authority to do what it did.

14      And where I come from, that means that their rights are

15 fully protected; in other words, they have a complete and

16 adequate remedy at law.  And under those circumstances, there

17 cannot be any showing of irreparable injury.

18      Again, Judge Urbina, I think, dealt with that quite

19 explicitly in his opinion that the mere -- he said:  "The mere

20 prospect of having property taken by eminent domain is not an

21 injury sufficient to support judicial intervention."  That's in

22 his opinion in Rumber.  And he said he had no reason to believe

23 that if there were condemnation proceedings commenced pursuant to

24 the eminent domain power -- "the Court has no reason to believe

25 anything other than that any plaintiffs with a protected property

1  interest will have the opportunity to present their arguments and

2  will receive just compensation for any financial loss."

3       And he went on to say -- of course, very well settled

4  principles -- that economic loss rarely constitutes irreparable

5  harm.  He said:  "The Court concludes that this business-related

6  economic damage falls into the realm of the availability of

7  adequate compensatory or corrective relief being available at a

8  later date.  Accordingly, the Court determines that the

9  plaintiffs have not demonstrated irreparable harm."

10      Your Honor, I'd like to give you one other cite which I

11 think neither side cited, but I did run across it in preparation

12 or the argument and I wanted to give it to you because I think

13 it's really notable, given what was at stake and given the

14 justice from whom it comes.  It's an opinion by Justice Brandeis

15 in a case called *Hurley v. Kincaid*, H-u-r-l-e-y v K-i-n-c-a-i-d,

16 285 U.S. 95, especially at page 104.

17      And there the Supreme Court held in a unanimous decision

18 that a property owner could not enjoin the United States from

19 carrying out a flood control project which he claimed would have

20 the effect of unlawfully taking his property and he was remitted

21 to the remedy of just compensation and I think what Justice

22 Brandeis said about the equity jurisdiction is really worth

23 quoting, if you'll indulge me.

24      And he said, quote:  "Even where the remedy at law is less

25 clear and adequate, where large public interests are concerned

1    and the issuance of an injunction may seriously embarrass the

2    accomplishment of important governmental ends, a court of equity

3    acts with caution and only upon clear showing that its

4    intervention is necessary to prevent an irreparable injury.  No

5    such showing was made here."  The case was dismissed for lack of

6    equity jurisdiction.

7         I think those principles -- those basic principles of

8    equity apply to this case regardless of what label the plaintiffs

9    attach to it.  And I think, just as Judge Urbina in a very

10   similar case -- he didn't have the $165 million, I agree, but it

11   was a big development in Southeast Washington and it had a claim

12   of private use, but it was a taking for private rather than

13   public use.  That made no difference in terms of his analysis and

14   I suggest that it shouldn't make any difference here.

15        THE COURT:  That does take me back, frankly, to another

16   question that the plaintiffs have raised.  I think they were

17   complaining about the District's failure to comply with all of

18   the requirements that the Council set forth for doing the

19   re-estimate and they said that the CFO had not done an appraisal

20   versus a cost estimate of the parcels and so on.

21        How do you distinguish the Seventh Circuit's *Daniels*

22   blight finding concerning the agency that had not followed the

23   instructions of the legislature in making determinations about

24   whether there's blight?

25        MR. REZNECK:  Well, part of the problem, I think, was an

1    absence of direction from the legislation.   I would want to point

2    out -- and this was the other point I wanted to make about

3    *Daniels* -- that the Court of Appeals said, quote:   "Even though

4    the Supreme Court has required the existence of a public use to

5    justify the taking, the burden on the state is remarkably light."

6    In other words, that's the general rule.   No question about it.

7    It comes from *Berman v. Parker* here in the District.   It's been

8    carried through by the Supreme Court right up through and

9    including the *Kelo* case that was recently decided.

10        With respect to your specific question, I would like to

11   direct you to one of their own exhibits, Plaintiff 11 --

12   Plaintiff's Exhibit 11, which is a letter from Dr. Gandhi to

13   Chairman Cropp of April 25, 2005, and he addresses this issue

14   because that was one of the questions that had been put to him

15   when he was briefing the Council and meeting with the Council.

16        He said:   "The purpose of the study" -- I'm reading from

17   page 3:   "The purpose of the study was to provide adequate

18   acquisition costs for the site.   Thus the study contains market

19   value appraisals of the individual parcels as an interim step of

20   the overall analysis and is to be used by the Mayor and the

21   Council as a part of the decision-making process in determining

22   the location of the baseball stadium."

23        And then he says -- obviously, what we weren't doing was

24   the kind of appraisal that you would have to do to make an offer

25   and have a meaningful negotiation because our people weren't even

1   given access to many of these sites so that he had to do the best

2   that he could with what he had.

