**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHEAST LAND DEVELOPMENT ASSOCIATES, L.P. et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 05-1413 (RWR) |
| THE DISTRICT OF COLUMBIA et al., | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION**

Property owners in an area targeted as the favored site for the construction of a new baseball stadium in the District of Columbia filed suit to stop the city from taking their property as planned, arguing that the taking would violate the Public Use Clause of the Fifth Amendment as well as the Substantive Due Process Clause of the Fifth and Fourteenth Amendments. The city filed a motion to dismiss for failure of the complaint to state claims upon which relief may be granted. Because plaintiffs are unable to establish a violation of the Public Use Clause or the Substantive Due Process Clause, the city's motion to dismiss the complaint will be granted.

-2-

## BACKGROUND

In an effort to attract a major league baseball team to the District of Columbia, the Council of the District of Columbia ("City Council") passed the Ballpark Omnibus Financing and Revenue Act of 2004 ("Ballpark Act") to authorize and require the Mayor and the Sports and Entertainment Commission to acquire land, and to develop and construct a ballpark.  The legislation incorporated an express finding that the construction of a baseball park was a municipal use for the benefit of the citizens of the District of Columbia.

The Council finds that:

(1) The ownership, construction, development, or renovation of a publicly financed stadium in the District of Columbia, after October 1, 2004, for use primarily for professional athletic team events is a municipal use that is in the interest of, and for the benefit of, the citizens of the District of Columbia because such a publicly owned stadium or arena will contribute to the social and economic well-being of the citizens of the District of Columbia and significantly enhance the economic development and employment opportunities within the District of Columbia.

(2) To further that interest, it is appropriate for the District of Columbia to pay all or a portion of the cost of constructing, developing, or renovating a stadium . . . .

D.C. Code § 10-1601.01 (West, Westlaw current through Sept. 13, 2005).  The legislation, which took effect April 8, 2005, provides in pertinent part:

(a) For the purposes of this section, the term:

-3-

(1) "Ballpark" means a baseball-specific stadium owned by the District and constructed on the ballpark site.

(2) "Ballpark site" means the site bounded by N Street, S.E., Potomac Avenue, S.E., South Capitol Street, S.E. and 1st Street, S.E., or such other site as determined in accordance with subsection (b)(2) of this section if this primary site shall be unavailable to be approved by the Mayor.

* * * *

(b) . . . .

(2) The Mayor, subject to such conditions as the Mayor shall determine, shall:

(A) Acquire and convey to the Anacostia Waterfront Corporation, for use by the Sports and Entertainment Commission to satisfy its responsibilities under this subchapter, all necessary real property, including rights-of-way or other easements, that shall be required to develop, construct, and complete a ballpark within the site bounded by N Street, S.E., Potomac Avenue, S.E., South Capitol Street, S.E. and 1st Street, S.E.; provided, that if this site shall be unavailable or infeasible for the timely completion of a ballpark on or prior to March 1, 2008 relying only on the funding authority provided in this subchapter, any designated alternative site in the District of Columbia, including the site for Robert F. Kennedy Stadium, . . . that the Mayor determines, subject to the approvals required in section 4.01 of the Baseball Stadium Agreement, will be available and feasible for the timely completion of a ballpark relying only on the funding authority provided in this subchapter; . . . .

D.C. Code § 10-1601.05.  Soon after adopting the Ballpark Act, the City Council adopted an additional provision, requiring a cost review and directing that alternative sites be pursued if