3        But he clearly complied with the Council's direction here,

4   which was to look at it on a parcel-by-parcel basis.  What they

5   were interested in --

6        THE COURT:  But that's not what they're complaining about.

7   They're complaining about appraisal versus the estimate that he

8   did.

9        MR. REZNECK:  Well --

10       THE COURT:  Right?

11       MR. REZNECK:  I think their primary claim as I read their

12  papers was that he didn't perform a parcel-by-parcel appraisal or

13  analysis.  I mean, that recurs in their papers all the time.

14       I think that is belied by what I just read and by other

15  documents as well.  We did file some additional documents

16  yesterday just so the record would be complete here, the

17  documentary record.  They also, I think, made clear what was done

18  here.

19       THE COURT:  We probably came at what they were arguing

20  differently because I thought that originally they were arguing

21  that they had not assessed the individual squares and lots.

22  They're saying no, we don't attack that; that we appreciate that

23  they did some estimation based upon units grouped together.

24       MR. REZNECK:  Yes.

25       THE COURT:  But it turned -- I thought I understood that

1    the argument was not that, but rather that they did not follow

2    the statutory requirement that an appraisal be done as opposed to

3    a cost estimate be done.  And I guess I'm asking you --

4         MR. REZNECK:  Well, that's not what Dr. Gandhi said and

5    what I just read.  He says:  "Thus the study contains market

6    value appraisals of the individual parcels as an interim step of

7    the overall analysis."  And I think the other document that we

8    put in yesterday, which includes a document from Deloitte, which

9    was the consultant on the thing, makes clear that that was done.

10        THE COURT:  Then help me understand what your point was

11   when you said that sometimes the District couldn't even get into

12   some of these properties or onto some of the properties.

13        MR. REZNECK:  I'm sorry, Judge.

14        THE COURT:  You had made some point that the District

15   could not get into the properties or get access to the properties

16   and I thought you were saying that you couldn't do a full market

17   appraisal when you can't get access to the property.

18        MR. REZNECK:  You couldn't do what you were doing if you

19   were in a negotiation between a willing buyer and a willing

20   seller where each side wanted to have its own appraisal of the

21   property and would be cooperating in that.  You couldn't do that

22   kind of thing because of the unwillingness.

23        For example, in the case that Mr. Hartman referred to, the

24   Siegel case, which I argued over in Superior Court, Mr. Siegel

25   denied the people from the Office of Property Management any

1    access to his property at all.  They had to do the best they

2    could.  They went down, they inspected it, they viewed it, but

3    they couldn't do it internally.

4        THE COURT:  I guess the question is would that have

5    significance to the *Daniels* court?  Would the *Daniels* court have

6    found, well, you were supposed to get appraisals; you didn't.  I

7    understand that there are reasons you didn't get them, but you

8    didn't do what you were supposed to?

9        MR. REZNECK:  They didn't have that -- any appraisal issue

10   before them at all.  The issue there was whether they had to go

11   to the State Court.  Now, I've argued in our papers that you

12   could make a good argument here -- I think Your Honor anticipated

13   it, really, in some of your earlier remarks; you could make a

14   good argument here that this whole thing belongs in the Superior

15   Court because it's a dispute over local land law involving the

16   interpretation of a D.C. statute.

17       I think what's happened here, and I think we have to be

18   realists about this, is that they lost.  The people who brought

19   that case in the Superior Court lost.  Judge Alprin ruled that

20   they had no private right of action and were not going to be

21   allowed to do that.  Well, what's the alternative?  You bring a

22   federal case under 1983, which, I submit, is really in essence a

23   state law case dressed up in the garb of federal law so as to try

24   satisfy 1983.

25       There's no bad faith in that.  I'm not suggesting that at

1    all.  I think it's creative lawyering.  But as a practical

2    matter, I think that's what's happening here.  And I think Your

3    Honor's question about whether this whole thing shouldn't be

4    thrashed out in the Superior Court is a good one.  I said in my

5    papers that, while that's a good argument, you didn't have to go

6    that far in this case to decide on that ground because there were

7    so many other grounds for denying both subject matter

8    jurisdiction here and a preliminary injunction.

9         Now, I haven't dealt, and this is pursuant to Your Honor's

10   order yesterday -- I haven't dealt with the subject matter

11   jurisdiction issue here in terms -- and I gather that Your Honor

12   did not want a full argument on that.  The only thing I would

13   submit on that is that if there's no subject matter jurisdiction,

14   there, of course, can be no substantial likelihood of success on

15   the merits and that would be the end of the preliminary

16   injunction, which would become moot right then and there.

17        And the Federal Rules, of course, Rule 12(h)(3) are quite

18   specific that when it appears, by suggestion of the parties or

19   otherwise, that the Court lacks subject matter jurisdiction, the

20   Court shall dismiss the action.

21        I am prepared to argue that, if you want me to, further in

22   terms of subject matter jurisdiction, but I don't know that it's

23   really necessary here.  I would, I guess, just close, because I

24   think my time is -- may have expired -- just very briefly on the

25   last two issues, balance of the equities and the public interest.