-4-

the cost estimate was in excess of a certain amount.  The Council

mandated that

> (b) For the purposes of this section, land acquisition
> costs shall include the following:
>
>> (1) One separate appraisal of each parcel of land
>> to be acquired, which shall be performed after
>> April 8, 2005;
>>
>> (2) An estimate of the environmental remediation
>> costs; and
>>
>> (3) Legal expenses associated with land acquisition.
>
> (c) For purposes of this section, infrastructure costs
> shall include the following:
>
>> (1) The District Department of Transportation's
>> estimate for basic road and sidewalk improvements;
>>
>> (2) The cost of expanding the Navy Yard Metro
>> station to accommodate the additional usage
>> anticipated by the stadium; and
>>
>> (3) Water and sewer relocation costs.
>
> (d) Prior to May 15, 2005, . . . the Chief Financial
> Officer shall re-estimate the costs to the District for
> land acquisition and infrastructure [for the primary
> ballpark site] and provide a report on this re-estimate
> to the Mayor and the Council.
>
> (e) If the total amount of these re-estimated costs to
> the District exceeds $165 million, the primary ballpark
> site shall be deemed financially unavailable by the
> District pursuant to this subchapter. Pursuant to this
> subchapter, the Mayor and the Sports and Entertainment
> Commission shall pursue replacement of the primary
> ballpark site with a substantially less costly site in
> the District, subject to the approval of Baseball
> Expos, L.P., or its assigns or successors, in
> accordance with the Baseball Stadium Agreement.

D.C. Code § 10-1601.07.

-5-

The re-estimated cost, figured at $161.4 million, was reported to the Council in a briefing on March 30, 2005, during which several Council members raised questions about the methods used to generate the re-estimated cost. The District's Chief Financial Officer responded to these various questions by letter to the Council dated April 25, 2005. The City Council discussed and debated the cost re-estimate and related issues again on May 13, 2005. Again, some Council members questioned the methods used and the validity of the results.

In the meantime, on April 11, 2005, a group of owners of property in the primary ballpark site filed suit in the Superior Court for the District of Columbia, seeking to enjoin the District from proceeding with plans to acquire land in the primary ballpark site. See Order, Robert Seigel, Inc. v. District of Columbia, Civil Action No. 05ca2770, at 1 (D.C. Super. Ct. June 15, 2005). Plaintiffs in Robert Seigel alleged that the District had not acted in good faith compliance with the legislative directive in conducting the re-estimate, and that the result was not a reasonably realistic estimate. See id. The court concluded that the property owners in the primary ballpark site did not have a private right of action to contest the conduct of the re-estimation or to otherwise enforce any mandate of the ballpark statutes. See id. at 6-7. Two weeks after the Superior Court order was issued, Southeast Land Development

-6-

Associates, L.P., a plaintiff here, informed the Attorney General of the District of Columbia of its intent to sue the District for civil rights violations, asserting that the cost re-estimate "does not meet the express or implied requirements contained in the [legislation codifed at D.C. Code § 10-1601.07]."  Letter from Barry M. Hartman to Robert J. Spagnoletti, June 28, 2005 (appended as Ex. 16 to Pl.'s Mot. for Prelim. Inj.).

Plaintiffs filed this action against the District and the Mayor asserting federal question jurisdiction under 28 U.S.C. § 1331, and a claim under 42 U.S.C. § 1983.[1]  They allege the District's conduct violates the Public Use Clause of the Fifth Amendment and plaintiffs' substantive due process rights guaranteed by the Fifth and Fourteenth Amendments.  Plaintiffs' argument consists of two critical components.  First, they maintain that the ballpark legislation incorporates a finding of public use <u>only if</u> certain specified estimated costs do not exceed $165 million, and that if those costs exceed $165 million, then the legislature's public use finding is void.  Second, they assert that the District's cost re-estimate of $161.4 million is an under-estimate of the true cost, which exceeds $165 million, and that the under-estimate resulted from the District's failure

---

[1]  Section 1983 provides a cause of action against "[e]very person who, under color of any statute . . . of . . . the District of Columbia, subjects . . . any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws . . . ."

-7-

to employ the specific methods for estimating costs mandated by the legislature.  Plaintiffs conclude that the District is not authorized to proceed with acquiring land in the primary ballpark site – – where they are landowners – – because the cost exceeds $165 million and the public use finding is therefore void. Defendants argue, among other things, that plaintiffs have not presented claims for which relief may be granted with respect to either the Public Use Clause or substantive due process guarantees, and that the complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

### DISCUSSION

A complaint will not be dismissed for failure to state a claim upon which relief may be granted unless a plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  See Fed. R. Civ. P. 12(b)(6); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  A court should liberally construe all pleadings in favor of a plaintiff, except that a court need not rely on unsupported factual inferences and legal conclusions posing as factual allegations.  Id.