1    I would refer Your Honor to Mr. Tuohey's declaration on

2    the balance of the equities now.

3        THE COURT:  Well, one thing I don't know that I would be

4    able to get from it is if I have -- for example, if I maintain

5    the status quo, I don't know if I would consider maintaining the

6    status quo quite as the proposed order is drafted, but if I tried

7    to maintain the status quo for the 30-day period of the

8    negotiations, what is going to happen to the District?  What harm

9    is going to befall the District?

10        MR. REZNECK:  During that period?

11        THE COURT:  Yeah.

12        MR. REZNECK:  I'm just looking -- if you'll indulge me for

13   a moment because this baseball agreement is kind of complicated

14   and has a lot of deadlines in it.

15        There are, I think, three deadlines by December 31, 2005.

16   That's the end of this year, less than five months than now.  One

17   is to obtain site control.  A second is to enter into a lease and

18   a construction administration agreement for the construction of

19   the stadium so that construction can start in the first quarter

20   of next year.  And the one that could be quite important is the

21   "deposit of the revenues from the sale of the revenue bonds to

22   finance this by the District must be made by December 31, 2005."

23        I don't know what the issuance of an injunction would do

24   to the marketplace in terms of adding the element of risk and

25   uncertainty to the sale of those bonds, which is, I think,

1  absolutely critical here, whether it would chill the sale of the

2  bonds altogether, whether it would substantially raise the

3  interest costs because of the uncertainty that would be

4  introduced.

5      It would certainly do one or the other, it seems to me.

6  And I do think that is an important factor to consider.

7      The next key deadline, I guess --

8      THE COURT:  Remind me, though, the schedule for concluding

9  the bond work and actually having them sold.

10     MR. REZNECK:  December 31, 2005.  It says:  "The deposit

11 of the revenues from the sale of revenue bonds by the District

12 must be made by December 31, 2005," so the sale has to take place

13 before that, in other words, and --

14     THE COURT:  Have the sales begun already?

15     MR. REZNECK:  Not that I --

16     THE COURT:  I don't know.

17     MR. REZNECK:  Can I consult my colleague?  I don't believe

18 so, but --

19     THE COURT:  Yes, go ahead.

20     MR. REZNECK:  We don't know what the status is right now,

21 Your Honor, in terms of the sale of those bonds, but as you know,

22 it's not something you can do overnight.  You've got to deal with

23 these underwriters on Wall Street and get them to go along.  And

24 my experience has been that there 's a lot of drafting and

25 counter-drafting that goes on and then you have to sell -- you've

1    got to sell the bonds, which itself can be a major activity.

2         THE COURT:  Well, let's assume, though, that if there were

3    some preliminary injunction issued that did not stretch as widely

4    as the plaintiffs have asked -- namely, enjoin all obligations in

5    connection with the ballpark construction undertaking, but were

6    far more narrowly limited to efforts to condemn the property in

7    this -- the parcels in this property, and it didn't prevent --

8         MR. REZNECK:  Their properties?  Not anybody else's,

9    though?

10        THE COURT:  Correct.  And did not prevent the bond

11   underwriters from talking to the bond lawyers, didn't prevent all

12   of these other matters that would have to go forward to get

13   contracts on construction, demolition, all of those thing --

14   suppose those were all outside of the scope of a limited time

15   injunction, what harm would befall the District?

16        MR. REZNECK:  I don't know how to answer that, Your Honor,

17   other than to suggest to you that there are all kinds of

18   imponderables here.  I would submit, of course, that nothing is

19   going to happen to these people in 30 days so from the standpoint

20   of issuing an injunction, again, you don't have the immediacy

21   that is required here either for standing, which I haven't gotten

22   into yet, but for irreparable injury.  In other words, there is

23   no immediate threat of irreparable injury and they haven't

24   demonstrated one.

25        If we were going to do this next week, I could see -- you

1    know, they might have -- I wouldn't regard it as a plausible

2    claim because I think it's compensable.

3        THE COURT:  All right.  I interrupted you when you wanted

4    to wrap up with your final two points, so I'll let you finish

5    with those.

6        MR. REZNECK:  The only thing I wanted you to do is have

7    you read Mr. Tuohey's declaration carefully.  Contrary to

8    Mr. Hartman's efforts to characterize it at conclusory, I don't

9    think it's conclusory at all.  In terms of this very complicated

10   agreement, which he was one of the draftsmen of -- and it goes

11   into very great detail in terms of what the deadlines are and

12   what can happen to the deadlines in the deadlines aren't met:

13   The loss of the community's benefits program, for example, which

14   is a very substantial plus that we got from baseball and it took

15   a lot of pulling and hauling to get that, I'll tell you.