I.    PUBLIC USE

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  As its text makes

-8-

plain, the Takings Clause imposes two conditions on a valid
taking.  First, the transfer must be for the public – – as
opposed to purely private – – use or benefit.  <u>See</u> <u>Kelo v. City
of New London</u>, – U.S. – , 125 S. Ct. 2655, 2661 (2005) (stating
that the public use requirement prohibits taking private land for
the purpose of conferring a private benefit on a particular
private party); <u>Hawaii Hous. Auth. v. Midkiff</u>, 467 U.S. 229, 245
(1984) ("A purely private taking could not withstand the scrutiny
of the public use requirement; it would serve no legitimate
purpose of government and would thus be void.").  Second, when
the governmental interference with property rights amounts to a
taking, the private property owner must receive a fair price for
the loss.  <u>See</u> <u>Lingle v. Chevron</u>, – U.S. – , 125 S. Ct. 2074,
2080 (2005).  Plaintiffs here are concerned with a public use
violation only, not just compensation.  (<u>See</u> Pl.'s Mem. in Opp'n
to Def.'s Mot. to Dismiss Compl. at 4 ("The injury caused by
these violations and the remedy sought have nothing to do with
'just compensation.'").)

    A legislature's authority to make a public use determination
is "coterminous with the scope of a sovereign's police powers."
<u>Midkiff</u>, 467 U.S. at 240.  The government satisfies the Public
Use Clause if it can demonstrate that "the exercise of the
eminent domain power is rationally related to a conceivable
public purpose."  <u>Id.</u> at 241 (stating that "where the exercise of

-9-

the eminent domain power is rationally related to a conceivable

public purpose, the Court has never held a compensated taking to

be proscribed by the Public Use Clause").  Courts display great

deference to a legislature's determination of public use.

> There is, of course, a role for courts to play in
> reviewing a legislature's judgment of what constitutes
> a public use . . .[but] it is "an extremely narrow"
> one.  . . . [D]eference to the legislature's "public
> use" determination is required "until it is shown to be
> an impossibility."  . . .  In short, the Court has made
> clear that it will not substitute its judgment for a
> legislature's judgment as to what constitutes a public
> use "unless the use be palpably without reasonable
> foundation."

Id. at 240-41 (citations omitted).

Courts manifest this deference in part by refusing to engage

in a cost-benefit analysis of the taking.  "When the

legislature's purpose is legitimate and its means are not

irrational, our cases make clear that empirical debates over the

wisdom of takings − − no less than debates over the wisdom of

other kinds of socioeconomic legislation − − are not to be

carried out in federal courts."  Id. at 242-43, quoted in Kelo,

125 S. Ct. at 2667.  "[W]hen the legislature has spoken, the

public interest has been declared in terms well-nigh conclusive.

In such cases the legislature, not the judiciary, is the main

guardian of the public needs to be served by social legislation

. . . ."  Berman v. Parker, 348 U.S. 26, 32 (1954).  The courts

"do not sit to determine whether a particular housing project is

-10-

or is not desirable." Id. at 33, quoted in Kelo, 125 S. Ct.
at 2663.

> It is not for the courts to oversee the choice of a
> boundary line nor to sit in review on the size of a
> particular project area.  Once the question of the
> public purpose has been decided, the amount and
> character of land to be taken for the project and the
> need for a particular tract to complete the integrated
> plan rests in the discretion of the legislative branch.

Berman, 348 U.S. at 35-36 (citations omitted).  Recently, by
refusing to adopt some test designed to assess the likelihood or
magnitude of the anticipated public benefit resulting from a
taking, the Supreme Court has reaffirmed that the Public Use
Clause requires only that a taking be rationally related to the
broad concept of public use or public interest, and does not
imply a means-end test.  See, e.g., Kelo, 125 S. Ct. at 2667
(refusing to adopt a "reasonable certainty" test for takings);
Lingle, 125 S. Ct. at 2085 (criticizing and refusing to adopt the
"substantially advances" test or any other test of
effectiveness).  Further eschewing involvement in assessing the
prudence of fiscal or social decisions associated with the
taking, the Supreme Court has declared that "it is only the
taking's purpose, and not its mechanics, that must pass scrutiny
under the Public Use Clause." Midkiff, 467 U.S. at 244.