16       So I think if you read that, you'll see that we're not

17   just talking about an injury even to the District government but

18   you're talking about a lot of other people, the youth of this

19   city, who are to be the beneficiaries of that, employees, people

20   who want to work on the stadium, who want to get started, small

21   business people who are entitled to do so under the local

22   disadvantaged and small business provisions of the law, other

23   people who've invested in the city, the city planners, the

24   developers -- I mean you're talking about a whole range of

25   interests which are affected here.  And it seems to me that they

1    far outweigh the purely private economic interests which are

2    being asserted here by the plaintiffs.

3        I respect them, but I think in the balance that we've got

4    much the better of it.  Public interest really follows right

5    along from that, I think, that the Council has declared the

6    public interest to be in the construction of this stadium.

7        It's an integral part of the baseball agreement.  They've

8    made some suggestion in their papers that we could somehow

9    unilaterally decide to go someplace else.  That's not true under

10   the agreement.  The agreement does not allow the District

11   unilaterally to change the site that has been agreed to in the

12   agreement, which is this Southeast site; it can only be done with

13   the consent of the team and if they don't consent to another

14   site -- and it's probably not in the record, but, you know,

15   nobody's too wild about RFK for a variety of reasons, I think,

16   and the idea that we can somehow unilaterally just transfer this

17   whole thing to RFK is not in keeping with the agreement and would

18   not be agreed to by the baseball team.

19       So I think the public interest should allow this project

20   to go forward.  I think their rights are going to be protected.

21   They're not going to be overreached.

22       THE COURT:  All right.  Thank you.

23       MR. REZNECK:  Thank you, Your Honor.

24       THE COURT:  I'll give you rebuttal time.

25       MR. HARTMAN:  All right.  Thank you, Your Honor.  I'll

Case 1:05-cv-01413-RWR    Document 30-2    Filed 10/28/2005    Page 63 of 81

63


1    keep this short and make what I think I've numbered correctly,

2    six points, I hope.

3        First, we'll begin where the District ended and that is

4    this:. They discussed the balance of equities and what would

5    happen to the District and Mr. Rezneck incorrectly stated that we

6    suggested that they could unilaterally move the stadium.  What we

7    said was, number one, baseball and the District agreed they could

8    look at alternative sites.  It's in the agreement, section 4.01.

9        Number two, the statute requires that the District look at

10   alternative sites if the appropriate estimate isn't met so it is

11   clearly within their power to deal with that.  That directly

12   relates to the bond issue he's concerned about.  The bond issue

13   has nothing to do with where the stadium is.  The stadium could

14   be anywhere in the District; they would still be able to issue

15   the bonds.  He's trying to confuse that with trying to suggest

16   that the stadium can only be in this location and that's just

17   patently not true.  I don't know --

18       THE COURT:  I guess the point he was trying to make is the

19   reality is if it doesn't go forward at the current location,

20   there's no -- apparently no deal or agreement as to where it

21   would be going forward and that would have some impact on the

22   bonds.

23       MR. HARTMAN:  It may or may not, but I would suggest, Your

24   Honor, that his statement that baseball would not agree to an

25   alternative site -- I do not see anything in the record to

Scott L. Wallace, RDR, CRR
Official Court Reporter

1    suggest that anybody's even approached baseball about this issue.

2         THE COURT:  All right.

3         MR. HARTMAN:  Number two (sic), Mr. Rezneck made some

4    comments regarding the appraisal or the cost estimate that was

5    done that he's calling an appraisal.  I can only say this to Your

6    Honor:  Number one, the statute says an appraisal.  Number two,

7    their own document says, by their -- even though Dr. Gandhi

8    called it in his cover letter "a parcel-by-parcel appraisal,"

9    their own experts say in their report this cannot be relied upon

10   as an appraisal of each parcel.  It is not an appraisal.  It is a

11   cost estimate of some sort.  And the statute says you shall

12   estimate cost, but you shall use as a component of that an

13   appraisal.  They admitted this is not an appraisal and they know

14   what that means.

15        THE COURT:  Is there something a little uncomfortable,

16   however, with your arguing that they didn't do what they were

17   supposed to do when it sounds as if your clients, or some of

18   them, didn't let the government do what it was supposed to do?

19        MR. HARTMAN:  No, Your Honor.  And in fact, that's my

20   third point.  He's incorrect about that.  Right now, the District

21   is conducting appraisals for purposes of their eminent domain --

22   for purposes of negotiating or taking property any way they can.

23   They do not need our permission to do that.  They're conducting

24   those appraisals, the normal ones that the Office of Property

25   Management does, without any consent from anybody.  They're doing

1    it.

2        What he was talking about is environmental issues and

3    environmental reviews that he claimed they couldn't get access

4    to, but we explained in our papers that really, that wasn't the

5    case; they could have done an environmental review that they

6    didn't do.