Plaintiffs' constitutional claims depend on a particular
interpretation of the ballpark statutes, namely, that public use
is defined by the $165 million figure.  Plaintiffs'

-11-

interpretation of the ballpark statutes is not supported by the
text of the statutes.

"It is axiomatic that in interpreting any statutory
provision our starting point must be the language of the statute
itself." <u>Symons v. Chrysler Corp. Loan Guar. Bd.</u>, 670 F.2d 238,
241 (D.C. Cir. 1981) (citing <u>Consumer Prod. Safety Comm'n v. GTE
Sylvania</u>, 447 U.S. 102, 108 (1980)).  The statute provides,
without any monetary qualification, that "the ownership,
construction, development or renovation of a publicly financed
stadium in the District of Columbia . . . is a municipal use that
is in the interest of, and for the benefit of, the citizens
. . . ."  D.C. Code § 10-1601.01(1).  This finding is express,
unequivocal, and broad.  Nothing in the remainder of the statute
vitiates it.  The public use finding is not limited to or defined
by reference to a particular site within the District, a
particular cost, or a particular cost for a particular site.
Regardless of the price tag on the baseball stadium, there is
nothing in the ballpark statutes to suggest that the taking – –
regardless of the cost – – will not be for the use and benefit of
the public.  If the Council had intended the public use finding
to be dependent upon a $165 million cost cap, it could have
inserted a proviso directly into that finding, but it did not.
Because the Council made an unqualified, independent finding that
"a publicly financed stadium . . . is a municipal use that is in

-12-

the interest of, and for the benefit of, the citizens," id., the District's conduct in proceeding with plans to acquire the primary ballpark site does not violate the Public Use Clause of the Constitution.

This interpretation, based on the plain meaning of the statutory text, is consistent with the statutory scheme apparent from the ballpark statutes.  See United States v. Barnes, 295 F.3d 1354, 1368 (D.C. Cir. 2002) ("If the language of a statute has a 'plain and unambiguous meaning,' our inquiry ends so long as the resulting 'statutory scheme' is coherent and consistent.") (citations omitted).  The $165 million cost trigger is neither an express element of the public use finding nor an express limitation on it.  Other features of the statutes also indicate that the cost figure was not intended to be linked to the public use finding.  The statute expressly equates the cost trigger with "financial unavailability," not with public use.  D.C. Code § 10-1601.07(e).  The cost limit is expressly imposed as to only one site.  Id.  If the cost limit is exceeded, the statute requires pursuit of alternative sites as to which no express cost trigger is imposed, although it presumes that "substantially less costly" sites are available.  Id.  The ballpark statutes, read as a whole, do not anticipate that the cost trigger will operate to negate the entire effect of the legislative authorization.  See D.C. Code § 10-1601.05(B)(2)(A).

-13-

Plaintiffs take the position that the Council intended to find that taking private property for $165 million constitutes a public use, but that taking private property for $166 million does not constitute a public use.  In so doing, they disregard what the Supreme Court has said the Public Use Clause does and does not do.  The Public Use Clause prohibits the transfer of private property for private uses.  As a constitutional matter, the prohibition is not tethered to any local fiscal concerns or appropriations limits.  See generally, Kelo, 125 S. Ct. 2663-67; Lingle, 125 S. Ct. at 2083-87; Midkiff, 467 U.S. at 241-44; Berman, 348 U.S. at 32-36.  While the ballpark statutes clearly authorize the District to proceed with plans to acquire land in the primary ballpark site only if the cost re-estimate does not exceed $165 million, this limitation operates as an independent condition, and not as an ingredient of the public use finding. The $165 million condition set by the City Council may well have a bearing on the District's authority to proceed to acquire the primary ballpark site, but it is not a constitutional requirement and cannot be made so by a vote of the District of Columbia's legislature.  In short, a failure by the District to satisfy a fiscal condition imposed by the City Council does not create a constitutional bar to the District's authority to proceed.