7        But for appraisals, they are doing those appraisals now.

8    They have been doing them since March, when the Deputy Mayor

9    testified that he understood they were doing appraisals and

10   that's in our Exhibit 6.  They were in process.  They're still in

11   process.  They haven't come on the property in any other way.

12   They've had no other power to come on the property to do that.

13   They don't need to do that in order to do that kind of appraisal.

14       So to suggest that we're not letting them on the property

15   and that's why they didn't do the appraisal they were supposed to

16   do is just simply not true.

17       Next point, there has been some discussion about private

18   use and public use.  I would submit, Your Honor, that the

19   Constitution says "public use" and that means, according to *Kelo*

20   and every other case that's ever addressed this issue, a valid

21   public use.

22       If there were no statute passed to build a stadium and the

23   District chose to go do it anyway, but there was no statute --

24   that they were going to say everybody in the world can come and

25   watch free baseball, there would be no valid public use because

1    it hadn't been authorized.  It would be if it was authorized, but

2    it wasn't.

3         So the question here is whether there's a valid public

4    use.  That's determined by the legislature and they aren't doing

5    that.  They're building a stadium, but not the one that the

6    legislature said would serve the purpose that the legislature

7    wanted it to serve because it's going to cost more than what they

8    wanted it to spend.

9         THE COURT:  Although in your hypothetical, it seems to me

10   that what the difference is is that the Court would have wider

11   latitude in assessing the action that the District or whatever

12   government you posited took rather than in a case where a

13   legislature has made it a declaration about public benefit,

14   public use and so on.

15        MR. HARTMAN:  Well, that's actually a good point.  And

16   *Daniels* does just that, Your Honor, and I invite you to look back

17   at *Daniels*.  *Daniels* first determined whether, under the

18   legislative direction, the proper public use determination was

19   made by the planning commission.

20        And they said it wasn't, so they said, let's go back and

21   look at what the general public -- what their general power is to

22   do things in their jurisdiction and see if what they're doing

23   here meets that.

24        Your Honor, their general power to acquire property in the

25   District does not -- for municipal uses does not include doing it

1  for a baseball stadium.  They needed to have special authority to

2  do that.  They needed to have that finding made to make it a

3  public use so they could acquire the property.

4      THE COURT:  The issue is still, I guess, what difference

5  does that make for Constitutional analysis.  But go ahead.

6      MR. HARTMAN:  For Constitutional analysis, it goes back to

7  our question of what is the public purpose and use that the

8  Council said should occur here.  And again, I won't repeat it.

9  *Daniels*, I think, is right on point.

10      Of course, the legislature passed a statute saying we're

11  concerned about blight and things like that, but we're going to

12  let you, Council, or the commission, make the determinations of

13  when blight exists, using these five steps, including a cost

14  estimate of certain things.

15      And the Court said if you don't follow those five steps,

16  you're not making the public use determination the legislature

17  told you you could do and that it put its box around and put its

18  criteria for.  And that's what happened here.  The legislature

19  did precisely that.  They said we think there should be baseball

20  if it's not too expensive and they were very specific about what

21  that meant.

22      THE COURT:  Although they weren't telling the Mayor, you

23  make a public use determination --

24      MR. HARTMAN:  Actually, Your Honor, in a way, they were.

25      THE COURT:  -- much less you make a public use

1    determination using these criteria.

2        MR. HARTMAN:  Actually, in a way they were.  They were

3    saying here's our public use determination.  We're willing to do

4    it at this location if it's not more than $165 million.  But if

5    it is, you go make sure that's not the case or let us know it is.

6    And you know what?  Don't even come back us.  If it isn't, we

7    won't use this property; you've got to go find another one.

8        So they were simply delegating to the Mayor the authority

9    to determine whether the public use they thought was appropriate

10   and the purpose they thought was appropriate and beneficial to

11   the District was really going to be there.  And that was based on

12   doing an estimate.

13       And they said, when you do that estimate, Mr. Mayor, to

14   make sure our goals are met of not having too expensive a

15   stadium, make sure you do an appraisal of each piece of property,

16   of each -- excuse me -- of each parcel of property.

17       They didn't do it.  They did a cost estimate and said as

18   part of that cost estimate, we'll do a market valuation using

19   some appraisal standards or appraisal procedures, but we're not

20   doing an appraisal.  They could have done it and they chose not

21   to.

22       The next point, Your Honor, is you asked me at the

23   beginning and I didn't have it in front of me and I apologize,

24   but I do now:  What is the right standard for some substantive

25   due process arguments?  And I'll read to you the standard

1  established in the *George Washington* case in this circuit:  "A

2  deliberate flouting of the law that trammels significant personal

3  or property rights qualifies for relief under 1983."

4       What we established in the opening and in our brief,

5  there's no question that the right to exclude people from your

6  property is the most fundamental of property rights and they're

7  going to take that completely away.