The second critical component of plaintiffs' argument is that the $161.4 million figure is an under-estimate of a true

-14-

figure in excess of $165 million, and that the under-estimate
resulted from the District's failure to comply with the Council's
mandated methods for conducting the cost re-estimate.  Because
the $165 million trigger has no constitutional significance, it
presents no federal question.  Whether the District complied with
the Council's mandate to conduct a cost review using certain
methods is a dispute of local law that may properly be determined
by a local court.  The Supreme Court has steadfastly resisted
injecting the federal courts into local controversies over the
prudence, wisdom or cost-benefit of a taking.  See, e.g., Kelo,
125 S. Ct. at 2667; Lingle, 125 S. Ct. at 2085; Midkiff, 467 U.S.
at 242-244; Berman, 438 U.S. at 32-33.

II.  SUBSTANTIVE DUE PROCESS

     The substantive due process guarantees of the Fifth and
Fourteenth Amendments are concerned with the legitimacy of the
governmental conduct.  See United States v. Simpkins, 826 F.2d
94, 97 (D.C. Cir. 1987) (equating substantive due process with
the legitimacy of the government interest).  "Substantive due
process prevents governmental power from being used for purposes
of oppression, or abuse of government power that shocks the
conscience, or action that is legally irrational in that it is
not sufficiently keyed to any legitimate state interests."
Washington Teachers' Union Local #6 v. District of Columbia Bd.

-15-

of Educ., 109 F.3d 774, 781 (D.C. Cir. 1997) (quotations and citations omitted).

The threshold for demonstrating a substantive due process violation is a stringent one that serves to differentiate substantive due process from local tort law for wrong-doing. See Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams, 375 F.3d 1141, 1145 (D.C. Cir. 2004); Yates v. District of Columbia, 324 F.3d 724, 725 ("Only the most egregious official conduct rises to the level of a substantive due process violation.") (citations and quotations omitted).  To assert a substantive due process violation, a plaintiff must show that the government's conduct was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Fraternal Order of Police, 375 F.3d at 1144 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

> [T]he doctrine of substantive due process constrains only egregious government misconduct.  We have described the doctrine as preventing only grave unfairness, . . . and identified two ways in which such unfairness might be shown:  Only (1) a substantial infringement of state law prompted by personal or group animus, or (2) a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983.

George Washington Univ. v. District of Columbia, 318 F.3d 203, 209 (D.C. Cir. 2003) (citations and quotations omitted).

To the extent that plaintiffs' substantive due process claim shares the same critical premises that underpin their public use

-16-

claim, it fails for the reasons already stated.  In addition,
assuming the truth of all allegations, that is, that the District
failed to follow the dictates of the Council in conducting the
cost re-estimate and has in fact under-estimated the true cost,
such conduct does not rise to the level required to support a
claim for a constitutional violation of substantive due process.
Such conduct does not "shock the conscience," <u>Fraternal Order of
Police</u>, 375 F.3d at 1144, or reflect "only the most egregious
official conduct," <u>Yates</u>, 324 F.3d at 725, and does not establish
either a "substantial infringement of state law prompted by
personal or group animus, or a deliberate flouting of the law
that trammels significant personal or property rights."  <u>George
Washington Univ.</u>, 318 F.3d at 209.

<u>CONCLUSION</u>

The Constitution countenances governmental takings for only
a public use.  The City Council made an express and unqualified
finding that construction of a publicly financed baseball stadium
is a municipal use in the public interest and for the public
benefit.  Other conditions imposed by legislation on the
construction of a baseball stadium in the District of Columbia
are of no constitutional significance and do not negate or
vitiate the City Council's express and unqualified public use
finding.  Accordingly, there is no set of facts plaintiffs can
prove that would entitle them to relief under the Public Use

-17-

Clause.  For the same reason, there is no set of facts plaintiffs can prove that would entitle them to relief under the Substantive Due Process Clause.  Therefore, plaintiffs' claims will be dismissed under Federal Rule of Civil Procedure 12(b)(6).  A separate order accompanies this Memorandum Opinion.

SIGNED this 31st day of October, 2005.


                              _____/s/_____
                              RICHARD W. ROBERTS
                              United States District Judge