8       So then the question is:  Was there a deliberate flouting?

9  Your Honor, as I said before, there's no question that this thing

10  that they did is not even close to being what the Council wanted

11  an estimate to be.  They deliberately flouted the requirement

12  that they conduct an appraisal of each parcel of property.  They

13  deliberately flouted the requirement that they do an

14  environmental cost estimate.  They literally pulled those numbers

15  out of a hat.  There's no basis.  They're just numbers put on a

16  piece of paper.  They deliberately flouted those requirements.

17       Your Honor, I'm not going to guess as to why they did.

18  According to the legislative history, Major League Baseball

19  really likes this site and the Council was concerned; the

20  District didn't want to go back and try to talk about another

21  one, so as we pointed out in the legislative history, they said,

22  we're going to give you the backbone to do it, and the District

23  didn't want to do that.

24       All of which results in a violation of our Fifth Amendment

25  rights.  So there's a deliberative flouting and a trammeling of

1    significant personal property interests.

2         Finally, Your Honor, let me address Mr. Rezneck's comment

3    about what they anticipate to happen in the next 30 days.

4    Mr. Rezneck said just before he ended, quote, "Nothing's going to

5    happen to these people."

6         I like that statement.  And perhaps if an order

7    accompanied that, we would have some reason to believe that they

8    wouldn't do something in the next 30 days.  But to say we don't

9    anticipate anything happening -- we anticipate a 30-day

10   negotiating process with everybody doesn't mean they'll guarantee

11   a negotiating process.

12        And we have to emphasize, Your Honor, this is not about

13   just compensation.  This is about whether they can do it in the

14   first place, whether they have the authority to do it in the

15   first place.

16        If they're going to -- and we suggest that the only

17   language that has to be written in an order is to adopt that

18   language from the statute that says you shall not acquire or --

19   "enter an obligation to acquire or purchase property -- any

20   property -- enter any obligation to acquire or purchase any

21   property on this site."

22        That's all we want them to do until we can have a hearing

23   on the merits or a further motion.  That's it.  That's what the

24   statute says.  Now, if they say that's vague, it's their own

25   statute they're interpreting.  And we would submit that that

1    language from the statute is exactly what should be at issue here

2    because that's exactly what they're doing that we say they can't

3    do right now.

4        If they want to negotiate, I'm not sure that prevents them

5    from negotiating. They "shall not enter into any obligation," so

6    they can still negotiate. We just don't want them to violate

7    that statute until we can get back here and deal with the merits

8    of this case. That's all we ask.

9        I think that was my sixth point, Your Honor. We certainly

10   appreciate your patience and interest and thank you very much.

11       THE COURT: Let me give everybody a ten-minute break and

12   we'll come back and try to wrap up.

13       MR. HARTMAN: Thank you.

14       (Thereupon, a break was had from 1:09 p.m. until

15   1:22 p.m.)

16       THE COURT: All right. Thank you, counsel, for your

17   arguments.

18       The plaintiffs, who are owners of property in the area

19   targeted for the proposed baseball stadium, have complained that

20   they are in imminent danger of having their land seized in

21   violation of their rights under the Fifth and 14th Amendments.

22   They filed an application for a preliminary injunction to

23   prohibit the District from proceeding essentially with its

24   efforts to acquire the land and the primary site here. The

25   District has opposed that application.

1    Of course, to justify a preliminary injunction, a movant

2    has to demonstrate that, first, irreparable harm will result

3    absent immediate intervention of the Court; and second, that the

4    movant is likely to succeed on the merits of the underlying

5    dispute; third, that any harm to other parties that would be

6    caused by granting the preliminary injunction does not outweigh

7    the equities in favor of granting the preliminary injunction; and

8    last, that granting the preliminary injunction does serve the

9    public interest.

10    These factors interrelate on a sliding scale so that

11    particularly strong equities on one or some factors may balance

12    weak equities on the others.

13    With respect in this case to irreparable harm, certainly

14    irreparable harm must be shown to be an imminent injury; that is,

15    both great and certain, and that legal remedies can't repair.

16    And the key word in this consideration is "irreparable." The

17    possibility that adequate compensatory or other corrective relief

18    will be available at a later date, in the ordinary course of

19    litigation or otherwise, weighs heavily against a claim of

20    irreparable harm, as our circuit has held in the *Virginia*

21    *Petroleum Jobbers* case.

22    Irreparable harm does require something more than having

23    to comply with or abide by an illegal agency action or decision

24    pending the outcome of litigation over that decision. Plaintiffs

25    have not convincingly identified any harm that they may suffer

1    that is not compensable by money damages.  The loss or

2    encumbrance of property is easily repaired by monetary

3    compensation and it's plain that the property can be valued and

4    compensated by money damages.  And far from the harm being

5    irreparable, certainly the Constitution expressly provides for

6    repair by requiring just compensation for seizing property

7    against the will of the owner.

8         A violation of plaintiff's Constitutional rights, whether

9    irreparable or not, is simply not imminent or certain at this

10   point.  The District would be required, first, to negotiate with

11   the property owners to attempt to purchase their property at a

12   mutually agreeable price.  They've certainly said that they have

13   every intention to do so within at least a 30-day period and

14   that's not been contradicted.

15        Certainly if that fails, the District can exercise their

16   power of eminent domain, but the plaintiffs certainly have

17   recourse to the courts to determine whether the compensation

18   provided by the District is just or fair.

19        With respect to the substantial likelihood of success on

20   the merits, plaintiffs have also not shown that they are likely

21   to succeed, in my judgement, on the merits.  What the Fifth

22   Amendment prohibits is a sovereign taking property from one party

23   for the sole purpose of transferring it to another private party

24   even though the first party is paid just compensation in one

25   aspect at least.

1    The plaintiffs certainly are unable to show that the

2    District's conduct, assuming it exercises power of eminent

3    domain, runs afoul of that requirement of the federal takings

4    clause.  And a publicly owned stadium meets the Fifth Amendment's

5    public use requirement.

6    The Supreme Court's recent rulings do reiterate its

7    position on public use jurisprudence and that is that it's the

8    role of the legislature and not the Federal Courts to determine

9    what will serve the public use, and that legislature's

10    determination is due a good measure of deference.

11    Now, the Ballpark Act relating to public use does plainly

12    say, as everybody concedes:  "The ownership of a publicly

13    financed stadium in the District of Columbia for use primarily

14    for professional athletic team events is a municipal use that is

15    in the interest of and for the benefit of the citizens of the

16    District of Columbia."

17    Nothing in the emergency legislation, in my judgment,

18    vitiates that finding.  The plaintiffs' hopes for establishing

19    success on the merits, it seems to me, depend on a single

20    critical premise and that is that for the purpose of the ballpark

21    legislation, "public use" is defined by the $165 million cost

22    trigger built into the District's authorizing emergency

23    legislation.  Plaintiffs have argued that if the $165 million

24    estimate cap is exceeded, the District is acting outside of the

25    public use authorization from the Council and, therefore, not

1    authorized to take under the takings clause.

2        But this argument fails to recognize that the public use

3    for Fifth Amendment purposes is not defined by reference to the

4    District's authorizing legislation, but is defined by Supreme

5    Court jurisprudence for Fifth Amendment purposes.  As the Court

6    in *Midkiff* said, "The public use requirement is coterminous with

7    the scope of a sovereign's police powers."  There is "a role for

8    courts to play in reviewing a legislature's judgment of what

9    constitutes public use," but "it is an extremely narrow one."

10   "Deference to the legislature's public use determination is

11   required until it is shown to be an impossibility."

12       In short, the Court has made clear, and I'm quoting from

13   *Midkiff*, that it "will not substitute its judgment for a

14   legislature's judgment as to what constitutes a public use unless

15   the use be palpably without reasonable foundation.  Where the

16   exercise of the eminent domain powers is rationally related to a

17   conceivable public purpose," the Court has never held a

18   compensated taking to be proscribed by the public use clause.

19       The *Midkiff* case is M-i-d-k-i-f-f.

20       Now, in the case here of the ballpark, the transfer of the

21   property was private to public for a facility that will be open

22   to and used by the public.  The Supreme Court's jurisprudence

23   provides no ground for concluding that the Council's

24   determination that the construction of a publicly owned ballpark

25   is a municipal use falls short, in any way, of the Fifth

1  Amendment requirement that the taking be rationally related to a
2  conceivable public purpose.

3       Now, while it may well be the case that the cost trigger
4  will not be fairly met or hasn't been fairly met at this point,
5  those are details that this Court can't enforce as part of a
6  Fifth Amendment analysis.  The Fifth Amendment doesn't require an
7  efficient public use or even a public use at a reasonable cost;
8  nor is it capable of enforcing details of local legislation that
9  are more stringent than the Constitution's own use requirements.

10      And so any rights the plaintiffs have regarding the cost
11  trigger would flow, if there is one, from the local legislation
12  and not from the Fifth Amendment.  Perhaps the Superior Court has
13  ruled on that already, but I don't see that the plaintiffs have
14  persuaded me that they're entitled to relief under the Fifth
15  Amendment for a violation of the District's cost trigger.

16      With respect to the balance of harms, I really can discern
17  no benefit to the plaintiffs from a short-lived preliminary
18  injunction.  Such an injunction would only minimally harm the
19  defendants in my judgment as well.  The defendants expressed
20  concern about which -- about meeting deadlines in the baseball
21  stadium agreement.  Those deadlines could snowball into other
22  difficulties that related to the delay of construction and
23  operation of the facility months down the road, but if any
24  injunction granted is truly short-lived, as I think it would have
25  to be, these are fairly remote harms so I don't find that this

1    factor tilts strongly in either party's direction.

2            And then with respect to the public interest, it does

3    appear plain to me that the Council has already determined that

4    the public interest in this case is that a baseball stadium will

5    serve the public interest.  And based on the parties' submissions

6    in this case, there's no reason for me to conclude that the

7    public interest will be better served by blocking the efforts of

8    the District to acquire land or to continue with its efforts to

9    engage in negotiations to acquire land at the primary site than

10   it would be by letting it proceed.

11           In summary, then, the plaintiff's case does not warrant,

12   in my judgment, a preliminary injunction.  The plaintiffs have,

13   in my judgment, an adequate remedy at law and are not entitled to

14   equitable relief.

15           Second, they are not likely to succeed or have not

16   persuaded me of a great likelihood of success on the merits at

17   this point.  The analysis of the balance of the harms to the

18   parties, in my judgment, does not weigh in favor of granting the

19   injunction as no harm to the plaintiffs, I don't think, will be

20   prevented and slight harm to defendants may reasonably be

21   anticipated by its imposition.

22           But finally, the legislature, I think, has determined the

23   public interest, which does not support blocking the efforts of

24   the District to continue with its efforts to construct the

25   stadium.  The plaintiffs have sued for an anticipated violation

1    of the takings clause, but the facts that they plead don't

2    necessarily implicate the takings clause as pled.

3        I think their dispute really turns on what the District's

4    legislation requires and whether the District has complied with

5    that legislation.  And even if the District exercises eminent

6    domain powers to acquire the plaintiffs' property and even if in

7    doing so, the District acts *ultra vires*, there's no indication

8    that the District's conduct is going to offend the takings clause

9    of the Fifth Amendment.

10        It seems to me that the acquisition of land at the primary

11    site is going to be for a public use, as that term is defined for

12    Fifth Amendment purposes, and that there is no reason to think,

13    certainly not yet anyway, that the compensation paid for the land

14    will not be just if a price cannot be agreed upon voluntarily by

15    the parties.

16        The Fifth Amendment's takings clause requires nothing more

17    than a public use and a just compensation and it does not require

18    that a state executive follow the dictates in particulars of the

19    state legislation outside of the fact that the State or locality

20    has declared public use.

21        The motion by the plaintiffs for a preliminary injunction

22    is denied.

23        The parties have also filed -- or the defendant has filed

24    a motion for -- to dismiss.  I think the briefing is now complete

25    with the filing that came in last night, but correct me if I'm

1  wrong.  I wanted to make sure that we got all the filings in

2  before we act on that.

3       Come on up to the mike.  Have the filings been now

4  completed?

5       MR. REZNECK:  I guess I could file a reply brief, Judge.

6  I'm sort of inclined to submit on the papers that we have.  So

7  far, it's been pretty thoroughly ventilated.

8       THE COURT:  What you submitted was a supplement, not a

9  reply?  What was just submitted?

10      MR. REZNECK:  That was just some additional documents so

11 the record would be complete on the documentary phase.

12      THE COURT:  All right.  But that was not intended as a

13 reply?

14      MR. REZNECK:  No, it was not.  It was not.  And I guess I

15 would like to think about it if I could.  I'm not sure how

16 many --

17      You served your papers yesterday?

18      MR. HARTMAN:  That's correct; we served our opposition to

19 his motion yesterday.

20      THE COURT:  Okay.

21      MR. REZNECK:  So I would normally have what?

22      THE COURT:  I guess you've still got five days or so.

23      MR. HARTMAN:  I think the 12th is the date, Your Honor,

24 but I'm not sure.

25      MR. REZNECK:  I'd like to think about it, Judge, and maybe

1    we'll just submit on the papers, but --

2        THE COURT:  All right.  Well, I think I should not

3    schedule anything at the moment until the motion is ripe and

4    fully pled.  So I'll wait to see what comes in and then we'll

5    either issue something to set a hearing or, if we don't need a

6    hearing, we'll just issue some decision.

7        If the case does go forward, we'll have to come back for

8    scheduling; if it doesn't go forward, there won't be much left to

9    do.

10        MR. REZNECK:  Okay.  Thank you.

11        THE COURT:  Is there anything else we should take up?

12        MR. HARTMAN:  No, Your Honor.  Thank you very much.

13        THE COURT:  Thank you very much for good arguments.  And I

14    want to thank the Court staff for indulging us well beyond their

15    normal lunch break.

16        So thank you very much.  You may be excused.

17        (Proceedings adjourned at 1:36 p.m.)

18

19

20

21

22

23

24

25

1

## C E R T I F I C A T E

3

4          I, Scott L. Wallace, RDR-CRR, certify that the
foregoing is a correct transcript from the record of proceedings
5     in the above-entitled matter.

6

                     ------------------------------
7                    Scott L. Wallace, RDR, CRR
                     Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25